# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TENNESSEE

|  |  |
|---|---|
| FREE SPEECH COALITION, INC.; DEEP CONNECTION TECHNOLOGIES, INC.; JFF PUBLICATIONS, LLC; PHE, INC.; and MELROSE MICHAELS, | ) ) ) ) ) |
| Plaintiffs, | ) CASE NO.: ) |
| v. | ) JUDGE: ) ) |
| JONATHAN SKRMETTI, in his official capacity as THE ATTORNEY GENERAL OF TENNESSEE, | ) <u>JURY DEMANDED</u> ) ) ) |
| Defendant. | ) |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs, by their undersigned attorneys, allege as follows:

### INTRODUCTION

1. After numerous federal court decisions invalidating as unconstitutional state and federal laws seeking to regulate or ban the publication of content harmful to minors on the internet, the Tennessee Legislature has tried yet again. S.B. 1792 (dubbed the "Protect Tennessee Minors Act" and referred to herein as the "PTMA" or "Act") places substantial burdens on Plaintiff website operators, content creators, and countless others who use the internet by requiring websites to age-verify every internet user before providing access to non-obscene material that meets the State's murky definition of "content harmful to minors." Specifically, and in relevant part, the Act subjects to liability any "individual or commercial entity that publishes

or distributes in this state a website that contains a substantial portion of content harmful to minors" without first verifying the age of each user via a "reasonable age-verification method." PTMA, §(c). That liability is twofold—owed both civilly to "an individual for damages resulting from a minor's accessing the content harmful to minors, including court costs and reasonable attorney fees" (the "civil provision"), and criminally to the State, as violation of the PTMA constitutes a Class C felony punishable by up to 15 years in prison and $10,000 in fines (the "criminal provision").

2. Pursuant to 18 U.S.C. § 2201 and 2202, and 42 U.S.C. § 1983 and 1988, this action seeks declaratory and injunctive relief to vindicate rights, privileges, and immunities secured by the Constitution and laws of the United States. The Act violates the First and Fourteenth Amendment to, and the Supremacy Clause of, the United States Constitution, because it impermissibly burdens Plaintiffs' exercise of their rights thereunder in myriad ways.

3. The Act violates the First Amendment in several respects. First, it imposes a content-based burden on protected speech that requires narrow tailoring and use of the least restrictive means to serve a compelling state interest, yet it captures a substantial quantity of protected speech without accomplishing its stated purpose of protecting minors from materials they may easily obtain from other sources and via other means. Second, compelling providers of online content to place an age-verification content wall over their entire websites unconstitutionally labels them as "adult businesses," with all the negative implications and ramifications that follow. And third, by requiring the use of some particularized approval method as a condition to providing protected expression, the Act operates as a presumptively-unconstitutional prior restraint on speech.

4.  The Act violates the Fourteenth Amendment, as well. First, because it fails to provide a person of ordinary intelligence with fair notice of to whom the Act applies, what is required, and what is prohibited, the Act is impermissibly vague, violating the procedural component of the Due Process Clause.

5.  Finally, by treating website operators as the publishers of material hosted on their websites but produced by other content providers, the Act stands in direct conflict with 47 U.S.C. § 230 ("Section 230") and is therefore preempted by that supreme federal law.

6.  This attempt to restrict access to online content is not novel. A quarter-century ago, the United States Supreme Court invalidated a federal law restricting internet communications deemed harmful to minors on First Amendment grounds in *Reno v. ACLU*, 521 U.S. 844 (1997). It did so again just a few years later in *Ashcroft v. ACLU*, 542 U.S. 656 (2004). And in state after state, laws containing content-based restrictions on internet communications deemed harmful to minors have been held unconstitutional.[1]

7.  Despite this long legacy of constitutional invalidity, the Tennessee Legislature enacted the law in April 2024, and the Governor signed it into law the next month, rendering it effective on January 1, 2025. Now, providers (including Plaintiffs) are in the untenable position of abiding by the Act's terms and enduring the constitutional infringement, or violating them and risking ruinous civil and criminal liability.

---

[1] *See, e.g., American Booksellers Foundation v. Sullivan*, 799 F. Supp. 2d 1078 (D. Alaska 2011) (Alaska); *American Booksellers Foundation v. Coakley*, 2010 WL 4273802 (D. Mass. 2010) (Mass.); *PSINet, Inc. v. Chapman*, 362 F.3d 227 (4th Cir. 2004) (Virginia); *American Booksellers Foundation v. Dean*, 342 F.3d 96 (2d Cir. 2003) (Vermont); *Cyberspace Communications, Inc. v. Engler*, 238 F.3d 420 (6th Cir. 2000) (Michigan); *ACLU v. Johnson*, 194 F.3d 1149 (10th Cir. 1999) (New Mexico); *ACLU v. Goddard*, Civ. 00- 0505 (D. Ariz. Aug. 11, 2004) (Arizona); *Southeast Booksellers v. Ass'n v. McMaster*, 282 F. Supp. 2d 389 (D.S.C. 2003) (South Carolina); *American Library Association v. Pataki*, 969 F. Supp. 160 (S.D.N.Y. 1997) (New York).

