**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TENNESSEE**

| | |
|---|---|
| FREE SPEECH COALITION, INC.; DEEP CONNECTION TECHNOLOGIES, INC.; JFF PUBLICATIONS, LLC; PHE, INC.; and MELROSE MICHAELS, | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| | ) |
| JONATHAN SKRMETTI, in his official capacity as THE ATTORNEY GENERAL OF TENNESSEE, | ) ) ) |
| Defendant. | ) ) |

CASE NO.:

JUDGE:

**MEMORANDUM OF LAW IN SUPPORT OF THE PLAINTIFFS' MOTION FOR PRE-**

**LIMINARY INJUNCTION**

**Table of Contents**

I.    INTRODUCTION.................................................................................................. 1

II.   FACTUAL BACKGROUND ............................................................................... 2

   1.  THE ACT ............................................................................................................ 2

   2.  THE PLAINTIFFS ................................................................................................ 3

III.  LEGAL BACKGROUND AND HISTORY ...................................................... 5

IV.   ARGUMENT ........................................................................................................ 8

   1.  LEGAL STANDARDS GOVERNING ISSUANCE OF A PRELIMINARY INJUNCTION. ..................... 8

   2.  PLAINTIFFS ARE SUBSTANTIALLY LIKELY TO PREVAIL ON THE MERITS................................ 9

      A.   Facial Challenge.......................................................................................... 9

      B.   The PTMA is a content-based regulation of speech that cannot survive strict scrutiny,
           as the First Amendment demands it must. ................................................. 10

      C.   The Act is both constitutionally overbroad and vague. ............................. 22

      D.   The Act violates the Supremacy Clause. ................................................... 25

   3.  PLAINTIFFS ARE SUBSTANTIALLY LIKELY TO SUFFER IRREPARABLE INJURY ABSENT
       IMPOSITION OF THE INJUNCTION. ...................................................................... 26

   4.  NO SUBSTANTIAL HARM TO OTHERS WILL RESULT FROM ENJOINING THE
       UNCONSTITUTIONAL LAW.................................................................................. 26

   5.  AN INJUNCTION IS NOT ADVERSE TO THE PUBLIC INTEREST................................. 26

V.    CONCLUSION ................................................................................................... 27

## Table of Authorities

### C<small>ASES</small>

*ACLU v. Goddard*, Civ. 00- 0505 (D. Ariz. Aug. 11, 2004) .......................................... 7

*ACLU v. Johnson*, 194 F.3d 1149 (10th Cir. 1999) ...................................................... 7

*American Booksellers Foundation v. Coakley*, 2010 WL 4273802 (D. Mass. 2010).................... 7

*American Booksellers Foundation v. Dean*, 342 F.3d 96 (2d Cir. 2003) ...................................... 7

*American Booksellers Foundation v. Sullivan*, 799 F. Supp. 2d 1078 (D. Alaska 2011).............. 7

*American Booksellers Foundation v. Webb*, 919 F.2d 1493 (11th Cir. 1990)............................ 14

*American Libraries Ass'n v. Pataki*, 969 F. Supp. 160 (S.D.N.Y.1997) ....................................... 7

*Ashcroft v. ACLU*, 535 U.S. 564 (2002) ....................................................................... 14

*Ashcroft v. ACLU*, 542 U.S. 656 (2004) ........................................................ 1, 6, 17, 22

*Ashcroft v. Free Speech Coalition,* 535 U.S. 234 (2002) .......................................... 14, 22

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963)...................................................... 19

*Bays v. City of Fairborn*, 668 F.3d 814 (6th Cir. 2012) ............................................... 26

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973) ............................................................... 22

*Connally v. General Constr. Co.*, 269 U.S. 385 (1926)......................................... 23, 25

*Connection Distrib. Co. v. Holder*, 557 F.3d 321 (6th Cir. 2009).................................... 9

*Croft v. Governor of Texas*, 562 F.3d 735 (5th Cir. 2009) ........................................... 26

*Cyberspace Communications, Inc. v. Engler*, 238 F.3d 420 (6th Cir. 2000)................................ 7

*Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville and Davidson Cnty*., 274 F.3d 377 (6th

    Cir. 2001) ............................................................................................................... 26

*Denver Area Educ. Telecomms. Consortium v. FCC*, 518 U.S. 727 (1996)............................... 17

*Elrod v. Burns*, 427 U.S. 347 (1976) ..................................................................... 22, 26

*Erznoznik v. City of Jacksonville*, 422 U.S. 205 (1975) ............................................... 25

*Free Speech Coal. v. Colmenero*, 689 F. Supp. 3d 373 (W.D. Tex. 2023) ............................. 8, 21

*Free Speech Coal. v. Knudsen*, 2024 WL 4542260 (D. Mont. Oct. 22, 2024).............................. 7

*Free Speech Coal. v. Rokita*, 2024 WL 3228197 (S.D. Ind. June 28, 2024) ................................. 7

*Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263 (5th Cir. 2024) ...................................... 8, 10, 12

*Grayned v. City of Rockford*, 408 U.S. 104 (1972)........................................................... 23

*Jones v. Dirty World Ent. Recordings LLC*, 755 F.3d 398 (6th Cir. 2014) ................................. 26

*Kolender v. Lawson*, 461 U.S. 352 (1983)...................................................................... 23

*Lamont v. Postmaster General*, 381 U.S. 301 (1965)................................................... 17

*Liberty Coins, LLC v. Goodman*, 748 F.3d 682 (6th Cir. 2014)...................................... 8

*NAACP v. Button*, 371 U.S. 415 (1963)....................................................................... 23

*New York State Club Ass'n v. City of New York*, 487 U.S. 1 (1988) ........................................... 10

*Pope v. Illinois*, 481 U.S. 497 (1987) .......................................................................... 15

*PSINet, Inc. v. Chapman*, 362 F.3d 227 (4th Cir. 2004)............................................... 7

*Reno v. ACLU*, 521 U.S. 844 (1997)............................................................... passim

*Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781 (1988) .............................. 18

*Sable Commc'ns of Cal., Inc. v. Fed. Commc'ns Comm'n*, 492 U.S. 115 (1989)............. 12, 20, 25

*Southeast Booksellers v. Ass'n v. McMaster*, 282 F. Supp. 2d 389 (D.S.C. 2003)........................ 7

*Speet v. Schuette*, 726 F.3d 867 (6th Cir. 2013) .......................................................... 9

*U.S. v. Salerno*, 481 U.S. 739 (1987)............................................................................ 9

*United States v. Stevens*, 559 U.S. 460 (2010).............................................................. 10

S<span style="font-variant:small-caps">TATUTES</span>

18 U.S.C. § 2201................................................................................................... 2

18 U.S.C. § 2202................................................................................................... 2

42 U.S.C. § 1983................................................................................................... 2

42 U.S.C. § 1988................................................................................................... 2

47 U.S.C § 230................................................................................................ 2, 25, 26

47 U.S.C. § 223....................................................................................................... 5

47 U.S.C. § 231................................................................................................... 6, 13

Protect Tennessee Minors Act .................................................................................. passim

OTHER AUTHORITIES

Ahmed Ghappour, *Searching Places Unknown: Law Enforcement Jurisdiction on the Dark Web*, 69 Stan. L. Rev. 1075 (2017) ........................................................................ 21

TREATISES

Wright & Miller, FED PRAC. & PROC. § 2948.2 ........................................................... 26

## MEMORANDUM

## I.    INTRODUCTION

After numerous federal court decisions invalidating as unconstitutional state and federal laws seeking to regulate or ban the publication of content harmful to minors on the internet, the Tennessee Legislature has tried yet again with S.B. 1792, dubbed the Protect Tennessee Minors Act (hereafter, "PTMA" or "Act"). The Act places substantial burdens on Plaintiff website operators, content creators, and countless others who use the internet by requiring websites to age-verify every internet user before providing access to non-obscene material that meets the State's murky definition of "content harmful to minors."

