## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE

FREE SPEECH COALITION, INC.;           )
DEEP CONNECTION TECHNOLOGIES,          )
INC.; JFF PUBLICATIONS, LLS; PHE,      )
INC.; AND MELROSE MICHAELS,            )
                                       )
    *Plaintiffs*,                      )
                                       )    **Civil Action No. 2:24-cv-02933**
**v.**                                 )    **Judge Sheryl H. Lipman**
                                       )
JONATHAN SKRMETTI, in his official     )
capacity as THE ATTORNEY GEN-          )
ERAL OF TENNESSEE,                     )
                                       )
    *Defendant*.                       )

---

## DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFFS'
## MOTION FOR PRELIMINARY INJUNCTION

---

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 2

    A.  Minors' Growing Exposure to Harmful Online Pornography. ......................... 2

    B.  The PTMA's Limitation on Purveying Pornography to Minors. ...................... 3

LEGAL STANDARD .......................................................................................... 4

ARGUMENT ....................................................................................................... 5

  I.  Plaintiffs Are Unlikely to Succeed on the Merits. .................................... 5

    A.  Plaintiffs have not made a "clear showing" of this Court's jurisdiction. ........... 5

    B.  The PTMA does not facially violate the First Amendment. ........................... 10

    C.  Section 230 does not preempt the PTMA. ........................................................ 25

  II.  The Remaining Factors Weigh Against Preliminary Injunctive Relief. ................. 26

CONCLUSION ................................................................................................... 27

## INTRODUCTION

Earlier this year, Tennessee's elected officials unanimously passed the Protect Tennessee Minors Act, 2024 Tenn. Pub. Acts, ch. 1792 ("PTMA") (attached as Ex. 1), to address the many harms associated with minors' exposure to online pornography. The PTMA requires websites displaying a "substantial amount" of content that is obscene for minors to implement now-common tools to verify the age of site visitors. Adults can still access the sites, and the PTMA preserves their privacy. The PTMA thus aligns long-accepted practices with 21st century realities; as adult movie theatres move online, so must the requirement that they verify the age of their customers. *See Reno v. ACLU*, 521 U.S. 844, 886 (1997) (O'Connor, J., concurring in part and dissenting in part) (recognizing "'adult zones' on the internet").

Plaintiffs contend that the PTMA is unconstitutional and seek a preliminary injunction. That request should be denied. Plaintiffs cannot make a "*clear showing*" of an entitlement to equitable relief. *Enchant Christmas Light Maze & Mkt. Ltd. v. Glowco, LLC*, 958 F.3d 532, 539 (6th Cir. 2020) (emphasis in original). At the outset, Plaintiffs lack standing to advance their claims. To prevail, Plaintiffs also must demonstrate that any unconstitutional applications of the PTMA substantially outweigh the Act's significantly greater constitutional sweep. They have not and cannot because the PTMA lawfully protects children in a host of circumstances. Plaintiffs likewise fail to show that the PTMA—which significantly tracks accepted obscenity standards—is unconstitutionally vague. Because the PTMA limits only minors' access to speech that is ob-scene for minors, it needs only to satisfy rational-basis review. *See Free Speech Coal. v. Paxton*, 95 F.4th 263, 269-78 (5th Cir. 2024), *cert. granted*, 144 S. Ct. 2714 (2024). It easily does; indeed, the law would satisfy any tier of review given the grave harms to children it prevents. Nor can Plaintiffs establish a conflict between the PTMA and 47 U.S.C. § 230 ("Section 230"). While

Plaintiffs' faulty merits showing alone forecloses preliminary relief, the balance of equities and the public interest also weigh against enjoining a duly enacted statute designed to protect minors from clearly harmful material.

## BACKGROUND

### A.    Minors' Growing Exposure to Harmful Online Pornography.

Internet pornography is prolific. Byrin Romney, *Screens, Teens, and Porn Scenes: Legislative Approaches to Protecting Youth from Exposure to Pornography*, 45 VT. L. Rev. 43, 50 (2020). And this material is readily available on virtually any device without restriction—in high-definition recordings streamed at little or no cost. Aina M. Gassó & Anna Bruch-Granados, *Psychological and Forensic Challenges Regarding Youth Consumption of Pornography: A Narrative Review*, 1 Adolescents 108, 108-09 (2021), https://www.mdpi.com/2673-7051/1/2/9.

Studies have shown a significant negative association between reported hours of pornography viewing per week and gray-matter volume and brain function in certain areas of the adolescent brain. Kiihn, S., & Gallinat, J., *Brain Structure and Functional Connectivity Associated With Pornography Consumption: The Brain on Porn,* 71 JAMA Psychiatry 827 (2014) https://doi.org/10.1001/jamapsychiatry.2014.93. Early pornography exposure is "also related to the early occurrence of sexual intercourse, more experience with casual sex behavior, and riskier sex practices," including "prostitution." Romney, *supra* at 53. Studies show that the average child is exposed to internet pornography while still in elementary school. *Id.* By age 18, more than 72% of adolescents say they have viewed pornography online. Chiara Sabina et al., *The Nature and Dynamics of Internet Pornography Exposure for Youth*, 11 Cyberpsychology & Behav. 1, 1 (2008), https://www.unh.edu/ccrc/sites/default/files/media/2022-03/the-nature-and-dynamics-of-

internet-pornography-exposure-for-youth-under-18.pdf.  Some 50% of minors between 14 and 17 watch pornography online.  Gasso, et al., *supra* at 109.

Of course, teenagers' curiosity about sex is nothing new.  What *is* new is the failure of pornography purveyors to verify the age of their patrons.  Unlike the adult theatres and bookstores of the 20th century, where employees could readily police underage patrons' access, many pornography websites do nothing to ensure that visitors to their site are adults.

### B.    The PTMA's Limitation on Purveying Pornography to Minors.

The PTMA applies to "individual[s] and commercial entit[ies] that publish[] or distribute[]" a "website that contains a substantial portion of content harmful to minors."  PTMA § 1(c). A "substantial portion," the statute provides, means at least one third of a website's overall content. *Id.* § 1(b)(13).  If a website's content exceeds that threshold, the site must then apply some "reasonable age-verification method" to help ensure that only adults gain access.  *Id.* § 1(c).  To protect privacy, the PTMA prohibits the site from retaining visitors' personally identifying information used for age verification; it also requires the site to retain historical age-verification data only in anonymized form.  *Id.* § 1(d).  Violating these requirements gives rise to criminal and civil liability. *See id.* § 1(e),(i).