8.  As such, Plaintiffs seek to have the Act declared unconstitutional and void, and to have the Attorney General enjoined from participating in its enforcement.

## JURISDICTION AND VENUE

9.  This case arises under the United States Constitution and the laws of the United States and presents a federal question within this Court's jurisdiction under Article III of the Constitution and 28 U.S.C. § 1331 and 28 U.S.C. § 1343(3). It seeks remedies under 28 U.S.C. §§ 2201 and 2202, 42 U.S.C. §§ 1983 and 1988, and Fed. R. Civ. P. 65.

10. Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claim occurred in this district.

## PARTIES

### I.    Plaintiffs

11. Plaintiff <u>Free Speech Coalition, Inc. (FSC)</u> is a not-for-profit trade association incorporated under the laws of California with its principal place of business in Canoga Park, CA. FSC assists film makers, producers, distributors, wholesalers, retailers, internet providers, performers, and other creative artists located throughout North America in the exercise of their First Amendment rights and in the vigorous defense of those rights against censorship. Founded in 1991, the Free Speech Coalition currently represents hundreds of businesses and individuals involved in the production, distribution, sale, and presentation of constitutionally-protected and non-obscene materials that are disseminated to consenting adults via the internet. Most of that material would fit within Tennessee's statutory definition of "content harmful to minors."

12. The Free Speech Coalition sues on its own behalf and on behalf of its members to vindicate its own constitutional rights, its members' constitutional rights, and those of the members'

respective owners, officers, employees, and current and prospective readers, viewers, and customers. Both FSC and its members are harmed by the Act as detailed in this Complaint. The requested declaratory and injunctive relief will, in whole or in part, alleviate those harms.

13. Plaintiff <u>Deep Connection Technologies Inc. (DCT)</u> is a business corporation organized under the laws of Delaware with its principal place of business in San Francisco, CA. DCT operates O.school, a judgment-free online educational platform focused on sexual wellness. Andrea Barrica, O.school's founder and CEO, is a queer woman of color who has grown O.school to reach more than 25 million people globally and 4.2 million across the United States. O-school's mission is to help people worldwide improve their sexual health, power, and confidence. Previously, Barrica co-founded inDinero.com, the leading financial solution for growing startups, and served as a partner at 500 Startups, a global venture capital fund where she worked with hundreds of startup companies. Barrica was raised in a religious, conservative Filipino family that preached abstinence, and she received only fear-based sex education in public schools. Seeking support and information about sex and sexuality, Barrica was unable to find reliable resources online, leading her to launch O.school in 2017 in order to change the way people learn about sexuality. She is the author of *Sextech Revolution: The Future of Sexual Wellness*, and she is a professional speaker, having presented for TED Unplugged, SXSW, the Women in Tech Festival, UN Women, Planned Parenthood, and others. Barrica fears that O.school contains a "substantial portion" of content that meets the statutory definition of "content harmful to minors."

14. As O.school provides critical sex education that it deems appropriate (and necessary) for older minors, DCT opposes any age-verification measure that would preclude those teens

from accessing O.school's content. DCT is confused as to what constitutes "reasonable age verification methods" under the Acts and concerned about the prohibitive cost of providing complying age verification protocols.

15. DCT is harmed by the Act as detailed in this Complaint. The requested declaratory and injunctive relief will, in whole or in part, alleviate those harms.

16. Plaintiff <u>JFF Publications, LLC (JFF)</u> is a limited liability company organized under the laws of Delaware with its principal place of business in Broward County, FL. It has one Member, a natural person who is a citizen of Florida. JFF operates an internet-based platform at the domain <JustFor.Fans> that allows independent producers/performers of erotic audiovisual works to publish their content and provide access to fans on a subscription basis. Each producer/performer operates and maintains an individual JustFor.Fans channel, which may contain photographs or videos and permits the exchange of messages between producers/performers and fans. JFF developed and continues to enhance the software and features that drive the JustFor.Fans platform, it arranges third-party billing capabilities, and it otherwise maintains the platform. Although it develops and implements advertising and marketing plans for the platform, many of the independent producers/performers selling subscriptions on the platform implement their own marketing plans to drive customers to their specific JustFor.Fans channel. Most often, producers/performers maintain a social media presence through which they encourage their fans to purchase a subscription to their JustFor.Fans channel, sometimes providing a direct link to the JustFor.Fans platform.

17. JFF is confused about what constitutes a "website" (whether each performer channel, the JustFor.Fans platform, or even *other* platforms operated by JFF), confused as to what constitutes "reasonable age verification methods" under the Act and how a "substantial

portion" of a "website's" content is to be measured, and concerned about the prohibitive cost of providing complying age verification protocols. JFF currently intends to prevent access of JustFor.Fans from IP addresses geolocated to Tennessee if the Act goes into effect.