This attempt to restrict access to online material is not novel. The United States Supreme Court invalidated a federal law restricting internet communications deemed harmful to minors on First Amendment grounds in *Reno v. ACLU*, 521 U.S. 844 (1997). It did so again in *Ashcroft v. ACLU*, 542 U.S. 656 (2004). And in state after state, laws containing content-based restrictions on internet communications deemed harmful to minors have been held unconstitutional. *See* Complaint ¶ 6 & n.1. Yet despite this long legacy of constitutional invalidity, the Tennessee Legislature has raised the stakes, imposing *criminal* liability on online content providers who run afoul of the Act. In doing so, it has: 1) placed Plaintiff website operators in the untenable position of abiding by the Act's terms and enduring the constitutional infringement or violating them at great peril; and 2) forced Tennesseans, including Plaintiff Michaels, to surrender their anonymity and risk having their identifying information compromised if they wish to access erotic content through the internet.

The Act violates the First Amendment in several respects. It imposes content-based restrictions on protected speech without the required narrow tailoring and without employing the least restrictive means to serve a compelling state interest, yet it captures a substantial quantity of protected speech without accomplishing the stated purpose of protecting minors from materials they may easily obtain from other sources and via other means. It imposes a presumptively

-1-

unconstitutional prior restraint on speech without adequately administering that restraint. And because it is substantially overbroad and vague, it poses additional concerns under the First and Fourteenth Amendments. So, too, does it violate the Constitution's Supremacy Clause by treating certain website operators as "publishers"—just as federal law prohibits. *See* 47 U.S.C § 230 (hereafter, "Section 230").

Plaintiffs are a diverse mix of individuals and entities who, pursuant to 18 U.S.C. § 2201 and 2202, and 42 U.S.C. § 1983 and 1988, are seeking declaratory and injunctive relief to vindicate rights secured by the Constitution. To stave off irreparable injury from the (present and continuing) deprivation of these rights, they move herein for a preliminary injunction pending the final determination of their claims.

## II.    FACTUAL BACKGROUND

### 1. The Act

The PTMA imposes civil and criminal liability upon any "individual or commercial entity that publishes or distributes in this state a website that contains a substantial portion of content harmful to minors" without first verifying, via use of a "reasonable age-verification method," that each website visitor is at least 18-year-old. *See* PTMA §1(c). Violators are both guilty of a "Class C felony" (carrying up to 15 years' imprisonment) and "liable to an individual for damages resulting from a minor's accessing the content harmful to minors, including court costs and reasonable attorney fees." PTMA §1(e)(1) & (i).

"Content harmful to minors" is ostensibly defined to track the Supreme Court's modified-for-minors *Miller* Test[1] and includes:

> (A)(i) Text, audio, imagery, or video the average person, applying contemporary community standards and taking the material as a whole and with respect to

---

[1] *See Ginsberg v. United States*, 390 U.S. 629, 639 (1968) (adapting general test of obscenity under the First Amendment to reflect "prevailing standards in the adult community as a whole with respect to what is suitable material for minors").

minors of any age, would find sexually explicit and harmful or inappropriate for minors <u>or</u> designed to appeal to or pander to the prurient interest; <u>or</u>

(ii) Text, audio, imagery, or video that exploits, is devoted to, or principally consists of an actual, simulated, or animated display or depiction of any of the following:

    (a) Pubic hair, vulva, vagina, penis, testicles, anus, or nipple of a human body;

    (b) Pubic hair, vulva, vagina, penis, testicles, anus, or nipple of a fictitious character's body, or the parts of a fictitious character's body analogous or functionally equivalent to the aforementioned parts of the human body;

    (c) Touching, caressing, fondling, or other sexual stimulation of human nipples, breasts, buttocks, anuses, or genitals, or the analogous or functionally equivalent parts of a fictitious character's body; or

    (d) Sexual intercourse, masturbation, sodomy, bestiality, oral copulation, flagellation, excretory functions, exhibitions, or any other sexual act; <u>and</u>

(B) When taken as a whole, lacks serious literary, artistic, political, or scientific value for minors.

PTMA §1(b)(5).

When this "content harmful to minors" constitutes one-third or more "of the total amount of data available on a website," the "substantial portion" threshold is met, triggering liability unless the operator screens all would-be website visitors using one of two "reasonable age-verification methods": (A) matching a real-time photo of the user with the photo on a valid form of state ID, or (B) some other "commercially reasonable method relying on public or private transactional data." PTMA §1(b)(11). The verification must be "implemented in a manner not easily bypassed or circumvented" to provide the statutory safe harbor. *Id.*

## 2. The Plaintiffs

Plaintiffs are a collection of non-profits, for-profits, and individuals who rely on the internet for communication, both as providers and recipients of First Amendment-protected materials.

**Free Speech Coalition, Inc. (FSC)** is a not-for-profit trade association representing hundreds of businesses and individuals involved in the production, distribution, sale, and presentation of constitutionally-protected and non-obscene materials that are disseminated to consenting

-3-

adults via the internet. Most of that material would fit within Tennessee's statutory definition of "content harmful to minors." *See* Declaration of Alison Boden (hereinafter, "Boden Decl.").

**Deep Connection Technologies Inc. (DCT)** is the company that operates O.school, an online educational platform focused on sexual wellness. Because of the breadth and vagueness of the "content harmful to minors" definition, DCT is concerned that one-third or more of O.school content meets the statutory definition. As a provider of critical sex education appropriate (and necessary) for older minors, DCT opposes any age-verification measure that would preclude those teens from accessing O.school's content. *See* Declaration of Andrea Barrica (hereinafter, "Barrica Decl.").

**JFF Publications, LLC (JFF)** is the limited liability company that operates an internet-based platform at the domain <JustFor.Fans> that allows independent performers of erotic audio-visual works to publish their content and provide access to fans on a subscription basis. JFF is confused about what the Act requires and concerned about the costs of compliance. *See* Declaration of Dominic Ford (hereinafter, "Ford Decl.").

**PHE, Inc. (PHE)** is a North Carolina Corporation doing business as Adam and Eve, a sexual wellness retailer that owns and operates various online stores and franchises brick and mortar stores bearing its trademark. Through its online store at adameve.com, PHE sells adult toys, games, and other erotic items, and through other websites, it sells adult videos, streams erotic movies, and promotes its brick-and-mortar franchise stores. These sites contain some material that might qualify as "content harmful to minors" under the Act, but PHE cannot determine which (if any) are out of compliance because it does not know, for example, what constitutes "the material as a whole" or how it should measure the one-third threshold under which its "harmful to minors" offerings must remain vis-à-vis its other offerings. *See* Declaration of Chad Davis (hereinafter, "Davis Decl.").