Under the PTMA, "'[c]ontent harmful to minors" means:

> (A)(i) Text, audio, imagery, or video the average person, applying contemporary community standards and taking the material as a whole and with respect to minors of any age, would find sexually explicit and harmful or inappropriate for minors or designed to appeal to or pander to the prurient interest; or

> (ii) Text, audio, imagery, or video that exploits, is devoted to, or principally consists of an actual, simulated, or animated display or depiction of any of the following:

>> (a) Pubic hair, vulva, vagina, penis, testicles, anus, or nipple of a human body;

3

(b) Pubic hair, vulva, vagina, penis, testicles, anus, or nipple of a ficti-
tious character's body, or the parts of a fictitious character's body
analogous or functionally equivalent to the aforementioned parts of
the human body;

(c) Touching, caressing, fondling, or other sexual stimulation of human
nipples, breasts, buttocks, anuses, or genitals, or the analogous or
functionally equivalent parts of a fictitious character's body; or

(d) Sexual intercourse, masturbation, sodomy, bestiality, oral copula-
tion, flagellation, excretory functions, exhibitions, or any other sex-
ual act; and

(B) When taken as a whole, lacks serious literary, artistic, political, or sci-
entific value for minors.

*Id.* § 1(b)(5).

Plaintiffs sued the Tennessee Attorney General, alleging that the PTMA's age-verification
requirement violates the First Amendment and is preempted by Section 230. Other cases have
challenged similar laws adopted by States across the country. In allowing Texas and Indiana to
enforce their nearly identical statutes, the Fifth Circuit and the Seventh Circuit considered and
rejected arguments like those Plaintiffs raise here. *See generally* Appellee Opening Br., *Free
Speech Coal., Inc. v. Paxton*, 2023 WL 6465439 (Sept. 25, 2023). The Supreme Court granted
certiorari to review the Texas case. But it declined to enjoin Texas's law pending review. *See
Free Speech Coal., Inc. v. Paxton*, 144 S. Ct. 1473 (U.S. Apr. 30, 2024).

**LEGAL STANDARD**

"A preliminary injunction is an extraordinary and drastic remedy," *Munaf v. Geren*, 553
U.S. 674, 689-90 (2008) (citation omitted), one that should "only be awarded upon a clear showing
that the plaintiff is entitled to such relief," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22
(2008). In determining whether to grant a preliminary injunction, a district court must consider:
"(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant

4

would suffer irreparable injury absent the injunction; (3) whether the injunction would cause sub-stantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction." *Bays v. City of Fairborn*, 668 F.3d 814, 818-19 (6th Cir. 2012).[1]

## ARGUMENT

### I.    Plaintiffs Are Unlikely to Succeed on the Merits.

#### A.    Plaintiffs have not made a "clear showing" of this Court's jurisdiction.

"At the preliminary injunction stage . . . the plaintiff must make a 'clear showing' that she is 'likely' to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024); *see Waskul v. Washtenaw Cty. Cmty. Mental Health*, 900 F.3d 250, 256 n.4 (6th Cir. 2018) (quoting *Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 328 (D.C. Cir. 1987)) (Williams, J., concurring in part) ("[A]n 'affirmative burden of showing a likelihood of success on the merits . . . necessarily includes a likelihood of the court's reaching the merits, which in turn depends on a likelihood that plaintiff has standing.'"). Standing contains three elements: (1) injury—that the plaintiff suffered an injury in fact, (2) traceability—that the injury is causally connected to a defendant's actions, and (3) redressability—that the injury is likely to be resolved by a favorable judicial decision. *Id.* at 902 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). When plaintiffs bring suit under the Declaratory Judgment Act, 28 U.S.C. § 2201, they are not excused from the requirements of Article III. *See Fieger v. Mich. Supreme Court*, 553 F.3d 955, 961 (6th Cir. 2009).

Plaintiffs "must demonstrate standing for each claim." *Daimler Chrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). And they must do so separately for each form of relief sought. *Id.* So, Plaintiffs must allege how the requested relief against the Attorney General could redress

---

[1]  A plaintiff must establish all four factors. To the extent other Sixth Circuit case law suggests otherwise, it is inconsistent with *Winter* and should be disregarded. *See D.T. v. Sumner Cty. Schs.*, 942 F.3d 324, 328 (6th Cir. 2019) (Nalbandian, J., concurring).

Plaintiffs' alleged injuries-in-fact, including their fear of criminal prosecution and private lawsuits. *See Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1031 (6th Cir. 2022).

### 1.    Standing and sovereign immunity principles bar claims against the Attorney General related to criminal or private enforcement.

Plaintiffs do not point to a specific "injury" that implicates the Attorney General by seeking an injunction against being "prosecuted criminally or haled into court by any number of private individuals." (Compl., D.E. 1, PageID# 23.)  Plaintiffs "may not name just any state actor as the defendant" to obtain relief. *Tenn. State Conf. of NAACP v. Lee*, No. 3:23-cv-00832, 2024 WL 3896639, at *22 (M.D. Tenn. Aug. 21, 2024) (three-judge panel).  They must establish standing and overcome sovereign immunity for each category of relief they seek against the Attorney General.  Plaintiffs cannot do so for criminal and private-party enforcement.

*First*, Plaintiffs have not shown the requisite connection between the Attorney General and future criminal prosecution.  The PTMA amends Title 47 of the Tennessee Code, which contains the Tennessee Consumer Protection Act that gives the Attorney General only civil enforcement authority, Tenn. Code Ann. § 47-18-114.  And the PTMA only affords civil enforcement authority when stating that the Attorney General "may bring any appropriate action or proceeding in a court of competition jurisdiction against a commercial entity that fails to comply with [the PTMA]." PTMA, § 1(j).  Only independent district attorneys general, not the Attorney General, can initiate criminal prosecutions.  *See Universal Life Church*, 35 F.4th at 1032-33; Tenn. Code Ann. §§ 8-7-103(1), 8-8-109(b)(1).  Thus, a preliminary injunction against the Attorney General would not prevent the district attorneys general from pursuing criminal prosecution.  *See* Fed. R. Civ. Pr. 65(d)(2); *Doe v. Lee*, 102 F.4th 330, 342 (6th Cir. 2024). (holding that a state official cannot be enjoined from enforcing provisions of a statute that he does not enforce).  Plaintiffs' lack of "plausible allegations" about what the Attorney General "might do" in the realm of criminal

6

enforcement defeats "traceability and redressability," and thus Plaintiffs' standing. *Doe*, 102 F.4th at 335. That the Attorney General is not "task[ed] with enforcing" the PMTA via criminal prosecution also means that Plaintiffs cannot overcome sovereign immunity. *Tenn. State Conf. of NAACP*, 2024 WL 3896639, at *22; *see Lawson v. Hargett*, No. 3:24-cv-00538, 2024 WL 3867526, at *19-21 (M.D. Tenn. Aug. 19, 2024).

*Second*, enjoining the Attorney General also would not redress Plaintiffs' fear of private enforcement. Plaintiffs cite no authority supporting private enforcement of the PTMA. (Compl., D.E. 1, PageID# 23.) But even if private enforcement exists, this Court cannot "lawfully enjoin the world at large, or purport to enjoin challenged laws themselves." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 44 (2021) (cleaned up). It can only provide "party-specific" relief. *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 490 (6th Cir. 2023). Because any injunctive relief here would not bind non-party, private individuals who might seek enforcement of the PTMA, Plaintiffs lack standing to enjoin private enforcement through this suit. *See Doe*, 102 F.4th at 335.