18. JFF, as well as the performers it hosts and the 'fans' viewing those performers, are harmed by the Act as detailed in this Complaint. The requested declaratory and injunctive relief will, in whole or in part, alleviate those harms.

19. Plaintiff PHE, Inc. (PHE) is a North Carolina Corporation doing business as Adam and Eve, an award-winning sexual wellness retailer that owns and operates various online stores and franchises brick and mortar stores bearing its well-respected trademark. Through its online store at adameve.com, PHE markets, processes payments for, and fulfills orders for adult toys, lingerie, soaps, lubricants, candles, bath items, novelty items, and adult games. PHE also publishes educational articles relating to sexual health and wellness on adameve.com, sells adult videos from a second web domain devoted exclusively to DVD sales (adultmoviemart.com), streams erotic movies on a third (adameveplus.com), and promotes its brick-and-mortar franchise stores via a fourth site (adamevestores.com) that provides a separate subdomain for each of its franchised stores to offer its own store-specific information. (These subdomains are created by adding alphanumeric characters in front of the second level domain so that, for example, https://smokeymountains.adamevestores.com would send a user to the site for Adam and Eve's Sevierville, TN store.)

20. Each of the websites described above contains some material that might qualify as "content harmful to minors" under the Act, but PHE cannot determine which (if any) are out of compliance because it does not know, for example, what constitutes "the material as a

whole" or how it should measure the 33 1/3% threshold under which its "harmful to minors" offerings must remain vis-à-vis its other offerings.

21. PHE is harmed by the Act as detailed in this Complaint. The requested declaratory and injunctive relief will, in whole or in part, alleviate those harms.

22. Plaintiff <u>MelRose Michaels</u>[2] lives in Tennessee, works there in various aspects of the adult industry, and maintains an active membership with Plaintiff FSC. She performs in, produces, and edits erotic films, which she monetizes through various "fan sites" (similar to Plaintiff JFF's JustFor.Fans site). Ms. Michaels owns and operates several small businesses connected to the adult entertainment industry, including: (1) a company that provides adult content creators with education, resources, and community; (2) a company that develops AI software for use within the adult industry; and (3) and a company that performs surveys and gathers information from and for adult businesses. Ms. Michaels's career requires that she be able to access adult websites, but her efforts to do so will be frustrated by the Act because (1) many such website operators have stated their intent to block access to Tennesseans once the Act becomes effective, and (2) Ms. Michaels has grave concerns about providing sensitive personal information about herself in order to access those websites that have attempted to comply with the Act by screening users via "reasonable age-verification methods."

**II.    Defendant**

23. Defendant <u>Jonathan Skrmetti</u> is a person within the meaning of Section 1983 of Title 42 of the United States Code, and he currently serves as the Attorney General for the State of Tennessee. As such, he "has and shall exercise all duties vested in the office by the

---

[2] MelRose Michaels is the plaintiff's stage name. Ms. Michaels files concurrently with this Complaint a motion to proceed using her pseudonym and to seal the unredacted version of the Complaint.

Constitution of Tennessee and all duties and authority pertaining to the office of the attorney general and reporter under the statutory law." Tenn. Code Ann. § 8-6-109(a). As pertains here, these "duties and authority" exist both in the PTMA itself, as well as the general Tennessee law.

24. The PTMA expressly empowers AG Skrmetti to "bring any appropriate action or proceeding in a court of competent jurisdiction against a commercial entity that fails to comply with the law." PTMA, §(j).

25. Elsewhere in the Tennessee Code, the fuller scope of his responsibilities are spelled out, including his duty to attend to "[t]he trial and direction of all civil litigated matters and administrative proceedings in which the state or any officer, department, agency, board, commission or instrumentality of the state may be interested"; to give the governor and other state officials "any legal advice required in the discharge of their official duties" and "written legal opinions on all matters submitted by them in the discharge of their official duties"; to "defend the constitutionality and validity of all legislation of statewide applicability"; and even to defend, in his discretion, "the constitutionality and validity of all private acts." Tenn. Code Ann. § 8-6-109(b)(1),(5),(6),(9),(10).

26. AG Skrmetti is sued for prospective relief concerning his future exercise of the foregoing powers and duties in order to prevent his subjecting the Plaintiffs and others to a deprivation of rights, privileges, or immunities secured to them by the Constitution and laws of the United States. Plaintiffs seek a declaration of the constitutional invalidity of the Act and an injunction precluding the Attorney General from participating in the enforcement of the Act in any manner.

**FACTS**

## I.      Communication Over the Internet

27. The internet is a decentralized, global medium of communication that links people,
institutions, corporations, and governments around the world. It is a giant computer network
that interconnects innumerable smaller groups of linked computer networks and individual
computers. The internet connects an estimated 5.39 billion people (or 68% of the world's
population), and in Tennessee, it is estimated that 79.1% of residents are internet users.[3]

28. Because the internet merely links together numerous individual computers and computer
networks, no single entity or group of entities controls the material made available on the
internet or limits the ability of others to access such materials. Rather, the range of digital
information available to internet users is individually created, maintained, controlled, and
located on millions of separate individual computers around the world.