-4-

**MelRose Michaels**[2] lives in Tennessee and works there in various aspects of the adult industry—including as a performer, producer, and editor of erotic films, which she monetizes through various "fan sites." Her career requires that she be able to access adult websites, but her efforts to do so will be frustrated by the Act because (1) many such website operators have stated their intent to block access to Tennesseans once the Act becomes effective, and (2) she has grave concerns about providing sensitive personal information about herself in order to access those websites that have attempted to comply with the Act by age-verifying their users. *See* Declaration of MelRose Michaels (hereinafter, "Michaels Decl.").

### III.    LEGAL BACKGROUND AND HISTORY

For almost as long as the internet has been in American households, legislators at the state and federal levels have tried their hands at legislating disfavored content in a manner that would pass constitutional muster. They have roundly failed.

The first such attempt came via the federal Communications Decency Acts (CDA) that criminalized, *inter alia,* the knowing dissemination of "obscene or indecent messages" to a recipient under 18 years of age and any message that "in context, depicts or describes, in terms measured by contemporary community standards, sexual or excretory activities or organs." *See* 47 U.S.C. § 223(a), (d). Shortly after the CDA took effect, groups of businesses, libraries, not-for-profit organizations, and educational societies brought a First Amendment challenge, which a three-judge panel in the Eastern District of Pennsylvania granted, enjoining the enforcement of the statute. *See ACLU v. Reno*, 929 F. Supp. 824 (E.D. Pa. 1996).

The government appealed directly to the Supreme Court, which invalidated the challenged provisions and affirmed the lower court's injunction. *See Reno v. ACLU*, 521 U.S. 844

---

[2] MelRose Michaels is the plaintiff's stage name. Ms. Michaels files concurrently with this Complaint a motion to proceed using her pseudonym and to seal the unredacted version of the Complaint.

(1997). The Court first held that the provisions prohibiting transmission of "indecent" or "patently offensive" materials were blanket content-based restrictions on speech and not mere time, place, and manner regulations. As such, they would be strictly scrutinized. *See id.* So, too, were they facially overbroad—capturing much constitutionally protected material. *See id*

After that invalidation, Congress returned to the drawing board to pass the Child Online Protection Acts (COPA), which prohibited any person from knowingly "making any communication [over the internet] for commercial purposes available to any minor and that includes any material that is harmful to minors." 47 U.S.C. § 231. Publishers could assert an affirmative defense to prosecution if they restricted minors' access in one of several ways: "(A) by requiring use of a credit card, debit account, adult access code, or adult personal identification number; (B) by accepting a digital certificate that verifies age; or (C) by any other reasonable measures that are feasible under available technology." *Id.* at § 231(c)(1). More limited than "indecent" or "patently offensive" messages, material "harmful to minors" was restricted to any communication, picture, image, graphic image file, article, recording, writing, or other matter of any kind that is obscene or that:

> (A) the average person, applying contemporary community standards, would find, taking the material as a whole and with respect to minors, is designed to appeal to, or is designed to pander to, the prurient interest;
>
> (B) depicts, describes, or represents, in a manner patently offensive with respect to minors, an actual or simulated sexual act or sexual contact, an actual or simulated normal or perverted sexual act, or a lewd exhibition of the genitals or post-pubescent female breast; and
>
> (C) taken as a whole, lacks serious literary, artistic, political, or scientific value for minors.

47 U.S.C. § 231(e)(6).

Again, the statute was challenged by a diverse array of website operators offering everything from "resources on obstetrics, gynecology, and sexual health" to "books and images for sale." And sitting in review of the district court's grant of a preliminary injunction to the plaintiffs and the Third Circuit's affirmance of the same, the Supreme Court upheld the injunction. *See Ashcroft v. ACLU*, 542 U.S. 656 (2004). Specifically, it agreed that the least intrusive means

of preventing minors from accessing erotic materials was through device-level technology, not site-level restrictions on speech:

> Filters are less restrictive than COPA. They impose selective restrictions on speech at the receiving end, not universal restrictions at the source. Under a filtering regime, adults without children may gain access to speech that have a right to see without having to identify themselves or provide credit card information. Even adults with children may obtain access to the same speech on the same terms by turning off the filter on their home computers. Above all, promoting the use of filters does not condemn as criminal any category of speech, and so the potential chilling effect is eliminated, or at least much diminished. All of these things are true, regardless of how broadly or narrowly the definitions in COPA are construed.

*Id.* at 667. *See also id.* (noting that filtering software was more effective than COPA at keeping minors from harmful material online, per "findings of the Commission on Child Online Protection, a blue-ribbon Commission created by Congress in COPA itself").

Although Congress apparently lost its will to tinker with statutes aiming to restrict online content, some states then took up that mantle—albeit with the same record of failure.[3] This most recent effort from Tennessee reflects yet another wave of moral panic animating similar bills working their way through State Houses around the country. *See* FSC Action center, *Age Verification Bills and Laws*.[4] Courts have proved a bulwark against enforcement of those laws when challenged. *See Free Speech Coal. v. Rokita*, 2024 WL 3228197 (S.D. Ind. June 28, 2024) (granting preliminary injunction); *Free Speech Coal. v. Knudsen*, 2024 WL 4542260 (D. Mont. Oct. 22, 2024) (denying motion to dismiss); *Free Speech Coal. v. Colmenero*, 689 F. Supp. 3d

---

[3] *See, e.g., American Booksellers Foundation v. Sullivan*, 799 F. Supp. 2d 1078 (D. Alaska 2011) (Alaska); *American Booksellers Foundation v. Coakley*, 2010 WL 4273802 (D. Mass. 2010) (Mass.); *PSINet, Inc. v. Chapman*, 362 F.3d 227 (4th Cir. 2004) (Virginia); *American Booksellers Foundation v. Dean*, 342 F.3d 96 (2d Cir. 2003) (Vermont); *Cyberspace Communications, Inc. v. Engler*, 238 F.3d 420 (6th Cir. 2000) (Michigan); *ACLU v. Johnson*, 194 F.3d 1149 (10th Cir. 1999) (New Mexico); *ACLU v. Goddard*, Civ. 00- 0505 (D. Ariz. Aug. 11, 2004) (Arizona); *Southeast Booksellers v. Ass'n v. McMaster*, 282 F. Supp. 2d 389 (D.S.C. 2003) (South Carolina); *American Library Association v. Pataki*, 969 F. Supp. 160 (S.D.N.Y. 1997) (New York).

[4] *Available at*: https://action.freespeechcoalition.com/age-verification-bills/all/.

373 (W.D. Tex. 2023), *aff'd in part, vacated in part sub nom, Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263 (5th Cir. 2024), *cert. granted*, 144 S. Ct. 2714 (2024) (granting preliminary injunction). The one court that *didn't* will hear the Supreme Court consider its opinion (reversing a preliminary injunction) later in its October 2024 Term. *See Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263 (5th Cir.), *cert. granted*, 144 S. Ct. 2714 (2024) (oral argument scheduled for Jan. 15, 2025).

The PTMA has done nothing to redress the many noted infirmities that led to COPA's demise at the federal level and injunctions at the state level. In some respects, this most recent effort has made those defects even worse.