### 2.    Plaintiffs lack injury permitting pre-enforcement review.

Plaintiffs may establish standing "from an imminent, rather than an actual, injury, but only when 'the threatened injury is real, immediate, and direct.'" *Crawford v. U.S. Dep't of the Treasury*, 868 F.3d 438, 454 (6th Cir. 2017) (quoting *Davis v. FEC*, 554 U.S. 724, 734 (2008)). Thus, pre-enforcement challenges like this one can proceed only when a plaintiff (1) "alleges an intention to engage in a course of conduct arguably affected with a constitutional interest, (2) that the challenged statute proscribes, and (3) the plaintiff's intention generates a certainly impending threat of prosecution." *Friends of George's, Inc. v. Mulroy*, 108 F.4th 431, 435 (6th Cir. 2024) (citations omitted). Plaintiffs cannot satisfy those requirements: their conduct lacks constitutional interest, and they suffer no "certainly impending" threat of enforcement by the Attorney General.

### a. Plaintiffs have no constitutional interest in disseminating indecent material to minors.

"[T]he law in this area is clear—there is no constitutional interest in exhibiting indecent material to minors." *Friends of George's, Inc.*, 108 F.4th at 438. The Sixth Circuit recently reiterated that point in rejecting a plaintiff's pre-enforcement standing to challenge Tennessee's Adult Entertainment Act ("AEA"). *Id.* at 434-40. Relevant here, the AEA restricts the permissible locations of "adult-oriented performances that are harmful to minors." *Id.* at 435. The "harmful to minors" definition in turn incorporated the familiar test of whether a performance has "serious literary, artistic, political or scientific values *for minors*." *Id.* (emphasis supplied by the court). The AEA did not ban adult cabaret entertainment. *Id.* at 439. Instead, it limited such entertainment to "adult-only zones." *Id.*

The PTMA is similar to the AEA, but for the internet. It limits material harmful to minors to the equivalent of an "adult-only" zone for the internet—websites that verify the age of their users. PTMA, § 1(c). And like the AEA, the PTMA applies only to content that "taken as a whole, lacks serious literary artistic, political or scientific value for minors." *Compare*, PTMA, § 1(b)(5)(B) *with* Tenn. Code Ann. § 7-51-1401 (incorporating by reference the definition of "harmful to minors" from Tenn. Code Ann. § 39-17-901).

Thus, the Sixth Circuit's standing analysis in *Friends of George's* controls. Like the AEA, the only constitutionally protected content implicated by the PTMA is content that can be constitutionally restricted from minors but not adults—"a narrow slice of speech" that is not banned, just restricted to adults only. *Friends of George's*, 108 F.4th at 439. In *Friends of George's*, the Sixth Circuit held that if the content of plaintiff's performances possessed "artistic value for a reasonable 17-year-old" then the AEA posed no restriction to the plaintiff's constitutional interest. *Id.* But,

8

if the content of plaintiff's performances *lacked* "value for reasonable 17-year-olds," then the plaintiff had no constitutional interest.  *Id.*

Here, if the content of Plaintiffs' websites possesses "serious literary, artistic, political or scientific value" for a reasonable 17-year-old, then the PTMA poses no restriction to Plaintiffs' constitutional interests.  *See id.*  But if the content of Plaintiffs' websites *lacks* "value for reasonable 17-year-olds," then Plaintiffs lack a constitutional interest.  *See id*.  Under a straightforward application of *Friends of George*'s, Plaintiffs cannot point to a constitutional interest affected by the PTMA.  Therefore, Plaintiffs lack pre-enforcement standing because they have no injury.

### b. Plaintiffs face no "certainly impending" threat of enforcement by the Attorney General.

Plaintiffs further fail to show a "*certainly impending*" threat of enforcement under the governing *McKay* framework.  *Online Merchs. Guild v. Cameron*, 995 F.3d 540, 550 (6th Cir. 2021) (citing *McKay v. Federspiel*, 823 F.3d 862, 869 (6th Cir. 2016)).  Under that test, the Sixth Circuit requires "some combination" of: "(1) 'a history of past enforcement against the plaintiffs or others'; (2) 'enforcement warning letters sent to the plaintiffs regarding their specific conduct'; (3) 'an attribute of the challenged statute that makes enforcement easier or more likely, such as a provision allowing any member of the public to initiate an enforcement action'; and (4) the 'defendant's refusal to disavow enforcement of the challenged statute against a particular plaintiff.'" *Id.*  Each factor cuts against Plaintiffs having standing.

Plaintiffs fail to even cite *McKay*, let alone provide factual support for any of the *McKay* factors.  There is no evidence of "history of enforcement against plaintiffs or others" or "enforcement warning letters" sent to Plaintiffs.  While the Complaint alleges a risk of private lawsuits, Plaintiffs do not explain how that is related to a pre-enforcement challenge *against the Attorney General*.  And Plaintiff MelRose Michaels's concerns related to accessing adult websites for her

9

business or concerns about providing sensitive information so that her age can be verified are too attenuated to establish standing by threat of enforcement. (Compl., D.E. 1, PageID# 8.) Plaintiff Michaels's concerns relate to enforcement of the PTMA against *non-parties*.

Any general refusal to disavow enforcement of the PTMA by the Attorney General does not carry the day. A certainly impending threat of prosecution requires more. *See Steffel v. Thompson*, 415 U.S. 452, 456, 459 (1974) (finding a threat of prosecution where police warned the petitioner twice about prosecution and the petitioner's companion was arrested and charged with a crime); *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014) (the organization "was the subject of a recent complaint"); *Holder v. Humanitarian L. Project*, 561 U.S. 1, 16 (2010) (the government had charged about 150 persons for violating the law and declined to disavow prosecution, should the plaintiffs "do what they say they wish to do.") The disavowal factor focuses on "a particular plaintiff," *Online Merchs. Guild*, 995 F.3d at 550, and "*specific* speech," *Davis*, 51 F.4th at 174. Plaintiffs have not presented facts to which the Attorney General has specifically threatened enforcement.

Thus, Plaintiffs lack standing full stop.