29. The internet presents extremely low entry barriers to anyone who wishes to provide or
distribute information or gain access to it. Unlike television, cable, radio, newspapers,
magazines or books, the internet provides the average citizen and business, whether large or
small, with an affordable means for communicating with, accessing, and posting content to a
worldwide audience "with a voice that resonates farther than it could from any soapbox."
*Reno*, 521 U.S. at 870. Although the majority of the information on the internet does not
depict or describe nudity or sexual activity, such material is indeed widely available on the
internet.

30. An Internet Protocol (IP) address is a unique address that identifies a connection to a device
on the internet or a local network, much like a telephone number is used to connect a

---

[3] *See* http://www.internetworldstats.com/stats.htm;
https://www.statista.com/statistics/184691/internet-usage-in-the-us-by-state/.

telephone to other telephones. In essence, an IP address is the identifier that allows information to be sent between devices on a network. Internet Service Providers (ISPs) and telecommunications companies control blocks of IP addresses, and the location of an internet connection can be roughly determined according to the geo-location those companies assigned the IP address associated with a connection.

31. A Virtual Private Network (VPN) functions as an intermediary between an individual computer and the targeted server. It hides the user's actual public IP address and instead "tunnels" traffic between the user's device and a remote server. Setting up a VPN is free and simple, and doing so permits users to hide their location while browsing the web.

**II.    The PTMA**

32. In the Spring of 2024, the Tennessee Legislature enacted, and Governor Bill Lee signed into law, S.B. 1792 ("PTMA" or "Act"), codified within Tennessee Code Title 39, Chapter 17, and effective as of January 1, 2025.

33. The PTMA is attached hereto as Appendix A, and its operative provisions are as follows:

> (c) An individual or commercial entity that publishes or distributes in this state a website that contains a substantial portion of content harmful to minors is liable if the individual or commercial entity does not:
>
> > (1) Verify, using a reasonable age-verification method, the age of each active user attempting to access its website; or
> >
> > (2) Verify, using a reasonable age-verification method, the age of an active user attempting to access its website again after completion of an age-verified session.
>
> (d) A website owner, commercial entity, or third party that executes a required age-verification method shall:
>
> > (1) Retain at least seven (7) years of historical anonymized age-verification data; and
> >
> > (2) Not retain any personally identifying information of the active user after access to the content harmful to minors has been granted.

34. An entity found to have violated subsection (c) above "is liable to an individual for damages resulting from a minor's accessing the content harmful to minors, including court costs and reasonable attorney fees as ordered by the court," and a "violation of subsection (c) or (d) is a Class C felony" prosecutable by the Attorney General. *See* PTMA, §(e)(1),(i),(j).

35. "Content harmful to minors" includes:

> (A)(i) Text, audio, imagery, or video the average person, applying contemporary community standards and taking the material as a whole and with respect to minors of any age, would find sexually explicit and harmful or inappropriate for minors or designed to appeal to or pander to the prurient interest; or
>
> > (ii) Text, audio, imagery, or video that exploits, is devoted to, or principally consists of an actual, simulated, or animated display or depiction of [certain body parts or acts]; and
>
> (B) When taken as a whole, lacks serious literary, artistic, political, or scientific value for minors.

PTMA, § (b)(5).

### III.    The Impact of the Act

36. To comply with the PTMA, commercial websites providing materials that they are concerned might meet the vague statutory definition of "content harmful to minors" may respond in one of three ways: by (1) attempting to divert all web traffic from Tennessee IP addresses, thus precluding *all* online visitors from this State; (2) contracting (at great expense) the services of age-verification operators to age-verify visitors to their site; or (3) declining to abide by the terms of the Act, thus risking criminal prosecution and private lawsuits. It is a Hobson's Choice they should not have to make.

### A.  The Act's Failure to Abide the Modified-for-Minors Obscenity Standard.

37. For more than a half-century after *Miller v. California*, the obscenity standard—if not easy to apply—was at least easy enough to recite. "The basic guidelines for the trier of fact must be: (a) whether the average person, applying contemporary community standards would find that

the work, taken as a whole, appeals to the prurient interest; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." *Miller v. California*, 413 U.S. 15, 24 (1973) (internal quotation marks and citations omitted).

38. When the regulation impacts only minors, *Ginsberg v. State of N. Y.* has been read to permit further restriction by stripping constitutional protection of material obscene only *as to minors* where it (a) is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable for minors; (b) appeals to the prurient interest of minors; and (c) lacks serious value for minors when viewed as a whole. *Ginsberg v. State of N. Y.*, 390 U.S. 629, 633 (1968).

39. But the PTMA fails to track the modified-for-minors *Miller* standard in important ways. Rather than restricting sexual material that is both "patently offensive" *to* minors <u>and</u> "appealing to the prurient interest" *of* minors, the PTMA instead aims to regulate contents that are "sexually explicit and harmful or inappropriate for minors" <u>or</u> "designed to appeal to or pander to the prurient interest." Material that is sexually explicit and inappropriate for minors therefore plainly is subject the regulation even if it isn't designed to appeal to the prurient interest, and material that is designed to appeal to the prurient interest plainly is subject to the regulation even if it isn't sexually explicit and harmful or inappropriate for minors.