## IV.    ARGUMENT

### 1.  Legal standards governing issuance of a preliminary injunction.

In the Sixth Circuit, four factors guide a court's decision to grant or deny a preliminary injunction:

> First, the court must determine whether the plaintiff has established a substantial likelihood or probability of success on the merits of his claim. Second, the court will determine whether the plaintiff would suffer irreparable injury if a preliminary injunction did not issue. Third, the court determines whether the injunction would cause substantial harm to others. And finally, a court must consider whether the public interest would be served if the court were to grant the requested injunction.

*Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 689–90 (6th Cir. 2014) (internal quotation marks, citations, and brackets omitted). The factors are to be "balanced against one another and should not be considered prerequisite" to the requested relief. *Id.* at 690. But "[i]the context of a First Amendment claim, the balancing of these factors is skewed toward an emphasis on the first factor," as the likelihood of success on the merits often will prove "determinative," with the other three factors "often hing[ing] on this first." *Id.* (quotation marks and citations omitted). This is because "it is well-settled that 'loss of First Amendment freedoms unquestionably constitutes irreparable injury'"; "it is always in the public interest to prevent the violation of a party's

constitutional rights"; and "questions of harm to the parties and the public interest generally cannot be addressed properly in the First Amendment context without first determining if there is a constitutional violation." *Id* (quotation marks, citations, and ellipsis omitted).

Plaintiffs are entitled to a preliminary injunction in this case. They have a strong likelihood of success on the merits, as the Act restricts constitutionally protected content in a manner that is woefully ineffective, poorly tailored to the State's interest, overbroad, vague, and in conflict with supreme federal law. So, too, will Plaintiffs suffer irreparable injury absent the grant of an injunction, as they'll face the untenable choice between (on one hand) ruinous civil and criminal liability and (on the other) statutory compliance at great expense and sacrifice of constitutional freedoms. Because the injunction will vindicate constitutional rights, its issuance will not invite harm upon others and doubtless will serve the public interest rather than frustrate it.

### 2. Plaintiffs are substantially likely to prevail on the merits.

The PTMA imposes clear violations of Plaintiffs' rights under the First and Fourteenth Amendments to, and the Supremacy Clause of, the United States Constitution. Much of the Act's language is warmed over from previous efforts to restrict online content, which the Supreme Court, federal district and appellate courts, and state supreme courts all have roundly criticized.

### A. Facial Challenge

Generally, the party asserting a facial challenge to a statute must establish that "no set of circumstances exists under which [it] would be valid." *U.S. v. Salerno*, 481 U.S. 739, 745 (1987). But "[w]here a plaintiff makes a facial challenge under the First Amendment to a statute's constitutionality, the 'facial challenge' is an 'overbreadth challenge.'" *Speet v. Schuette*, 726 F.3d 867, 872 (6th Cir. 2013) (quoting *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 335 (6th Cir. 2009) (en banc)). Therefore, "[i]nstead of having to prove that no circumstances exist in which the enforcement of the statute would be constitutional, the plaintiff bears a lesser burden: to demonstrate that a substantial number of instances exist in which the law cannot be applied constitutionally." *Id.* (internal quotation marks omitted); *see also New York State Club Ass'n v. City*

*of New York*, 487 U.S. 1, 14 (1988) ("To succeed in its challenge, appellant must demonstrate from the text of [the law] and from actual fact that a substantial number of instances exist in which the [l]aw cannot be applied constitutionally.").

 **B. The PTMA is a content-based regulation of speech that cannot survive strict scrutiny, as the First Amendment demands it must.**

 i. <u>The Act must survive strict scrutiny</u>

 The Act imposes substantial burdens on content providers that want to publish constitutionally-protected materials on the internet. It precludes older minors from accessing important information about sex and sexuality at a time in their lives when they need it most. And it sweeps within its ambit a broad swath of content published by pornographic and *non*-pornographic websites alike that adults have a First Amendment right to share and receive without state interference. *See Reno v. ACLU*, 521 U.S. 844, 874-75 (1997) (recognizing that "sexual expression which is indecent but not obscene is protected by the First Amendment" and that the government cannot pursue its interest in protecting minors through an "unnecessarily broad suppression of speech addressed to adults"). As a content-based restriction on protected, non-obscene speech, the Act is "presumptively invalid, and the Government bears the burden to rebut that presumption." *United States v. Stevens*, 559 U.S. 460, 468 (2010) (internal quotation marks omitted).

 The *only* court to have considered a similar state enacted age-verification law and concluded otherwise did so on grounds that provide no comfort for the State here. In *Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263 (5th Cir.), *cert. granted,* 144 S. Ct. 2714 (2024), the Fifth Circuit concluded—illogically, indefensibly, but inappositely for purposes here—that strict scrutiny need not apply to Texas's age-verification law so long as it was drawn to track the *Miller* obscenity standard, as-modified by *Ginsberg* to apply to minors. *See Paxton*, 95 F.4th at 270 ("*Ginsberg's* central holding—that regulation of the distribution to minors of speech obscene for minors is subject only to rational-basis review—is good law and binds this court today."). However, it does not even matter that the opinion strained to distinguish decades of precedent strictly scrutinizing restrictions on speech that impact *adults* as well as minors, or that the Supreme

Court has granted certiorari and appears poised to reaffirm those precedents, because *unlike* the Texas law, the PTMA fails to track the *Miller* and *Ginsberg* standards in any meaningful way.

For more than a half-century after *Miller,* the obscenity standard, if not easy to apply, was at least easy enough to recite. "The basic guidelines for the trier of fact must be: (a) whether the average person, applying contemporary community standards would find that the work, taken as a whole, appeals to the prurient interest; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." *Miller*, 413 U.S. 15, 24 (1973) (internal quotation marks and citations omitted). When the regulation impacts only minors, *Ginsberg* has been read to permit further restriction by stripping robust constitutional protection of material obscene only *as to minors* where it (a) is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable *for minors*; (b) appeals to the prurient interest *of minors*; **and** (c) lacks serious value *for minors* when viewed as a whole. *Ginsberg*, 390 U.S. at 633 (1968).

The PTMA fails to track this modified-for-minors *Miller/Ginsberg* standard in important ways. Rather than restricting sexual material that is both "patently offensive" *to* minors and "appealing to the prurient interest" *of* minors, the PTMA instead aims to regulate content that is "sexually explicit and harmful or inappropriate for minors" <u>or</u> "designed to appeal to or pander to the prurient interest." Material that is sexually explicit and inappropriate for minors therefore plainly is subject the regulation even if it isn't designed to appeal to the prurient interest, and material that is designed to appeal to the prurient interest plainly is subject to the regulation even if it isn't sexually explicit and harmful or inappropriate for minors.

The poor drafting doesn't end there. PTMA subpart (ii) is separated from subpart (i) of Section (A) by another disjunctive—meaning that "text, audio, imagery, or video" that "principally consists of" an enumerated sexual organ or act may be obscene as to minors *even if* it is neither designed to appeal to the prurient interest nor is sexually explicit and inappropriate for minors. The specific forbidden acts need not even be "patently offensive" to run afoul of the

statute—a critical aspect of the *Miller/Ginsberg* standard that nowhere appears in the definition of "content harmful to minors." As drafted, even "text" that is "devoted to" a "depiction" of a "nipple of a human body" constitutes "content harmful to minors" so long as it "lacks serious literary, artistic, political, or scientific value for minors." This application reflects a laughable distortion of the *Miller/Ginsberg* standard.