## B.    The PTMA does not facially violate the First Amendment.

### 1.    Plaintiffs cannot show facial invalidity given the PTMA's lawful application to online obscenity.

Plaintiffs challenge the facial constitutionality of the PTMA (Pls.' Mem. Supp. Mot. Prelim. Inj., D.E. 2-6, PageID# 240), and when a plaintiff chooses "to litigate . . . cases as facial challenges, . . . that decision comes at a cost." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024). "Even in the First Amendment context, facial challenges are disfavored" and "hard to win." *Id.* at 723, 744. To succeed, a plaintiff must demonstrate that a "substantial number of instances exist" in which the law cannot be applied constitutionally. *Speet v. Schuette*, 726 F.3d

867, 872 (6th Cir. 2013) (citation omitted).  So the court must first determine "[w]hat activities, by what actors" the law "prohibit[s] or otherwise regulate[s]," then assess which of the law's applications "violate the First Amendment," and finally "measure" those unconstitutional applications "against the rest."  *NetChoice*, 603 U.S. at 723.  A law with constitutional applications is facially invalid "*only if* the law's unconstitutional applications *substantially outweigh* its constitutional ones."  *Id.* (emphasis added).  That is a heavy lift, and "neither parties nor courts can disregard the requisite inquiry into how a laws works in *all* of its applications." *Id.* at 744.  Plaintiffs cannot carry that burden.

The PTMA's age-verification requirement does not unconstitutionally burden Plaintiffs' speech as to adults.  But even assuming adult speech were affected, the PTMA's restrictions would be clearly constitutional as applied to the petabytes[2] of obscene, hardcore pornography on websites that is "unprotected by the First Amendment" for adults too.  *Miller*, 413 U.S. at 23.  Moreover, even if some non-obscene material hides in the depths of these sites, "[w]here the purveyor's sole emphasis is on the sexually provocative aspects of publications, that fact may be decisive in the determination of obscenity"; that rule applies particularly where the purveyor undertakes "deliberate and studied arrangement … editorialized for the purpose of appealing predominantly to prurient interest."  *Ginzburg v. United States*, 383 U.S. 463, 470-72 (1966).  The PTMA thus carries a large and "plainly legitimate" sweep given the "full range" of pornographic sites it covers. *NetChoice*, 603 U.S. at 724.

States also may constitutionally "shield[] minors" from material that is obscene for minors, even if not obscene "by adult standards."  *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126

---

[2] "In 2018, Pornhub transferred 4,403 petabytes of data—which is more bandwidth than the entire internet consumed just sixteen years earlier in 2002."  Romney, *supra* at 50.

(1989); *see Erznoznik v. City of Jacksonville*, 422 U.S. 205, 212 (1975); *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 793-94 (2011). And that is exactly the purpose of the PTMA, as its title and substantive provisions reveal. In assessing whether material is "[c]ontent harmful to minors" the statute considers both the material's nature "with respect to minors" as well as its "value for minors." PTMA § 1(b)(5). Again, there is "no constitutional interest in exhibiting indecent material to minors." *Friends of George's*, 108 F.4th at 438.

In short, many affected sites are either entirely obscene and unprotected, or carry only limited amounts of non-obscene, protected material—and even then, material that is protected only as to adults. *See id.* In this facial challenge, it was thus incumbent on Plaintiffs to demonstrate that the PTMA's allegedly unlawful application to non-obscene, protected material on their sites "substantially outweighs" application to obscene material the State can restrict. *NetChoice*, 603 U.S. at 724. But they have not wrestled at all with the PTMA's obvious constitutional applications. And once the "full range of applications—the constitutionally impermissible and permissible both" is "explore[d]," it is clear the constitutional applications of the Act simply are not "substantially outweigh[ed]" by the limited, theoretical unconstitutional ones. *See id.* at 724, 726.

> ### 2. The PTMA's age-verification provisions satisfy any level of First Amendment scrutiny.
>
> #### a. Rational-basis review applies and is met.

The PMTA's purpose and application targets only underage access to material that is obscene to minors. To the extent some of the Plaintiffs' speech is protected, rational-basis review applies under *Ginsberg*, 390 U.S. at 642-43. *See Paxton*, 95 F.4th at 269 ("[R]egulations of the distribution *to minors* of materials obscene *for minors* are subject only to rational-basis review." (emphasis in original)). *Ginsberg* dealt with a First Amendment challenge to a New York law criminalizing the sale of so-called "girlie" picture magazines. 390 U.S. at 634-35. The Court

acknowledged that such magazines were "not obscene for adults," but the regulation did not pro-hibit their sale to adult buyers. *Id.* Instead, New York criminalized only the selling of such mag-azines to children, which the Court held was rationally related to the State's interest in the "well-being of its youth" while preserving the authority of parents "who so desire [to] purchas[e] the magazines for their children." *Id.* at 639.

It is thus "well settled that a State or municipality can adopt more stringent controls on communicative materials available to youths than on those available to adults"—i.e., adjust the obscenity standard for minors. *Erznoznik*, 422 U.S. at 212. And "because obscenity is not pro-tected expression," regulating its dissemination to minors does not offend the First Amendment so long as "the legislature's judgment that the proscribed materials were harmful to children was not irrational." *See Brown*, 564 U.S. at 794 (describing *Ginsberg*'s holding) (internal quotation marks omitted). As the Fifth Circuit explained in upholding a materially identical age-verification law, "*Ginsberg's* central holding—that regulation of the distribution to minors of speech obscene for minors is subject only to rational-basis review—is good law and binds this court today." *Paxton*, 95 F.4th at 270.

Plaintiffs say that the laws in *Paxton* and *Ginsberg* do not track the PMTA's language verbatim. (Pls. Mem. Supp. Mot. Prelim. Inj., D.E. 2-6, PageID# 242-43.) But neither case held that the *Ginsberg* statute's "harmful to minors" definition is the only one that triggers rational-basis review. The key to both cases was that the States had adopted obscenity definitions specifi-cally "to be assessed in term[s] of the sexual interests of . . . minors." *Ginsberg*, 390 U.S. at 636-38; *see Paxton*, 95 F.4th at 269. And the PTMA does just that: it limits "content harmful to minors" to materials that, "with respect *to minors*," are "sexually explicit and harmful or inappropriate" or "designed to appeal to or pander to the prurient interest" or that display various sexual depictions

that "lack[] serious . . . value *for minors*."  PTMA § 1(b)(5) (emphasis added).

Regardless, the PTMA's definition of "[c]ontent harmful to minors" is not the outlier Plaintiffs claim.  For example, they contend that under the Act "[m]aterial that is sexually explicit and inappropriate for minors therefore plainly is subject [to] the regulation even if it isn't designed to appeal to the prurient interest, and material that is designed to appeal to the prurient interest plainly is subject to the regulation even if it isn't sexually explicit and harmful or inappropriate for minors."  (Pls.' Mem. in Supp., D.E. 2-6, PageID# 242).  But those things go hand-in-hand.  *See Prurient*, Merriam-Webster Online (2024),  https://tinyurl.com/y827xrx5 ("marked by or arousing an immoderate or unwholesome interest or desire especially: marked by, arousing, or appealing to sexual desire").  And both are adjudged "with respect to minors of any age."  PTMA § 1(b)(5)(A); *see Ginsberg*, 390 U.S. at 645 (upholding obscenity standard applied to "*any person under* the age of seventeen") (emphasis added); *see also Friends of George's*, 108 F.4th at 435-36 (citing narrowing construction of "harmful to minors" in *Davis-Kidd Booksellers, Inc. v. McWherter*, 866 S.W.2d 520, 522-23, 528 (Tenn. 1993)).  For that same reason, the Plaintiffs' focus (at PageID# 242) on the second "disjunctive" between the subparts of (A) is misplaced, because the sexual depictions prohibited in subpart (ii) are still measured by their "value for minors."  *Id.* § 1(b)(5)(B).  Like the materially similar statute upheld in *Paxton*, the PTMA is aimed at "regulati[ng] . . . the distribution *to minors* of material obscene *for minors*" and thus is subject to rational-basis review. 95 F.4th at 269.