40. The poor drafting doesn't end there. Subpart (ii) is separated from subpart (i) of Section (A) by another disjunctive—meaning that "text, audio, imagery, or video" that "principally consists of" an enumerated sexual organ or act may be obscene as to minors even if it is

neither designed to appeal to the prurient interest nor is sexually explicit and inappropriate for minors. The specific forbidden acts need not even be "patently offensive" to run afoul of the statute—a critical aspect of the *Miller* standard that nowhere appears in the definition of "content harmful to minors."

41. Precision is the touchstone of legislation regulating speech. Tennessee has instead bastardized a long-venerated standard to permit far greater restrictions on speech than the constitution tolerates. *See Reno v. ACLU*, 521 U.S. 844, 874 (1997) (holding that the Communications Decency Act "lacks the precision that the First Amendment requires when a statute regulates the content of speech" where it did not faithfully apply the modified-for-minors obscenity standard).

**B.  The Impact on Older Minors**

42. In its clumsy attempt to track the modified-for-minors *Miller* obscenity test, the Tennessee Legislature has painted all minors, regardless of age or maturity, with a single brush. Whether material is designed to appeal to the prurient interest is determined by an average person applying contemporary community standards "with respect to minors of any age." And whether the material lacks serious literary, artistic, political, or scientific value is, again, considered "with respect to minors" without further limitation. But there is a broad range of material that has serious value for at least some 16- and 17-year-olds which might legitimately be considered "harmful" to a 10-year-old—like that concerning the risk of sexually-transmitted diseases, sexual health, and the enjoyment of sex (in a state where 17-year-old minors may get married with parental consent).

43. The Act fails to explicitly exclude material appropriate for older minors from the "content harmful to minors" for which access is conditioned upon proof of majority. Requiring

persons who publish such material on the internet to place it behind an age-verification wall infringes upon the constitutional rights of both older minors (who are denied access to constitutionally-protected material), and the commercial entities that publish or distribute such material.

**C.  The Impact on All Minors**

44. Requiring age verification to access a website whose content offerings include a "substantial portion" of "content harmful to minors" means denying those minors access to websites whose content offerings are overwhelmingly *not* classified as "content harmful to minors." The Act aims to preclude *all* minors from accessing even those websites offering content, almost two-thirds of which is plainly *not* violative of the already vague and overbroad standard defining "content harmful to minors."

**D.  The Impact on Adults**

45. The Act demands that, as a condition of access to constitutionally protected content, an adult must provide a digital proof of identity to adult content websites that are doubtlessly capable of tracking specific searches and views of some of the most sensitive, personal, and private contents a human being might search for. They must do so *every sixty minutes* over the course of a single session—a requirement that can only exist for the purpose of shaming the adult viewer. *See* PTMA, § (b)(2). And although the Act provides a cause of action to any website visitor whose identifying information is retained by the website, such provision offers cold comfort to adults who value the privacy of their search history for non-obscene pornographic material more than a speculative damages award in an era of rampant data

leaks—including from websites purporting to place a premium on privacy and discretion.[4]
The Act even requires the age-verifier to "[r]etain at least seven (7) years of historical
anonymized age-verification"—heightening the privacy risks even more. PTMA, § (d)(1).
The inevitable result is that at least some portion of Tennessee adults will feel the Act's chill
and forego accessing this constitutionally-protected material.

### E.  The Impact on Non-Pornographic Websites

46. Because of the Act's vagueness, cautious operators of even *non*-pornographic websites must
place an age-verification content wall over their entire websites if they wish to continue
communicating with Tennessee audiences without risking ruinous tort liability. Doing so
labels them an "adult business"—resulting not only in declining internet traffic, but social
stigma, lost ad revenue, and exclusion from public or private programs or curricula. If they
are a website that processes payments, they may lose the ability to accept VISA, Mastercard,
Amex, and other major credit cards and be forced to use third-party billing companies that
charge fees up to 15% of the purchase price, rather than the 3-5% typically charged by credit
card companies. They also may face difficulty purchasing business liability insurance and
hiring employees.

47. Some of the Supreme Court's leading First Amendment precedents have established the
principle that the government may not compel persons to speak a particular message. *See
Wooley* v. *Maynard,* 430 U.S. 705 (1977) (requiring motorists to display state's "live free or
die" motto on license plate found to violate First Amendment); *Hurley v. Irish-American*

---

[4] *See, e.g.,* https://www.independent.co.uk/news/uk/crime/porn-hacker-blackmail-zain-qaiser-trial-prison-sentence-a8861236.html (discussing hacker who blackmailed porn users after they clicked on his pop-up advertisements); https://www.wired.com/2015/08/happened-hackers-posted-stolen-ashley-madison-data/ (discussing Ashley Madison data breach).