Precision is the touchstone of legislation regulating speech. Tennessee has instead bastardized a long-venerated standard to permit far greater restrictions on speech than the constitution tolerates. *See Reno v. ACLU*, 521 U.S. 844, 874 (1997) (holding that the Communications Decency Act "lacks the precision that the First Amendment requires when a statute regulates the content of speech" where it did not faithfully apply the modified-for-minors obscenity standard). Even in the unlikely event that the Supreme Court should affirm the Fifth Circuit in *Paxton* (effectively reversing decades of its own precedent), that opinion would not extend to supply the standard of review for the instant challenge where the PTMA does not adhere to the obscenity roadmap that has been laid out for a half-century.

To survive this challenge, therefore, the PTMA must survive strict scrutiny—meaning it must: (1) serve a compelling governmental interest, (2) be narrowly tailored to achieve that interest, and (3) be the least restrictive means of advancing that interest. *Sable Commc'ns of Cal., Inc. v. Fed. Commc'ns Comm'n*, 492 U.S. 115, 126 (1989). Plaintiffs acknowledge that Tennessee has a compelling interest in protecting minors from exposure to harmful material on the internet. But the Act fails to withstand strict scrutiny because it is neither narrowly tailored to achieve the State's interest nor the least restrictive means of doing so. At state and federal levels, laws containing content-based restrictions on internet communications deemed harmful to minors have been held unconstitutional. *See supra* at 6-8. In enacting the PTMA, Tennessee has not learned its lessons from the past.

ii.    <u>The Act is not narrowly tailored to serve Tennessee's interest</u>

Much of the PTMA's definition of "content harmful to minors" was pulled verbatim from challenged sections of COPA that the district court for the Eastern District of Pennsylvania, Third Circuit, and Supreme Court declared unconstitutional. The Tennessee Legislature did not so much as attempt to revise these definitions to save them from constitutional challenge, and there has been no intervening legal development to shield them today from the same arguments that carried the day two decades ago.

The Act is poorly tailored in at least the following respects:

a.   *"Content harmful to minors"*

As discussed above, the PTMA fails to track the *Miller/Ginsberg* standard in critical respects. That standard is *itself* a narrower and less restrictive means of addressing the State's stated interest in protecting minors from adult content online. The State's drastic expansion of that standard to capture materials that need not be "patently offensive," "prurient," or even "sexually explicit" simply is not reflective of an earnest effort to narrowly tailor the statute.

b.   *"As a whole"*

COPA defined material "harmful to minors" as that which:

> (A) the average person, applying contemporary community standards, would find, taking the material *as a whole* and with respect to minors, is designed to appeal to, or is designed to pander to, the prurient interest; (B) depicts, describes, or represents, in a manner patently offensive with respect to minors, an actual or simulated sexual act or sexual contact, an actual or simulated normal or perverted sexual act, or a lewd exhibition of the genitals or post-pubescent female breast; and (C) taken *as a whole*, lacks serious literary, artistic, political, or scientific value for minors.

*ACLU v. Mukasey*, 534 F.3d at 191 (citing 47 U.S.C. § 231(e)(6)) (emphasis added). As the Third Circuit recognized,

> when contemporary community standards are applied to the Internet, which does not permit speakers or exhibitors to limit their speech or exhibits geographically, the statute effectively limits the range of permissible material under the statute to that which is deemed acceptable only by the most puritanical communities. This limitation by definition burdens speech otherwise protected under the First Amendment for adults as well as for minors living in more tolerant settings.

> This burden becomes even more troublesome when those evaluating questionable material consider it "as a whole" in judging its appeal to minors' prurient interests. As Justice Kennedy suggested in his concurring opinion [in *Ashcroft v. ACLU*, 535 U.S. 564, 599 (2002)], it is "essential to answer the vexing question of what it means to evaluate Internet material 'as a whole,' when everything on the Web is connected to everything else."

*ACLU v. Ashcroft*, 322 F.3d at 253.

Although COPA did not define what, exactly, constituted the "whole" to be judged, the definition's reference to "*any* communication, picture, image file, article, recording, writing, or other matter of any kind" that satisfies the three prongs of the "harmful to minors" test led the Third Circuit to conclude that the statute "mandates evaluation of an exhibit on the Internet in isolation, rather than in context"—which "surely fails to meet the strictures of the First Amendment." *Id.* at 252–53 (noting that "one sexual image, which COPA may proscribe as harmful material, might not be deemed to appeal to the prurient interest of minors if it were to be viewed in the context of an entire collection of Renaissance artwork"); *see also Ashcroft v. Free Speech Coalition,* 535 U.S. 234 (2002) ("[It is] an essential First Amendment rule [that t]he artistic merit of a work does not depend on the presence of a single explicit scene.").

The PTMA likewise fails to define "as a whole"—ostensibly "mandat[ing] evaluation of an exhibit on the Internet in isolation, rather than in context," just as Supreme Court precedent forbids. The Tennessee Legislature had two decades to study the history and refine its definition to pass constitutional muster. But it failed to do so, leaving Plaintiffs and others scratching their heads. *See* Davis Decl. ¶¶ 6-9; Ford Decl. ¶¶ 14-21.

    *c.    "Minor"*

The Supreme Court has strongly suggested that "modified for minors" obscenity regulations are unlikely to survive First Amendment scrutiny if they do not exempt older minors. *See Reno v. ACLU*, 521 U.S. 844, 865–66 (1997) (distinguishing the "junior obscenity" statute upheld in *Ginsberg* from the unconstitutional regulation before the Court on the basis that, among other things, the former exempted 17-year-olds, whereas the latter did not); *see also American Booksellers Foundation v. Webb*, 919 F.2d 1493, 1505 (11th Cir. 1990) ("*Pope* [*v. Illinois*, 481

-14-

U.S. 497 (1987)] teaches that if any reasonable minor, including a seventeen-year-old, would find serious value, the material is not 'harmful to minors.'"). COPA defined "minor" as "any person under 17 years of age"—prompting the Third Circuit to quip that it "need not suggest how the statute's targeted population could be more narrowly defined, because even the Government does not argue, as it could not, that materials that have 'serious literary, artistic, political or scientific value' for a sixteen-year-old would have the same value for a minor who is three years old." *ACLU v. Ashcroft*, 322 F.3d at 253-54. The court concluded that "[e]ven if the statutory meaning of 'minor' were limited to minors between the ages of thirteen and seventeen, Web publishers would still face too much uncertitude as to the nature of material that COPA proscribes." *Id.* at 255. For that reason alone, the statute was determined to be unconstitutional. *See also ACLU v. Mukasey,* 534 F.3d at 193 ("Our prior decision [in *ACLU v. Ashcroft*] is binding on these issues on this appeal.").

Rather than whittling down COPA's definition of "minor," the Tennessee Legislature *broadened* it to include seventeen-year-olds—an age group more developed in its sensibilities and more burdened by a blanket definition that judges the "literary, artistic, political, or scientific value" *not* by reference to other seventeen-year-olds, but to the broader (and younger) group of all "minors." The result is the restriction of material appropriate (and in some cases, critical) to an older teen's self-discovery in matters as elemental as sexual expression, sexual orientation, gender identity. *See* Barrica Decl. ¶¶ 8-9. Again, the Tennessee Legislature had more than two decades to adjust its definition to pass constitutional muster. Again, it failed to do so.