Nor do *Reno*—involving the federal Communications Decency Act ("CDA")—or *Ashcroft v. ACLU*, 542 U.S. 656 (2004) ("*Ashcroft II*")—involving the Child Online Protection Act ("COPA")—require differently.  Neither overturned *Ginsberg*, and the Court has since reiterated States' power to protect minors from content that is obscene as to minors but not as to adults.  *See*

*Brown*, 564 U.S. at 794. And both involved statutes that criminalized the act of communicating, sending, or posting speech itself. *Reno*, 521 U.S. at 859; *Ashcroft II*, 542 U.S. at 661-62. The PMTA, by contrast, merely requires steps to limit the age of viewers using now-common and effective processes—it does not "suppress" the creation or distribution of any speech. *Id.* at 874; *cf. Ashcroft II*, 542 U.S. at 665.

More important, *Reno* and *Ashcroft II* arose at a time when purveyors of pornography lacked the technological capability to engage in the type of age verification the PMTA requires. As *Reno* recognized, the lack of "a viable age verification process" meant that any adult-versus-child line in effect operated like an outright ban on even protected "adult-to-adult communication." 521 U.S. at 876. The *Ashcroft II* Court likewise proceeded from the premise that COPA could operate only by "effectively suppress[ing] a large amount of speech that adults have a constitutional right to receive and address to one another." 542 U.S. at 665 (quoting *Reno*, 521 U.S. at 874); *see also United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 805 (2000) (cited at PI Br. 20) (assessing "nationwide daytime speech ban" of adult-oriented cable channels). Now, though, age-verification processes are readily available, in widespread commercial use by websites, and permit adult access to speech while restricting minors. *See Paxton*, 95 F.4th at 272; Allen Dec., Ex. 2 at 8-17. Plaintiffs, for their part, do not contest that they could implement age verification like myriad other website operators must. That "rapid" change in "current technological reality" means that the cornerstone of the Court's reasoning in *Ashcroft II*, 542 U.S. at 658, and *Reno*, 521 U.S. at 755-56, is missing here.

The regimes in *Reno* and *Ashfroft II* suffered additional problems that the PTMA lacks. Among other examples: the CDA's definition of obscenity omitted reference to "sexual conduct," and it did not account for the potential "serious literary, artistic, political or scientific value" of the

15

material.  *See Reno*, 521 U.S. at 870, 873.  The PTMA does.  *See* PTMA § 1(b)(5).  The CDA did

not allow parental consent.  *Reno*, 521 U.S. at 865.  The PTMA does not prohibit parents from

providing their children with access to restricted websites.  The CDA swept in private, non-com-

mercial speech.  *See id*.  But Plaintiffs are engaged only in commercial activities.  Age verification

was only an affirmative defense under COPA, *Paxton*, 95 F.4th at 273 n.24; not so under the

PTMA.

For these reasons, the PTMA warrants *Ginsberg*'s rational-basis review, which it easily

satisfies.  *See F.C.C. v. Beach Commc'n, Inc.,* 508 U.S. 307, 314 (1993).  There is abundant evi-

dence of the serious harms online pornography causes to minors, and the PTMA is reasonably

related to Tennessee's undisputed interest in protecting children, *see Ginsberg*, 390 U.S. at 643.

Because rational-basis review does not require the government to "draw the perfect line nor even

to draw a line superior to some other line it might have drawn," the Act survives constitutional

scrutiny.  *Armour v. City of Indianapolis*, 566 U.S. 673, 685 (2012).

### b.    Alternatively, intermediate scrutiny applies and is met under the secondary-effects doctrine.

Even if the Court concludes that the PTMA is a content-based law that triggers heightened

review, at most intermediate scrutiny applies under the secondary-effects doctrine.  The secondary-

effects doctrine allows Tennessee to "accord differential treatment to a content-defined subclass

of speech because that subclass was associated with specific 'secondary effects' of the speech,

meaning that the differential treatment was 'justified without reference to the content of the . . .

speech.'"  *Daunt v. Benson*, 956 F.3d 396, 420 (6th Cir. 2020) (quoting *City of Renton v. Playtime*

*Theatres, Inc.*, 475 U.S. 41, 48 (1986)).

A statute aimed at the secondary effects of expressive conduct, need not survive strict scru-

tiny.  *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989).  Instead, a regulation of secondary

effects need only "promote[] a substantial government interest that would be achieved less effectively absent the regulation," and do so by means that "are not substantially broader than necessary to achieve the government's interest." *Id.* at 799-800. The Supreme Court has regularly applied this doctrine to regulations aimed at mitigating the secondary effects of sexually explicit but non-obscene conduct. For example, in *Renton*, the Supreme Court upheld a statute that prohibited adult films from being shown in certain areas to "prevent crime, protect the city's retail trade, maintain property values," and generally preserve "the quality of urban life. 475 U.S. at 43. The Court recognized that such a regulation was "aimed not at the *content* of the films, . . . but rather the *secondary effects*" of theatres showing those films in the sensitive areas." *Id.* at 47.

The PTMA fits well within this framework. As Justice O'Connor explained in *Reno*, efforts to regulate minors' access to online pornography are best understood as attempts to translate *Renton* to the internet. 521 U.S. at 888-909 (O'Connor, J., concurring in part and dissenting in part). The internet is not a physical location. The PTMA merely restricts minors' ability to access Plaintiffs' websites—the digital equivalent of the adult movie theatres and sex shops of yesteryear.

*Reno* is not to the contrary. There the Court relied on *Boos v. Barry*, 485 U.S. 312, 321 (1998), to explain that "'[r]egulations that focus on the direct impact of speech on its audience' are not properly analyzed under *Renton*." *Reno*, 521 U.S. at 867-68. But whereas the only purpose of the regulation in *Boos* was to shield an unwilling audience from seeing expression, the purpose of the PTMA is to regulate children's access to pornography because of the deep, long-term effects of consuming that content, not to regulate the content itself. *See* Statement of Rep. Hazlewood, House Justice Comm. Hearing (Mar. 19, 2024), available at https://tinyurl.com/3mp49hb6. And in any event, the only content that is protected is speech directed at adults, and without meaningful age gating, a secondary effect of allowing Plaintiffs to publish material to adults is that same

17

material will be available to children. Thus, any First Amendment review of the Act should be limited to the intermediate scrutiny applied under the secondary-effects doctrine.