*Gay, Lesbian and Bisexual Group of Boston, Inc*., 515 U.S. 557 (1995) (finding First
Amendment violation where parade organizers were forced to accept groups espousing
contrary messages). That principle is simply incompatible with the requirement of
commercial entities that find themselves on the margins of the Act's reach.

### F.  The Ineffectiveness of the Act and the Effectiveness of Alternative Means

48. While placing overwhelming burdens on certain providers of content online, the Act will fail
to accomplish its goal of protecting Tennessee's minors. Because the Act requires age-
verification in order to access only those websites that offer "content harmful to minors" as a
"substantial portion" of their total content (defined as one-third or more), minors will face no
impediment to obtaining such material from websites watered down—either incidentally or
purposefully in order to avoid the consequences of the Acts—with *other* content unoffensive
to the sensibilities of the Tennessee Legislature. Whether "content" percentages are measured
in bytes of material, discrete web pages, seconds of video, words of a sexual nature, or some
other metric, and whether they include linked material, is entirely unclear. What *is* clear is
that—given enough non-"harmful" material on a single site—even the providers of material
that *is* "harmful to minors" under any definition earn a pass under the Act.

49. Through the one-third "substantial portion" threshold, Tennessee appears to be the latest state
to seek to exempt social media companies and search engines from the reach of its age-
verification law. Ironically, however, it is these same sites that are most likely to provide a
minor's first exposures to sexually explicit content. As a pair of researchers recently
reported, "a higher proportion of 16- and 17-year-olds in the United Kingdom have been

exposed to sexually explicit videos or pictures on social media (63%) and search engines (51%) than on dedicated pornographic websites (47%)."[5]

50. Minors also have other routes to obtaining "content harmful to minors" over the internet, including by: (1) pursuing such content published by persons and entities in other countries beyond the jurisdiction of Tennessee's state or federal courts; (2) resorting to the dark web via a Tor browser to obtain material far more harmful than what is available from popular adult websites; and (3) using a VPN to create an encrypted connection between the device and a remote server operated by the VPN service in another state or country. Studies show that nearly *half* of 16- and 17-year-olds have used a VPN or Tor browser and another 23% know what they are.[6]

51. At the same time, there are alternative means available for Tennessee parents to address the Act's goal. The two major personal computer operating systems, Microsoft and Apple, include parental control features straight out of the box. Almost all browsers, including Google Chrome, Mozilla Firefox, Microsoft Edge, and Apple's Safari, also have parental control options. If parents want to add additional parental control features, they may easily purchase supplementary software like Bark or NetNanny or even download additional software for free, including Questodio, Kaspersky Safe Kids, FamilyKeeper, and others. These features enable parents to block access to sexually explicit materials on the Web, prevent minors from giving personal information to strangers by e-mail or in chat rooms,

---

5 *See* Thurman, Neil J. and Obster, Fabian, "The Regulation of Internet Pornography: What a Survey of Under-18s Tells Us About the Necessity for and Potential Efficacy of Emerging Legislative Approaches," POLICY & INTERNET (May 15, 2021), *available at* SSRN: https://ssrn.com/abstract=3846713.

6 *See id.*

limit a child's screentime, and maintain a log of all online activity on a home computer. Parents can also use screening software that blocks messages containing certain words, as well as tracking and monitoring software. A parent also may restrict and observe a child's use of the internet merely by placing a computer in a public space within the home. All of these methods constitute "less restrictive means" for accomplishing the same ends.

52. Over twenty years ago, the United States Supreme Court recognized that even the parental filtering programs available at the time were less restrictive and certainly more effective than government-imposed age-verification methods. *See Ashcroft v. ACLU*, 542 U.S. 656, 666 (2002). In that case, although a credit card was required for age-verification, the Court noted that it was *still* a less effective option due to the high rate of false certification.

**G.  Vagueness and Overbreadth**

53. Because many of the statutory terms are vague and overbroad, the Act further restricts and chills the speech of online content providers and restricts the availability of certain material to those entitled and wishing to receive it. The Act is riddled with vague words, phrases, and requirements, including the following.

54. The phrase "taken as a whole" in the definition of "content harmful to minors" is vague because what constitutes the "whole" is unclear in the context of the internet generally, or a particular website more specifically. Should one consider only a specific article, certain text, or an individual image on a website? Or should one consider the web page on which that text or image appears? Or the entire website? And should one include linked material?

55. The phrase "substantial portion," defined as one-third or more of the "total amount of data available on a website," is vague insofar as it fails to explain how "total material" is calculated and what metric is used to measure. Gigabytes? Character count? Number of

images? Video runtime? And what about linked material? May a website avoid the problem altogether by providing a link to all the anodyne content in the local public library?

56. The terms "commercial entity" and "website" lack the requisite precision demanded by the First Amendment. Because a "commercial entity" includes every "legally recognized entity" from the largest corporation down to the smallest "sole proprietorship," the Act (intentionally or otherwise) requires individual performers to implement their own age-verification protocols even when relying on another company's platform to host their content. At best, this is an inefficient and cost-prohibitive way of effecting the State's interest. At worst, it is impossible where performers do not control the computer code upon which the platforms are built.