### d.   *"Substantial portion"*

Because the Acts require age-verification in order to access only those websites that offer "content harmful to minors" as a "substantial portion" of total content (defined as one-third or more), minors will face no impediment to obtaining such material from websites watered down—either incidentally or purposefully in order to avoid the statutory consequences—with other content unoffensive to the sensibilities of the Tennessee Legislature. Thus, given enough

-15-

non-"harmful" material on a single site, even the providers of material that is "harmful to mi-nors" under *any* definition will earn a pass under the Act. At the same time, the Act seeks to pre-clude minors from accessing even those websites offering mostly anodyne content when one-third of the site's material crosses the threshold into what might be construed as "harmful to mi-nors."

Illogical results flowing from poorly conceived statutes usually occasion little constitu-tional concern, but the First Amendment demands greater precision. No content-based restriction on speech that would afford minors access to websites featuring hardcore pornography diluted sufficiently with Sesame Street videos, while denying access to websites (like O.school) offering a fulsome and honest sexual education, can survive strict scrutiny. Even less so when the statutes offer no guidance as to whether total content is determined according to bytes of material, num-ber of web pages, seconds of video, words of a sexual nature, or some other metric entirely. *See* Davis Decl. ¶ 8, Ford Decl. ¶ 18.

  *e. "Website"*

The Act imposes liability and penalties upon any individual or commercial entity that publishes or distributes a "website" that contains a substantial portion of content harmful to mi-nors without first (and every hour thereafter) age-verifying its users. But just what constitutes a "website" is unclear. In its simplest form, a website *can* mean a series of connected pages under a single domain name. Often, however, webpages have more complicated structures, sometimes involving multiple domain names or subdomains. *See* Ford Decl. ¶¶ 16-17. Some webpages might link to separate but related businesses, and others might be simple clearing houses linking to content housed on different servers. For the operator of a platform (like Plaintiff JFF) that hosts the content of myriad individual performers, defining the bounds of the "website" is criti-cal. In failing to define "website," the Act potentially captures far more speech than ostensibly intended, and certainly more than is constitutional. *Cf. ACLU v. Gonzales*, 478 F. Supp. 2d at 817 (E.D. Pa. 2007) ("[A]lthough Congress intended COPA to apply solely to commercial

pornographers . . . the phrase 'communication for commercial purposes', as it is modified by the phrase 'engaged in the business,' does not limit COPA's application to commercial pornographers. The lack of clarity in these phrases results in Web sites, which only receive revenue from advertising or which generate profit for their owners only indirectly, from being included in COPA's reach.").

### f.   Chill on adult speech

The Supreme Court acknowledged that COPA's age-verification requirement worked to chill adults from accessing protected speech. *Ashcroft v. ACLU*, 542 U.S. at 667  (noting less restrictive alternative where "adults without children may gain access to speech they have a right to see without having to identify themselves or provide their credit card information"). *See also* Michael's Decl. ¶ 10. Again and again, the Supreme Court has disapproved of such content-based restrictions that require recipients to identify themselves before receiving access to disfavored speech, given this chilling effect on those putative recipients.[5] *See, e.g., Lamont v. Postmaster General*, 381 U.S. 301 (1965) (holding that federal statute requiring Postmaster to halt delivery of communist propaganda unless affirmatively requested by addressee violated First Amendment); *Denver Area Educ. Telecomms. Consortium v. FCC*, 518 U.S. 727, 732–33 (1996) (holding unconstitutional a federal law requiring cable operators to allow access to sexually explicit programming only to those subscribers who request access to the programming in advance and in writing).

Here, Tennessee failed even to provide meaningful guideposts for what age-verification methods would prove "reasonable," thereby driving content producers from the marketplace—including Plaintiff JFF. *See* Ford Decl. ¶20, Barrica Decl. ¶ 10. Yet the few indications the State

---

[5] Requiring internet users to present identification as a condition of access imposes a substantially greater intrusion than does a prove-your-age requirement of a patron at a movie theater, liquor store, or adult bookstore. Unlike digital age verification over the internet, those latter "real world" visits leave no record (or risk of one) and affect only those who are plausibly under-age.

*did* provide all seem to require not just verification of the user's age, but the user's identity—as the Act demands scrutiny of a "valid form of identification issued by a state" or some other "commercially reasonable" use of a user's "transactional data." Higher courts have already called out the lack of precision in this same statutory language and the same chill imposed by a condition requiring adults to identify themselves before receiving sexually explicit speech online. Tennessee did not so much as attempt to remedy these failings, leaving the Act as poorly tailored now as COPA was two decades ago.

g. *Compelled speech*

Cautious operators of even *non*-pornographic websites must place an age-verification content wall over their entire websites if they wish to continue communicating with Tennessee audiences without risking tort liability or criminal exposure. Doing so necessarily labels them an adult business peddling "content harmful to minors"—the consequences of which can be dire, including not only declining internet traffic, but social stigma, lost ad revenue, and exclusion from public or private programs or curricula. Websites that process payments may lose the ability to accept major credit cards and be forced to use third-party billing companies that charge fees up to 15% of the purchase price (rather than the 3-5% typically charged by credit card companies). They also may face difficulty purchasing business liability insurance and hiring employees. *See* Ford Decl. ¶¶ 22-23.

By compelling speech based on the message of the speaker, the Act is, again, a content-based restriction subject to strict scrutiny. *See Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 796-97 (1988) ("There is certainly some difference between compelled speech and compelled silence, but in the context of protected speech, the difference is without constitutional significance, for the First Amendment guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what *not* to say."). Requiring website operators to self-identify in such manner shifts the burden of deciphering an indecipherable statute from the State to the regulated operator, thereby capturing the cautious site operators while

exempting the most brazen unless and until the AG decides to enforce or some private individual decides to sue. This is not the stuff of narrow tailoring, and by placing the onus on private parties to police themselves, the State has proven willing to tolerate a level of over- and under-inclusiveness that would be constitutionally problematic even if the Act was a paragon of clarity—which, of course, it isn't.

    *h. Prior restraint*

The PTMA effectively requires that, before a covered website may disseminate any constitutionally protected expression to a consenting adult requesting it, it must affirmatively employ a "reasonable age-verification method" on pain of express statutory liability. The requirement thus imposes a classic prior restraint on speech.

Although not unconstitutional per se, a prior restraint comes to the court bearing "a heavy presumption against its constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963). Prior restraints arising from a government pre-approval requirement are presumptively unconstitutional because they pose the danger that any discretion exercised in connection with the approval process may become an instrument of content-based censorship that will impose a serious chill upon the willingness of affected speakers to speak. Government may not require this sort of pre-approval process unless the discretion involved in administering it—both substantive and procedural—is tightly constrained to avoid the inherent censorship dangers.

With respect to those procedural safeguards, the pre-approval process must be administered so that the presumption favors allowing the expression in question; the burden must always fall on the side of disallowing the expression. Secondly, the pre-approval process must operate rapidly and without unnecessary delay. And finally, the costs of the pre-approval process, if assessed to the putative speaker at all, must also be tightly and objectively constrained so as to avoid unnecessarily burdening the expression in question.