The Act also satisfies that test. It advances Tennessee's substantial interest in protecting minors' physical and psychological health from the corrosive effects of pornography exposure. *See Sable Commc'ns of Cal., Inc.*, 492 U.S. at 126 (recognizing States' compelling interest in "protecting the physical and psychological well-being of minors"). And the PTMA's age-verification requirement is tailored to that objective. Instead of restricting speech itself or cutting off means by which the Plaintiffs may communicate their messages, age verification is only meant to prevent the known harms associated with minors viewing pornographic material. Meanwhile, the PTMA protects the privacy of adult visitors to the Plaintiffs' websites by prohibiting the sites from storing those customers' data.

### c.    The PTMA would also satisfy strict scrutiny.

Strict scrutiny requires that the law "be narrowly tailored" to advance a State's compelling interest, "not that it be 'perfectly tailored.'" *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 454(2015) (citing *Burson v. Freeman*, 504 U.S. 191, 209 (1992)). Here, Plaintiffs concede that the State has a compelling interest in "protecting minors from exposure to harmful material on the internet." (Pls.' Mem. Supp. Mot. Prelim. Inj., D.E. 2-6, PageID# 243.) But they argue that the PTMA lacks narrow tailoring in certain respects. That's wrong.

PTMA is narrowly tailored because its definition of "minor" does not over-include 17-year-olds who have a different constitutional interest than younger minors. *See Friends of George's*, 108 F.4th at 438 ("[T]here is no constitutional interest in exhibiting indecent material to minors."). Moreover, omitting a definition for "website" does not bolster Plaintiffs' narrow tailoring argument either because "website" has a clear and ordinary meaning. And the PTMA

18

provides for a high-level contextual review that prior unconstitutional statutes did not.

      *Application to minors.* PTMA's definition of "minor" is not constitutionally problematic. Contrary to Plaintiff's contention, *Reno* did not primarily ground its conclusion that the CDA was materially different than the statute upheld in *Ginsberg* because the former included 17-year-olds. 521 U.S. at 865-66. *Reno* distinguished the CDA from *Ginsberg* for *four* reasons: the CDA did not allow parents to consent, it applied to more than commercial transactions, it did not define "indecent," and it included 17-year-olds. *Id.* Indeed, the only mention the opinion makes of broadening the definition of "minor" to include 17-year-olds is in that one sentence. *See generally id.* In fact, the Court noted that "we need neither accept nor reject the Government's submission that the First Amendment does not forbid a blanket prohibition on all 'indecent' and 'patently offensive' messages communicated to a 17-year-old." *Id.* at 878.

      Despite the Court deeming *all four* distinctions "important," the last reason was not fundamental to the Court's analysis. But even if it were more than a marginal consideration in the Court's opinion, the PTMA does not prohibit a parent from sending "his 17-year-old college freshman information on birth control." *See id.* Moreover, the *Reno* Court noted arguments given for ways the CDA could have been more narrowly tailored that are present in droves in the PTMA. First, arguments there suggested "requiring indecent material be 'tagged' in a way that facilitates parental control of material coming into their homes." *Id.* at 879. *See generally* PTMA (nothing in the statute prohibits parental control). Second, "exceptions for messages with artistic or educational value." *Reno*, 521 U.S. at 879; PTMA § 5(b). Third, "providing some tolerance for parental choice." *Reno,* 521 U.S. at 879. *See generally* PTMA (nothing in the statute prohibits parental choice). Finally, "regulating some portions of the Internet—such as commercial Web sites—different from others, such as chat rooms." *Reno*, 521 U.S. at 879; PTMA §§ 1(4), (c).

*Meaning of website.*  "Website" is not ambiguous.  "When a statute does not define a term," courts typically "give the phrase its ordinary meaning."  *FCC v. AT&T Inc.*, 562 U.S. 397, 403 (2011) (quoting *Johnson v. United States*, 559 U.S. 133, 138 (2010)).  Website is defined as "a group of World Wide Web pages usually containing hyperlinks to each other and made available online by an individual, company, educational institution, government, or organization."  *Website*, Merriam-Webster Online (2024), https://tinyurl.com/3wcb6h3a.  Secondarily, it means "a service or business that operates via a particular website."  *Id.*  Applied here, Plaintiffs clearly meet the definition. (Pls.' Mem. in Supp., D.E. 2-6, PageID# 247.).  On JustFor.Fans' website, an individual accesses content made by individuals but consolidated on *one* platform made available by *one* company.  Schmidt Dec., Ex. 3 at 1-2; (Ford Dec., D.E. 2-24, PageID# 157-58).  Though, that does not answer the question of whether one-third of the website's material meets the statutory requirement.  If it only contains hyperlinks to other websites, that does not trigger the statute because hyperlinks alone are devoid of "content harmful to minors."

*Volume of content harmful to minors.*  The statute also considers context.  Contrary to Plaintiffs' assertion, "one sexual image ... viewed in the context of an entire collection of Renaissance artwork," (Pls.' Mem. in Supp., D.E. 2-6, PageID# 245), would not itself trigger the PTMA unless one-third of the paintings in the collection satisfied both elements of "content harmful to minors."  And that's an important distinction between the PTMA and COPA.  COPA did not account for the higher-level context that the PTMA does—i.e., the "substantial portion" requirement.  *Ashcroft v. ACLU*, 535 U.S. 564, 569 (2002) ("COPA prohibits any person from 'knowingly and with knowledge of the character of the material ... mak[ing] any communication for commercial purposes that is available to any minor and that includes any material that is harmful to minors.").  Even so, a Renaissance painting with nudity has individual context—the Renaissance.  Relying on

20

non-binding precedent applying a Supreme Court concurrence to equate Renaissance paintings and obscenity is mere desultory argle-bargle. (Pls.' Mem. in Supp., D.E. 2-6, PageID# 245-47.)

Plaintiffs' dilution argument is similarly misplaced for practical reasons. (Pls.' Mem. in Supp., D.E. 2-6, PageID# 248.) Mainstream pornography websites seeking to avoid the PTMA's coverage would need to upload petabytes of Sesame Street videos to skirt the PTMA. And it is unlikely that such websites disseminating "hardcore pornography," (*id.* at PageID# 247), would shift their business model towards uploading Sesame Street videos—presumably in that hypothetical—to provide minors apparently in need of "self-discovery" unrestricted access to "hardcore pornography." (*Id.* at PageID# 247-48.) That's fantastical.

*Proffered regulatory alternatives.* Plaintiffs' remaining argument boils down to their belief that the better regulatory alternative would be for Tennessee to incentivize the use of "device-level blocking and filtering technologies" to prohibit minors' access to porn. (Pls.' Mem. in Supp., D.E. 2-6, PageID# 243, 251.) Neither of Plaintiffs proffered less-restrictive means gives their theories any comfort. First, Plaintiffs strangely suggest that Tennessee could "create[] incentives … for the improvement and expanded use of content filters." (*Id.* at PageID# 253.) While maybe less restrictive, it does not better-achieve Tennessee's interest. It does the opposite. Sure, schools and libraries could use content filters—and they do. Parents could also use device-level blocking technologies—and they do. But in that world, nothing stops a child—whose parents employ that technology—from using a device on which there are no such restrictions to access willy-nilly the most despicable content the darkest corners of the internet have to offer. That is why site-level restrictions are necessary to achieve the government's interest.