57. Compounding the problem is the lack of definitude as to what constitutes a "website" in the first place. In its simplest form, a website *can* mean a series of connected pages under a single domain name. Often, however, webpages have more complicated structures, sometimes involving multiple domain names or subdomains, links to separate but related businesses, or links to third-party content living on different servers. In failing to define "website," the Act likely captures far more speech than intended, and certainly more than is constitutional.

58. The statutory catch-all permitting a "commercially reasonable method relying on public or private transactional data" as a means of verifying a user's age provides no guideposts whatsoever, as "commercially reasonable" is a vague term not defined by the Act.

59. Reference to "contemporary community standards" is vague and overbroad, due to the borderless nature of the internet. Tennessee is a diverse state, and the "contemporary community standards" vary widely from Nashville to Cleveland. But when a content

provider publishes material on a website, the same material is made available in *every* Tennessee county. To avoid running afoul of the Act, website operators must abide by a "most prudish county" standard—restricting (in the case of minors) or chilling (in the case of adults) substantial quantities of constitutionally protected content.

**H.  The Prior Restraint (and Statutory Severability)**

60. The Act effectively requires that, before a covered commercial website may disseminate any constitutionally protected expression to a consenting adult requesting it, the website must affirmatively employ a "reasonable age-verification method" on pain of express statutory liability. The requirement thus imposes a classic prior restraint on speech.

61. Prior restraints are not unconstitutional per se, but they come to the courts bearing "a heavy presumption against [their] constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963). Prior restraints arising from a government pre-approval requirement are presumptively unconstitutional because they pose the danger that any discretion exercised in connection with the approval process may become an instrument of content-based censorship that will impose a serious chill upon the willingness of affected speakers to speak. Government may not require this sort of pre-approval process unless the discretion involved in administering it—both substantive and procedural—is tightly constrained to avoid the inherent censorship dangers.

62. With respect to those procedural safeguards, the pre-approval process must be administered so that the presumption favors allowing the expression in question; the burden must always fall on the side of disallowing the expression. Secondly, the pre-approval process must operate rapidly and without unnecessary delay. Finally, the costs of the pre-approval process,

if assessed to the putative speaker at all, must also be tightly and objectively constrained so as to avoid unnecessarily burdening the expression in question.

63. The Act imposes an unconstitutional prior restraint on the communication between covered websites and adults seeking to access them. Covered websites must employ "reasonable age-verification methods" when individuals attempt to access their expression. But even assuming that these statutory specifications suffice, nothing requires that any such methods be made available to all website operators, operate reliably with common computer software, operate for a reasonable fee, or even exist in the first place. The State of Tennessee may not statutorily impose a prior restraint only to leave its operation to private actors who may or may not take up the mantle—*particularly* when leaving key terms like "commercially reasonable" undefined.

64. The Act cannot survive a judicial determination that the "reasonable age-verification methods," ostensibly providing safe harbor, in fact fail to provide the constitutionally sufficient channels for Plaintiffs to exercise their First Amendment rights.

### I.   The Express Conflict with Federal Statutory Law

65. Under Section 230, "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C § 230(c)(1).

66. Plaintiff JFF is a "provider or user of an interactive computer service" within the intendment of the statute. *See* 47 U.S.C § 230(f)(2) (defining "interactive computer service" to mean "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by

libraries or educational institutions."). JFF does not produce content that could plausibly be deemed "content harmful to minors." Rather, it merely provides the platform for other "information content providers." *See* 47 U.S.C § 230(f)(3) (defining term to mean "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service").

67. In seeking to render JFF and other providers and users of "interactive computer services" liable on account of the actions of "content providers," the Act stands in direct conflict with Section 230, which expressly preempts inconsistent state laws. *See* 47 U.S.C § 230(e)(3). Article VI, Paragraph 2 of the U.S. Constitution requires that federal law take precedence in such case.

**J.  The Need for, and Nature of, the Injunctive Relief Sought**

68. The Act has placed Plaintiffs in justified fear that, if they continue to exercise their constitutional rights, they will be prosecuted criminally or haled into court by any number of private individuals alleging harm cognizable under the Act.

69. All Plaintiffs seek an injunction precluding Attorney General Skrmetti from participating in the enforcement of the Act through any action, including but not limited to the following: (i) the real or threatened prosecution (or supervision of such prosecution) brought pursuant to that PTMA;  (ii) the real or threatened issuance of subpoenas, holding of hearings, or adoption of rules regarding the PTMA or perceived violations thereof; or (iii) the provision of a controlling legal opinion to the Tennessee Legislature or any state officer, board, or commission regarding a question of law concerning the PTMA.

**CAUSES OF ACTION**

**<u>COUNT 1: Violation of Free Speech Rights Secured Under the First and Fourteenth Amendments of the United States Constitution</u>**

70. Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth entirely herein.