The Act imposes an unconstitutional prior restraint on the communication between covered websites and adults seeking to access them. Covered websites must employ "reasonable

age-verification methods" when individuals attempt to access their expression. But even assuming that these statutory specifications suffice, nothing requires that any such methods be made available to all website operators, operate reliably with common computer software, operate for a reasonable fee, or even exist in the first place. The State of Tennessee may not statutorily impose a prior restraint only to leave its operation to private actors who may or may not take up the mantle—*particularly* when leaving key terms like "commercially reasonable" undefined.

iii.     The Act is not the least restrictive means of serving Tennessee's interest

When it comes to content-based restrictions on speech, it is well established that "[i]f a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." *Playboy*, 529 U.S. at 813; *see also Reno v. ACLU*, 521 U.S. at 874 ("Th[e] burden on adult speech is unacceptable if less restrictive alternatives would be at least as effective in achieving the legitimate purpose [of denying minors access to harmful content] that the statute was enacted to serve."); *Sable*, 492 U.S. at 126.

For decades now, courts have recognized the availability, affordability, and effectiveness of device-level blocking and filtering technologies that, as a parental option rather than a government mandate, pose no constitutional concerns. Faced with the argument that voluntary use of blocking and filtering software "places an onus on parents" who might not assume the mantle of responsibility, the Third Circuit was satisfied that the "Supreme Court has effectively answered this contention"—as a court must not assume "a plausible, less restrictive alternative would be ineffective; and a court should not presume parents, given full information, will fail to act." *ACLU v. Ashcroft,* 322 F.3d at 262 (quoting *Playboy*, 529 U.S. at 805).[6]

_____

[6] The *Playboy* Court held unconstitutional a federal statutory provision that required cable operators who provide channels primarily dedicated to sexually-oriented programming to scramble or block those channels completely, or to "time channel" their transmission by limiting their availability to nighttime hours. The Court found this to be a "significant restriction of [protected] communication between speakers and willing adult listeners" that failed strict scrutiny because less restrictive means were available—an opt-out provision whereby a cable subscriber could request the cable company to scramble or block receipt of sexually explicit channels.

Tennessee's legislatively-imposed site-level restriction casts the same wide net that decades ago was found both too wide and too porous to withstand constitutional scrutiny. Since then, that net hasn't shrunk, and the holes have grown only wider. The recent proliferation of cheap VPN programs has given children with a modicum of tech-savvy and access to Google the ability to scramble their IP address to evade a state's site-level restrictions. So, too, has accessing the dark web become simpler than ever before, and site-level content restrictions risk diverting children to corners of the hidden internet that are *not* so restricted and which contain material far more harmful (and illegal) than what is available at an http. *See generally* Ahmed Ghappour, *Searching Places Unknown: Law Enforcement Jurisdiction on the Dark Web*, 69 Stan. L. Rev. 1075, 1087-90 (2017).

Meanwhile, in the years since COPA's constitutional challenge, device-level restrictions have improved dramatically. After a bench trial in the COPA litigation, the district court found that filtering technology can be calibrated to a particular child's age and sensitivity by the child's parents, and that filters, unlike site-level age screening, are "difficult for children to circumvent." *ACLU v. Gonzales*, 478 F. Supp. 2d 775, 789 (E.D. Pa. 2007), *aff'd sub nom.*, *ACLU v. Mukasey*, 534 F.3d 181 (3d Cir. 2008). That technology has only improved in the intervening 15 years, as recent courts have found. *See, e.g., Free Speech Coal. v. Colmenero*, 689 F. Supp. 3d at 403 ("[C]ontent filtering is likely to be more effective [than age verification] because it will place a more comprehensive ban on pornography compared to geography-based age restrictions, which can be circumvented through a virtual private network ("VPN") or a browser using Tor. Adult controls, by contrast, typically prevent VPNs (or Tor-capable browsers) from being installed on devices in the first place. And minors who wish to access pornography are more likely to know how to use Tor or VPNs."). So, too, has this technology proliferated. Today, many of these programs come preinstalled and ready to use from the moment a new computer or phone is purchased; others are free or inexpensive to download and highly customizable, offering benefits well beyond screening for sexual content. *See* Boden Decl. ¶¶ 11-15.

Tennessee of course could have created incentives and campaigned for the improvement and expanded use of content filters—as the Supreme Court has suggested. *See Ashcroft v. ACLU*, 542 U.S. at 670 ("Congress can give strong incentives to schools and libraries to use [device filters]. It could also take steps to promote their development by industry, and their use by parents. . . . By enacting programs to promote use of filtering software, Congress could give parents that ability without subjecting protected speech to severe penalties."). It hasn't done so—opting instead for a blanket restriction that, by imposing substantial costs on content providers, reveals the State's true intention of stifling disfavored speech. *See* Ford Decl. ¶¶ 12-13, Barrica Decl. ¶ 10. *See also ACLU v. Mukasey*, 534 F.3d at 195 (suggesting that weaknesses of site-level restrictions, compared against device-level filters, "might raise the inference that Congress had some ulterior, impermissible motive for passing COPA").

"Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms." *Elrod v. Burns*, 427 U.S. 347, 363 (1976). Here, that precision is woefully lacking, leaving Defendants with no serious argument that the Act may survive strict scrutiny.

**C.  The Act is both constitutionally overbroad and vague.**

A statute that burdens otherwise protected speech is facially invalid when that burden is not only real, but "substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973). Put another way, the overbreadth doctrine prohibits the Government from restricting even *unprotected* speech where "a substantial amount of protected speech is prohibited or chilled in the process." *Ashcroft v. Free Speech Coal.*, 535 U.S. at 237. An overbreadth analysis often engages in the same questions as the narrow tailoring prong of a strict scrutiny analysis. *See ACLU v. Ashcroft*, 322 F.3d at 266 ("Overbreadth analysis—like the question whether a statute is narrowly tailored to serve a compelling governmental interest—examines whether a statute encroaches upon speech in a constitutionally overinclusive manner.").

So, too, may overbreadth challenges overlap substantially with Fourteenth Amendment void-for-vagueness challenges. *See Kolender v. Lawson*, 461 U.S. 352, 358 n. 8 (1983) ("[W]e have traditionally viewed vagueness and overbreadth as logically related and similar doctrines."). A statute is void for vagueness if it "forbids . . . the doing of an act in terms so vague that [persons] of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926); *see also Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) ("It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined."). "[S]tandards of permissible statutory vagueness are strict in the area of free expression," and the "Court has not hesitated to take into account possible applications of the statute in other factual contexts besides that at bar." *NAACP v. Button*, 371 U.S. 415, 432 (1963); *see also Reno v. ACLU*, 521 U.S. at 871–72 (1997) (where the vagueness arises amidst a "content-based regulation of speech[,] the vagueness of such a regulation raises special First Amendment concerns because of its obvious chilling effect on free speech").

The PTMA is both substantially overbroad and unconstitutionally vague in myriad respects. As discussed *supra*, the phrase "taken as a whole" in the definition of "content harmful to minors" does not explain how the "whole" is to be judged. Should one consider only a specific article, certain text, or an individual image on a website? Or should one consider the web page on which that text or image appears? Or the entire website? And should one include linked material? The phrase "substantial portion," defined as one-third or more of the "total amount of data available on a website," likewise fails to explain how this "total amount of data" is calculated. What is the proper metric to measure? Gigabytes? Character count? Number of images? Video runtime? And what about linked material? May a website avoid the problem altogether by providing a link to all the innocuous content in the local public library? These ambiguities have led to confusion among the Plaintiffs and fear of liability for noncompliance with the Act. *See* Davis Decl. ¶¶ 6-9, Ford Decl. ¶¶ 14-21.