Finally, the mere existence of minors' ability to circumvent age-restriction requirements by using VPNs to access the regulated content does nothing to render the PTMA more restrictive

than device-level alternatives.  If anything, that makes the PTMA less restrictive than that alternative because it cannot cover every instance of minors' access to the content rather than sweeping into its ambit certain accesses that are constitutionally permissible.

### 3.  Plaintiffs' remaining arguments fail.

Plaintiffs alternatively assert various theories of vagueness, compelled speech, chilled speech, and prior restraint.  All of these arguments likewise fail.

*Vagueness.*  Terms like "taken as a whole," "minor," and "contemporary community standards (Pls.' Mem. in Supp., D.E. 2-6, PageID# 254-55), derive from well-worn obscenity definitions that have survived "vagueness challenges."  *See Friends of George's*, 108 F.4th at 436.  Nor do PTMA terms like "substantial portion," "website," or "commercially reasonable"—considered in context—"fail[] to provide a person of ordinary intelligence fair notice of what is prohibited." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (citation omitted).  The first is expressly defined by the statute, *see* PTMA § 1(b)(13); the second carries a well-known common meaning and is used throughout Plaintiffs' papers (*see, e.g.* Pls. Mem. Supp. Mot. Prelim. Inj., D.E. 2-6, PageID## 235-36, 246-47)[3]; and the third appears throughout federal and state law, *see, e.g.*, 11 U.S.C. § 562(b); Tenn. Code Ann. § 47-9-627. That aside, use of "an imprecise but comprehensible normative standard" does not render the PTMA vague.  *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 495 n.7 (1982) (citation omitted).

Even if applying the PTMA's terms is difficult in marginal cases, "speculation about possible vagueness in hypothetical situations . . . will not support a facial attack on a statute when it is surely valid 'in the vast majority of its intended applications.'" *Hill v. Colorado*, 530 U.S. 703,

---

[3] A "group of World Wide Web pages usually containing hyperlinks to each other and made available online by an individual, company, educational institution, government, or organization." *Website*, Merriam-Webster Online (2024), https://tinyurl.com/3wcb6h3a.

733 (2000). That rule governs here, given the PTMA's widespread application to pornography websites whose content is predominately obscene. Nor does Plaintiffs' *mens rea* argument hold up. Because the PTMA appears in Title 39, it is subject to the statutory default *mens rea* of reck-lessness. *See* Tenn. Code Ann. § 39-11-301(c); *State v. Clark*, 452 S.W.3d 268, 295 (Tenn. 2014).

<u>Compelled speech.</u> Requiring providers of age-restricted services to verify the age of in-dulgers implicates only conduct, not speech: websites simply must verify the ages of their users—that's it. PTMA §§ (1)(c)(1)-(2). That requirement is not unique to Plaintiffs' websites. Tenn. Code Ann. § 4-49-125(a) (requiring sports-gambling websites to "implement commercially and technologically reasonable procedures to prevent access to sports wagering by minors on its inter-active platforms"). And it does not direct websites in "what to say [or] what *not* to say." *Riley v. Nat'l Fed'n of the Blind of N. Carolina*, *Inc.*, 487 U.S. 781, 796-797 (1988) (emphasis in original).

Plaintiffs respond that the act of requiring age verification implicitly connotes that websites are "peddling content harmful to minors." (Pls.' Mem. in Supp., D.E. 2-6, PageID# 249.) But States have broad leeway to require that commercial speakers "include in [their] advertising purely factual and uncontroversial information about the terms under which [their] services will be avail-able." *Zauderer v. Off. of Disciplinary Counsel of Sup. Ct. of Ohio*, 471 U.S. 626, 651 (1985). And the only websites to which the PTMA applies are those that obtain substantial volumes of content that *is* obscene as to minors. Thus, even if the age-verification step sends a message about minor-facing content, the First Amendment does not bar the State from requiring such accurate "warnings or disclaimers." *Id.* (brackets omitted).

<u>Chilled speech.</u> The PTMA does not chill adult speech in all events. It differs from the COPA in two important respects: the PTMA does not "criminal[ize] . . . the knowing posting . . . of World Wide Web content that is 'harmful to minors,'" and it does not "label[] *all speech*" that

meets its definitions as "criminal speech." *Ashcroft II*, 542 U.S. at 661 (emphasis added). COPA, by contrast, criminalized the speech at the outset and then "provide[d] an affirmative defense to those who employ specified means to prevent minors from gaining access to the prohibited materials on their Web site" on the back end. *Id.* at 662. The PTMA does not prohibit any materials whatsoever. It imposes only the requirement of age verification. PTMA § 1(c), (d).

The cases cited by Plaintiffs for the proposition that requiring "recipients to identify themselves before receiving access to disfavored speech" is unconstitutional change nothing. (Pls.' Mem. in Supp., D.E. 2-6, PageID# 249.) For one, *Lamont v. Postmaster General* dealt with political propaganda, not obscene speech. 381 U.S. 301, 302 (1965). Obscenity "is not within the area of constitutionally protected speech or press." *Roth v. United States*, 354 U.S. 476, 486 (1957). Similarly, the Court in *Denver Area Educ. Telecomms. Consortium v. FCC* held a federal law unconstitutional because "the several up-to-30-day delays, along with single channel segregation, mean[t] that a subscriber [could not] decide to watch a single program without considerable advance planning and without letting 'the patently offensive channel' in its entirety invade his household for days." 518 U.S. 727, 753-54 (1996). That statute is analogous to the PTMA only to the extent that the written-request requirement created a quasi-"age-verified session." *See* PTMA § 1(b)(2). Today, age verification is instantaneous, and the "age-verified session" under the PTMA only lasts for "sixty (60) minutes from the time the active user's age was verified …." *Id.* And if the indulger only wants to watch the material for five minutes, they can delete it from their device immediately. The PTMA is not comparable.

*Prior restraint*. The PTMA does not impose any prior restraint. Laws effectuating prior restraints grant "public officials the power to deny use of a forum in advance of actual expression." *Ward*, 491 U.S. at 795 n.5. Nothing in the PTMA prohibits Plaintiffs from publishing anything.

24

Instead, it ensures that only adults—and not children—maintain access to the covered material. A statute that neither prohibits Plaintiffs from disseminating their content or requires a pre-dissemination review is not a prior restraint.