71. The Act violates the First Amendment (made applicable to the states through the Fourteenth Amendment) both on its face and as applied to Plaintiffs because unconstitutionally interferes with the ability to communicate constitutionally protected speech, compels speech to the detriment of Plaintiffs, chills speech, and imposes an unconstrained prior restraint on speech.

72. The Act violates Plaintiffs' rights under the First and Fourteenth Amendments to the United States Constitution because it is not narrowly tailored and the least restrictive means of accomplishing any compelling governmental purpose.

73. The Act violates Plaintiffs' rights under the First and Fourteenth Amendments to the United States Constitution because it is substantially overbroad.

74. All Plaintiffs seek an injunction against the Attorney General precluding his participation in the enforcement of the Act, as articulated *infra.*

### COUNT 2: Violation of Due Process Rights Secured Under the Fourteenth Amendment of the United States Constitution

75. Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth entirely herein.

76. The Act violates Plaintiffs' rights under the Due Process Clause of the Fourteenth Amendment (procedural component) because it is impermissibly vague and fails to provide a person of ordinary intelligence fair notice of what is prohibited.

77. All Plaintiffs seek an injunction against the Attorney General precluding his participation in the enforcement of the Act, as articulated *infra.*

### COUNT 3: Violation of the Supremacy Clause of the United States Constitution and Section 230 of Title 47, United States Code

78. Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth entirely herein.

79. The Act violates the rights of Plaintiff JFF, a provider and user of an "interactive computer service" within the meaning of 47 U.S.C. § 230, because it effectively treats Plaintiff as the

publisher or speaker of material provided by other information content providers. As

47 U.S.C. § 230(e)(3) states that "[n]o cause of action may be brought and no liability may

be imposed under any State or local law that is inconsistent" with Section 230, the Act

violates Section 230.

80. Article VI, Paragraph 2 of the United States Constitution (Supremacy Clause) exalts the laws

of the United States as "the supreme law of the land" notwithstanding "anything in the

constitution or laws of any State to the contrary." Given the direct conflict between the

(Tennessee) Act and the (federal) Section 230, the federal law must preempt the State's.

81. Plaintiff JFF seeks an injunction against the Attorney General precluding his participation in

the enforcement of the Act, as articulated *infra.*

### COUNT 4: Declaratory Judgment Act

82. Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth entirely herein.

83. There is a genuine present and justiciable dispute as to whether participation in the

enforcement of the Act by the Attorney General violates the Plaintiffs' rights under the U.S.

Constitution and federal law, as stated in Counts 1-3.

84. The interests of Plaintiffs, on the one hand, and the Attorney General, on the other, are real

and adverse.

85. Absent court intervention, which would resolve the dispute over the Act's lawfulness, the

Attorney General will proceed with participating in the enforcement of the Acts, even though

they are unconstitutional and void.

86. All Plaintiffs seek a judicial declaration stating that the Act is unconstitutional and

unenforceable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the Court:

A.  Permanently enjoin the Attorney General, his officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction, from participating in the enforcement of the Act;

B.  Declare that the Act violates the First and Fourteenth Amendments to, and the Supremacy Clause of, the United States Constitution and is therefore unenforceable and void;

C.  Award Plaintiffs their reasonable costs and attorneys' and other fees pursuant to 42 U.S.C. § 1988; and

D.  Grant Plaintiffs such other and further relief as the Court deems just and proper.


Respectfully Submitted,

Dated: November 26, 2024

By attorneys:


*/s/ Edward Bearman*
Edward M. Bearman #14242
The Law Office of Edward M.  Bearman
780 Ridge Lake Blvd suite 202
Memphis, Tennessee 38120
Phone: (901) 682-3450 x125
Facsimile: (901) 682-3590
e-mail: ebearman@jglawfirm.com

*/s/ Gary Veazey*
Gary E Veazey # 10657
The Law Office of Gary E, Veazey
780 Ridge Lake Blvd suite 202
Memphis, Tennessee 38120
Phone: (901) 682-3450 x125
Facsimile: (901) 682-3590
e-mail: gveazey@jglawfirm.com

*/s/ James M. Allen*
James Allen # 15968
The Allen Law Firm
780 Ridge Lake Blvd suite 202
Memphis, Tennessee 38120
Phone: (901) 682-3450 x125
Facsimile: (901) 682-3590
e-mail: jim@jmallenlaw.com


*of counsel pending admission pro hac vice*

Jeffrey Sandman
LA Bar No. 39073 (*pro hac vice* pending)
Webb Daniel Friedlander LLP
5208 Magazine St., Ste 364
New Orleans, LA  70115
Phone: (978) 886-0639
e-mail: jeff.sandman@webbdaniel.law

D. Gill Sperlein
CA Bar No. 172887 (*pro hac vice* pending)
The Law Office of D. Gill Sperlein
345 Grove Street
San Francisco, CA  94102
Phone: 415-404-6615
e-mail: gill@sperleinlaw.com