The term "minor," defined as "a person under eighteen (18) years of age," is similarly vague in its connotation insofar as it fails to designate the whole from which a content provider must ascertain the average. Whether material is designed to appeal to the prurient interest, or whether it lacks serious literary, artistic, political, or scientific value, is determined with respect to minors. But does this "minor" refer to some generic pre-teen reflecting the median sensibility across *all* minors, from infants to high school seniors? Or some other person occupying some other position on a composite maturity spectrum? To the extent that older minors are shut out from accessing critical, age-appropriate content, the definition is substantially overbroad (and potentially dangerous). *See* Barrica Decl. ¶¶ 8-9.

The term "website" is also overbroad and vague to the extent that it might capture just about anything on the internet—from a performer's channel hosted on another platform, to the skeleton of that platform, to the entire contents of that platform and even *other* platforms housed on the same servers and sharing the same code. *See* Ford Decl. ¶¶ 16-17, Davis Decl. ¶ 7.

The statutory catch-all in the Act's safe harbor provision permits a "commercially reasonable method relying on public or private transactional data" as a means of verifying a user's age but provides no guideposts whatsoever as to what "commercially reasonable" demands. *See* Ford Decl. ¶ 19, Barrica Decl. ¶ 10, Davis Decl. ¶ 9.

Reference to "contemporary community standards" is vague and overbroad due to the borderless nature of the internet. Tennessee is a diverse state, and the "contemporary community standards" vary widely from Nashville to Cleveland, but when a content provider publishes material on a website, the same material is made available in *every* Tennessee county. To avoid running afoul of the Act, websites must abide by a "most prudish community" standard—restricting (in the case of minors) or chilling (in the case of adults) substantial quantities of constitutionally protected content.

Finally, it is unclear what *mens rea* the PTMA imparts. Must the site operator merely intend to publish or distribute material that, incidentally, happens to fit the statutory definition of "content harmful to minors?" Must it *know* that the published material meets that definition?

Must it know that the publishing website's offerings, as a whole, contain at least one-third such material? This is, after all, a *criminal* statute, and strict liability—or even insinuation as to its application—is extremely harsh medicine.

By placing significant burdens on web publishers' ability to disseminate protected speech and web users' ability to receive it, the Act encroached upon a significant amount of protected speech beyond that which Tennessee may target constitutionally to prevent minors' access to sexual material. *See Ginsberg*, 390 U.S. at 639–43; *Sable*, 492 U.S. at 126; *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 212–14 (1975). And by phrasing so much of the operative language in terms that even a trained attorney (never mind an average person) is unable to understand, the Act is unconstitutionally vague, as well. *See Connally*, 269 U.S. at 391; *Reno v. ACLU*, 521 U.S. at 871–72.

### D.  The Act violates the Supremacy Clause.

The Act violates the Constitution's Supremacy Clause because it stands in direct conflict with federal law.

Under Section 230, "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C § 230(c)(1). Plaintiff JFF is a "provider or user of an interactive computer service" within the intendment of the statute. *See* 47 U.S.C § 230(f)(2) (defining "interactive computer service" to mean "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions."). JFF does not produce material that could plausibly be deemed "content harmful to minors." Rather, it merely provides the platform for other "information content providers." *See* 47 U.S.C § 230(f)(3) (defining term to mean "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service").

-25-

In seeking to render JFF and other providers and users of "interactive computer services" liable on account of the actions of "content providers," the PTMA stands in direct conflict with Section 230, which expressly preempts inconsistent state laws. *See* 47 U.S.C § 230(e)(3). Article VI, Paragraph 2 of the U.S. Constitution requires that federal law take precedence in such case. *See Jones v. Dirty World Ent. Recordings LLC*, 755 F.3d 398, 417 (6th Cir. 2014) ("Because (1) the defendants are interactive service providers, (2) the statements at issue were provided by another information content provider, and (3) Jones's claim seeks to treat the defendants as a publisher or speaker of those statements, the CDA bars Jones's claims.").

### 3. Plaintiffs are substantially likely to suffer irreparable injury absent imposition of the injunction.

It is axiomatic that "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). And because Plaintiffs will be restricted in the speech they are able to deliver and receive as long as the Act remains enforceable, monetary relief alone could not suffice to make them whole.

### 4. No substantial harm to others will result from enjoining the unconstitutional law.

"[I]f the plaintiff shows a substantial likelihood that the challenged law is unconstitutional, no substantial harm to others can be said to inhere its enjoinment." *Bays v. City of Fairborn*, 668 F.3d 814, 825 (6th Cir. 2012) (quoting *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville and Davidson Cnty.*, 274 F.3d 377, 400 (6th Cir. 2001)). *See also* Wright & Miller, FED PRAC. & PROC. § 2948.2. For the reasons discussed *supra*, Plaintiffs are incurring constitutional injury every day the PTMA remains in effect; the State of Tennessee, meanwhile, has no legitimate interest in the maintenance and enforcement of a patently unconstitutional statute.

### 5. An injunction is not adverse to the public interest.

Finally, "it is always in the public interest to prevent violation of a party's constitutional rights." *Bays*, 668 F.3d at 825 (6th Cir. 2012) (quoting *Deja Vu of Nashville*, 274 F.3d at 400). The PTMA reflects a poorly crafted solution to a poorly articulated problem, and the public

interest is not advanced by the endurance of overly restrictive, vague, and overbroad statutes that imperil the rights of Tennesseans to provide and receive constitutionally-protected material over the internet.

## V.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully ask this Court to enjoin enforcement of the Acts pending the final determination of this action.


Respectfully Submitted,


Date: November 26, 2024


*/s/ Edward Bearman*
Edward M. Bearman #14242
The Law Office of Edward M.  Bearman
780 Ridge Lake Blvd suite 202
Memphis, Tennessee 38120
Phone: (901) 682-3450 x125
Facsimile: (901) 682-3590
e-mail: ebearman@jglawfirm.com

*/s/ Gary Veazey*
Gary E Veazey # 10657
The Law Office of Gary E, Veazey
780 Ridge Lake Blvd suite 202
Memphis, Tennessee 38120
Phone: (901) 682-3450 x125
Facsimile: (901) 682-3590
e-mail: gveazey@jglawfirm.com


*/s/ James M. Allen*
James Allen # 15968
The Allen Law Firm
780 Ridge Lake Blvd suite 202
Memphis, Tennessee 38120
Phone: (901) 682-3450 x125
Facsimile: (901) 682-3590
e-mail: jim@jmallenlaw.com

*of counsel pending admission pro hac vice*
Jeffrey Sandman
LA Bar No. 39073 (*pro hac vice* pending)
Webb Daniel Friedlander LLP
5208 Magazine St., Ste 364
New Orleans, LA  70115
Phone: (978) 886-0639
e-mail: jeff.sandman@webbdaniel.law

D. Gill Sperlein
CA Bar No. 172887 (*pro hac vice* pending)
The Law Office of D. Gill Sperlein
345 Grove Street
San Francisco, CA  94102
Phone: 415-404-6615
e-mail: gill@sperleinlaw.com