***

In all events, while Plaintiffs "do invoke constitutional precedents of the Supreme Court . . . not one of them resolves these claims." *L.W. by & through Williams v. Skrmetti*, 83 F.4th 460, 471 (6th Cir. 2023), *cert. dismissed in part sub nom. Doe v. Kentucky*, 144 S. Ct. 389 (2023), and *cert. granted sub nom. United States v. Skrmetti*, 144 S. Ct. 2679 (2024). And "in each instance, they seek to extend the constitutional guarantees to new territory." *Id.* That "suggest[s] that the key premise of a preliminary injunction—showing of a likelihood of success on the merits—is missing." *Id.*

### C.  Section 230 does not preempt the PTMA.

Plaintiffs also challenge the PTMA on preemption grounds, contending that it "stands in direct conflict with Section 230['s]" protections for JustFor.Fans, which hosts third-party content. (Pls.' Mem. Supp. Mot. Prelim. Inj., D.E. 2-6, PageID# 256-57.) It does not.

Under Section 230, "provider[s]" of an "interactive computer service" are not "treated as the publisher or speaker of any information provided" by a third party on the providers' websites. *See* 47 U.S.C § 230(c)(1). Nor are those providers liable for their efforts to "restrict access to" material they "consider[] to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable." *Id.* § 230(c)(2). Thus, Section 230 instructs courts not to treat internet companies as the publishers of third-party content on their sites, even if they try to filter out harmful content in good faith. *NetChoice*, 49 F.4th at 466. But Section 230 is no "shield for purposefully *putting* 'offensive material' onto the internet." *Paxton*, 95 F.4th at 285 (emphasis added);

25

*see Fair Hous. Council v. Roommates.com, LLC,* 521 F.3d 1157, 1163 (9th Cir. 2008) (en banc) (recognizing that Section 230 "was not meant to create a lawless no-man's land on the Internet").

The PTMA does not conflict with Section 230(c)'s protections.  It does not hold internet companies liable for third-party content, 47 U.S.C. § 230(c)(1), nor does it impose liability for good-faith measures to restrict access to offensive material, *id.* § 230(c)(2).  Rather, the PTMA imposes liability only if *the internet company* fails to implement reasonable age-verification measures when a "substantial portion" of the content hosted on its site is "harmful to minors." PTMA § 1(c).  Such liability does not "treat[]" internet companies as "publisher[s] or speaker[s]" of the underlying content.  *Paxton*, 95 F.4th at 285.  Instead of "rely[ing] on the harm done by third-party content," the PTMA "imposes liability purely based on . . . compl[iance] with the statute, independently of whether the third-party speech that [the site] host[s] harms anybody." *Id.* Indeed, if an internet company complies with the PTMA, Section 230 would still protect that company if a minor evades the age-verification procedures and is later harmed by third-party content on the company's site. Thus, Section 230 does not preempt the PTMA.

## II.    The Remaining Factors Weigh Against Preliminary Injunctive Relief.

The remaining factors cut against Plaintiffs and independently foreclose relief.  *First*, Plaintiffs have not—and cannot—demonstrate the type of "certain and great" irreparable harm "as required" to obtain preliminary injunctive relief. *Towerco 2013, LLC v. Berlin Township Bd. of Trustees*, 110 F.4th 870, 888 (6th Cir. 2024).  Plaintiffs' First Amendment claim lacks merit, *supra* Part I(b), so it necessarily follows that Plaintiffs' claim "that [it] is irreparably harmed by the deprivation of [its] First Amendment rights also fails." *McNeilly v. Land*, 684 F.3d 611, 621 (6th Cir. 2012).  Because that is the only irreparable harm Plaintiffs assert (Pls.' Mem. Supp. Mot. Prelim. Inj., D.E. 2-6, PageID# 257), they are not entitled to preliminary injunctive relief.

26

*Second*, the balance of equities tips sharply against an injunction: plaintiff's injury is non-existent, and the State would suffer significant harm. As a general matter, "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Thompson v. DeWine*, 976 F.3d 610, 619 (6th Cir. 2020) (cleaned up). And here the State has a well-recognized, compelling interest "in safeguarding the physical and psychological well-being of . . . minor[s]." *Ferber*, 458 U.S. at 756-57 (quotations omitted). An injunction would thwart Tennessee lawmakers' effort to ensure that children are safeguarded from the harmful effects of pornography. The State's interests thus vastly outweigh an illusory harm associated with requiring adults to identify themselves to access websites with large volumes of obscene material harmful to minors.

*Third*, the public interest also cuts against the Court's intervention. Protecting the well-being of children is a paramount state interest, and the PTMA furthers that interest by shielding kids from exposure to sexual/sadomasochistic performances that are obscene. "It's in the public interest that [this Court] give effect to the will of the people by enforcing the laws they and their representatives enact." *Thompson*, 976 F.3d at 619. This Court should decline to grant the "drastic and extraordinary remedy" of injunctive relief, *Monsanto Co.*, 561 U.S. at 165—particularly given Plaintiffs' delay in filing their complaint and preliminary injunction motion.[4] *See Jones v. Markiewicz-Qualkinbush*, 842 F.3d 1052, 1062 (7th Cir. 2016) (a three-month delay in seeking a preliminary injunction "outweighed any countervailing harm to" plaintiffs).

## CONCLUSION

For all these reasons, this Court should deny Plaintiffs' motion for preliminary injunction.

---

[4] The PTMA was signed by the Governor on May 28, 2024, PTMA, Ex. 1, but Plaintiffs did not file suit until November 26, 2024—a delay of 5 months and 29 days.

Respectfully submitted,

*/s/ Zachary L. Barker__*
ZACHARY L. BARKER, BPR # 035933
Senior Assistant Attorney General

HARRISON GRAY KILGORE
Strategic Litigation Counsel and
Assistant Solicitor General

Office of the Tennessee Attorney General
P.O. Box 20207
Nashville, Tennessee 37202
(615) 741-8726
Zachary.Barker@ag.tn.gov
Harrison.Kilgore@ag.tn.gov

*Counsel for Defendant*

28

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served via the Court's electronic filing system on this 16th day of December, 2024 to all counsel of record:

D. Gill Sperlein
THE LAW OFFICE OF D. GILL SPERLEIN
345 Grove Street
San Francisco, CA 94102
gill@sperleinlaw.om

Gary E. Veazey
JOHNSON GRUSIN KEE & SURPRISE
780 Ridge Lake Boulevard, Ste. 202
Memphis, TN 38119
gveazey@jglawfirm.com

James M. Allen
ALLEN LAW FIRM PLLC
780 Ridge Lake Boulevard, Ste. 202
Memphis, TN 38120-9426
jim@jmallenlaw.com

Edward M. Bearman
780 Ridge Lake Boulevard, Ste. 202
Memphis, TN 38120
ebearman@jglawfirm.com

/s/ Zachary L. Barker
Zachary L. Barker
Office of the Tennessee Attorney General
P.O. Box 20207
Nashville, Tennessee 37202
Zachary.Barker@ag.tn.gov

*Counsel for Defendant*

29