**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | | |
|---|---|---|
| FREE SPEECH COALITION, INC, et al., | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 2:24-cv-02933-SHL-tmp |
| JONATHAN SKRMETTI, in his official capacity as THE ATTORNEY GENERAL OF TENNESSEE, | ) ) ) | |
| Defendant. | ) | |

**ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

The First Amendment is not shy in its protective sweep.  It sits at the top of our Bill of Rights as the "star in our constitutional constellation" because its light reaches orthodox and unorthodox expression alike.  303 Creative LLC v. Elenis, 600 U.S. 570, 584–85 (2023) (quoting West Virginia Bd. of Educ. v. Barnette, 319 U.S. 624, 642 (1943)).  To be sure, freedom of speech is not absolute.  But the door preventing the state from intruding into this area "must be kept tightly closed and opened only the slightest crack necessary" to promote state interests.  Stanley v. Georgia, 394 U.S. 557, 563 (1969) (quoting Roth v. United States, 354 U.S. 476, 488 (1957)).  Based on the record at this stage, it appears that Tennessee has wedged its foot in the door farther than the Constitution will likely tolerate.

The Protect Tennessee Minors Act stands in a graveyard full of similar content-based restrictions at the state and federal level that lived—and died—before it.  It imposes criminal and civil liability on any individual or commercial entity that publishes a website comprised of one-third content that is harmful to minors without first verifying that each visitor is at least eighteen years old.  2024 Tenn. Pub. Acts, ch. 1021, § 1 (to be codified at Tenn. Code Ann. § 39-17-912) ("PTMA").  Plaintiffs seek to enjoin the Attorney General from enforcing the PTMA before it

becomes effective on January 1, 2025.  Not only does the PTMA suffer from the same First

Amendment fatalities as the state and federal laws that came before it, it also uniquely

exacerbates those shortcomings in its overbreadth.

The legislature has a compelling interest in protecting children from harmful content, and

that is uncontested.  But in its attempt to protect children, the State will unavoidably suppress a

large amount of speech that adults have a First Amendment right to give and receive.  See Reno

v. ACLU, 521 U.S. 844, 874 (1997).  The legislature's goal, however admirable, does not allow

it to undermine an adult's freedom of speech.  Neither the legislature nor this Court can turn a

blind eye to the Constitution.  See ACLU v. Gonzales, 478 F. Supp. 2d 775, 820 (E.D. Penn.

2007) ("I may not turn a blind eye to the law in order to attempt to satisfy my urge to protect this

nation's youth by upholding a flawed statute, especially when a more effective and less

restrictive alternative is readily available . . . .").  As a result, Plaintiffs' motion for a preliminary

injunction is **GRANTED**.

## BACKGROUND

## I.    THE PTMA

Tennessee is the latest state to succumb to the tidal wave of internet regulations sweeping

across the country.  These laws all have one important objective in common: they seek to protect

children from an online Wild West, where anything and everything is easily accessible, even

pornography.  To achieve this goal, the Tennessee General Assembly cobbled together the

PTMA from a patchwork of language recycled from similar types of state and federal legislation

that unfortunately suffer from constitutional infirmities.

The PTMA regulates internet content that Tennessee deems "harmful to minors."  PTMA

§ (c).  While it directly targets internet pornography, its reach is much broader.  The PTMA

equally captures three different types of expression: (1) content that is "sexually explicit and harmful or inappropriate for minors,"[1] (2) content "designed to appeal to or pander to the prurient interest," and (3) content depicting genitalia and sexual contact. PTMA § (b)(5)(A)(i)–(ii) (emphasis added). If the expression fits into one of these three categories, then it is considered "content harmful to minors" unless it contains "serious literary, artistic, political, or scientific value for minors." PTMA § (b)(5)(B).

When one-third of the total amount of data[2] on a website is comprised of "content harmful to minors," that website must use a "reasonable age-verification method" to confirm that each user is at least eighteen years old. PTMA § (c)(1). The website must re-verify the age of each user every hour. PTMA § (b)(2), (c)(2). To verify a user's age, the website can require the user to photograph their face on their device and upload a copy of their government-issued identification so that the website can match the two images. PTMA § (b)(11)(A). The website can also use a "commercially reasonable method," which is not further defined. PTMA § (b)(11)(B). Either method will shield the website from liability as long as it is "implemented in a manner not easily bypassed or circumvented." PTMA § (b)(11).

---

[1] In his opposition brief, the Attorney General asserts that this portion of the standard is "sexually explicit" and "harmful or inappropriate for minors," as outlined above. (ECF No. 27 at PageID 372.) Plaintiffs also interpret the language this way. (ECF No. 2-6 at PageID 233–34.) However, at the hearing on Plaintiffs' motion, Counsel for the AG contradicted his brief. He clarified that "inappropriate for minors" is not modified by "sexually explicit" and stands on its own, such that this portion of the standard would be divided into two: "sexually explicit and harmful" or "inappropriate for minors." (ECF No. 34 at PageID 791.) This is how the Court reads the PTMA. (Id.) However, because the language is likely unconstitutional either way, the Court adopts the narrow construction consistent with the parties' briefing for purposes of this Order.

[2] Plaintiffs are concerned about how to quantify their content for purposes of the one-third threshold. (ECF No. 2-3 at ¶ 8 ("I do not know whether to evaluate the running time of the videos, the lines of code required to display the videos, the size of the files containing viewable content, or some other metric. For that matter, I do not know how to compare text to photos, or photos to videos.").) The Court need not grapple with this issue here, so it remains unanswered.

The consequences for violating the PTMA are severe. Violators are guilty of a "Class C felony" punishable by up to fifteen years' imprisonment and are "liable to an individual for damages" resulting from a minor's access of the website, "including court costs and reasonable attorney fees." PTMA § (e)(1), (i). The Attorney General may also "bring any appropriate action" against "a commercial entity that fails to comply." PTMA § (j). The severity of these consequences and the breadth of the PTMA prompted Plaintiffs to initiate this action for declaratory and injunctive relief. (ECF No. 2-6 at PageID 233.)

## II.    PLAINTIFFS[3]

Plaintiffs are a collection of non-profits, for-profits, and individuals who joined together to challenge the PTMA. They include Free Speech Coalition, Inc.; Deep Connection Technologies, Inc.; JFF Publications, LLC; PHE, Inc.; and MelRose Michaels.

Free Speech Coalition is a not-for-profit trade association that represents "hundreds of businesses and individuals involved in the production, distribution, sale, and presentation" of constitutionally protected material to consenting adults on the internet. (ECF No. 2-2 at ¶ 3.) Deep Connection, JFF, and PHE all operate websites containing content that the PTMA deems "harmful to minors." (ECF No. 27-3 at ¶¶ 7–12, 16–18, 20–26; ECF No. 2-2 at ¶ 3; ECF No. 2-1 at ¶ 9; ECF No. 2-3 at ¶ 4; ECF No. 2-4 at ¶¶ 6, 10.) And Michaels is an individual working in the adult entertainment industry. (ECF No. 2-5 at ¶ 4.)

While the website Plaintiffs all host content that is sexual in nature, that content is not necessarily pornographic. For example, Deep Connection operates O.School, an online platform

---

[3] Unless otherwise noted, this information comes from the Complaint and the Declarations of Andrea Barrica, Alison Boden, Chad Davis, Dominic Ford, MelRose Michaels, and Marian Schmidt. Ford and Michaels are both proceeding under their pseudonyms after the Court granted their unopposed motion to do so on December 23, 2024. (ECF No. 32.)

designed to "help people improve their sexual health, power, and confidence." (ECF No. 2-1 at ¶

4.) O.School provides tens of thousands of Tennesseans with sex education appropriate for

adults and older minors. (Id. at ¶¶ 4, 9.) O.School publishes articles discussing topics like

"continuous consent in long-term relationships"[4] and how to support a partner struggling with

body image issues.[5] While O.School also publishes articles containing "detailed descriptions of

sexual acts," these descriptions are not pornographic—they are designed to educate. (ECF No.

27-3 at ¶¶ 15–18; ECF No. 2-1 at ¶ 4.)

Plaintiffs are a diverse group of entities and individuals, but they all have one thing in

common: they could each face liability under the PTMA.

## III.    PARTIES' ARGUMENTS

Plaintiffs bring this action for declaratory and injunctive relief, seeking to invalidate the

PTMA as unconstitutional and enjoin its enforcement statewide. They seek a preliminary

injunction to "stave off irreparable injury" before a final determination on the merits of their

claims. (ECF No. 3-2 at PageID 272.) The Attorney General opposes their request.

In support of their motion, Plaintiffs assert that the PTMA is a content-based restriction

on constitutionally protected speech that is subject to a strict scrutiny analysis. (ECF No. 2-6 at

PageID 241.) Because it is neither narrowly tailored to serve the State's interest in protecting

minors nor the least restrictive means of achieving that goal, Plaintiffs assert that it violates the

---

[4] Navigating Consent in Long-Term Relationships, O.SCHOOL (Apr. 16, 2024),
https://www.o.school/article/navigating-consent-in-long-term-relationships.
[5] 10 Ways to Support a Partner Struggling with Body Image Issues, O.SCHOOL (Mar. 11, 2022),
https://www.o.school/article/how-to-help-someone-with-body-image-issues.

First Amendment on its face.[6] (Id. at PageID 244–253.)  As a result, Plaintiffs ask the Court to preliminarily enjoin its enforcement.

The AG first challenges Plaintiffs' standing to bring their claims.  (ECF No. 27 at PageID 364–65.)  He asserts that Plaintiffs do not have standing because a preliminary injunction against him would not redress the harm posed by criminal and private enforcement.  (Id. at PageID 365–66.)  He also argues that Plaintiffs cannot demonstrate a certainly impending threat of enforcement that would infringe on a constitutional interest because there is no constitutional interest in disseminating obscenity to minors.  (Id. at PageID 366–69.)  Even if Plaintiffs do have standing, the AG asserts that the PTMA is not a content-based restriction.  (ECF No. 34 at PageID 794–95.)  Instead, he frames it as a constitutional restriction on the audience capable of viewing sexually expressive content, which is only subject to rational basis review—but he asserts that it would survive even under a strict scrutiny analysis.  (Id.; ECF No. 27 at PageID 371–84.)

"[T]his case is not close."  See Free Speech Coal., Inc. v. Rokita, No. 1:24-cv-00980-RLY-MG, 2024 WL 3228197, at *18 (S.D. Ind. June 28, 2024).  As explained below, the PTMA is an explicit restriction on "content harmful to minors," even if that content is protected for adults.  While it may be designed to prevent minors from accessing pornography, a laudable objective, it does much more than that—it prevents minors from viewing sexual content that is merely "inappropriate" for them, regardless of whether it is pornographic or not.  And it does so by quarantining that content from both adults and minors alike.  The PTMA effectively reduces Tennessee's adult population to viewing only what the legislature deems is "fit for children,"

---

[6] Because the Court finds that there is a strong likelihood that the PTMA violates the First Amendment, it does not reach Plaintiffs' other claims.

unless websites are willing to pay to verify the ages of their users, and unless those users are

willing to give up their privacy to access those websites.  See Reno, 521 U.S. at 875 (quoting

Denver Area Educ. Telecomm. Consortium v. FCC, 518 U.S. 727, 759 (1996)).

In its crusade against internet pornography, Tennessee would "burn the house to roast the

pig."  See Butler v. Michigan, 352 U.S. 380, 383 (1957).  The First Amendment undoubtedly

requires more precision than this kind of scorched-earth approach.  Thus, Plaintiffs' motion is

**GRANTED**, as discussed below.

## LEGAL STANDARD

A preliminary injunction is an extraordinary remedy.  Munaf v. Geren, 553 U.S. 674,

659–60 (2008).  It should only be granted when the balance of interests weighs in favor of the

moving party.  Liberty Coins, LLC v. Goodman, 748 F.3d 682, 690 (6th Cir. 2014).  The court

must examine whether (1) the plaintiff "has a strong likelihood of success on the merits," (2) the

plaintiff "would suffer irreparable injury absent the injunction," (3) "the injunction would cause

substantial harm to others," and (4) the injunction would serve the "public interest."  Bays v.

City of Fairborn, 668 F.3d 814, 818–19 (6th Cir. 2012).

In most cases, a single factor is not determinative.  Id. at 819.  But in First Amendment

cases, the analysis collapses into whether the plaintiff is likely to succeed on the merits.[7]  Liberty

---

[7] Relying on Judge Nalbandian's concurrence in D.T. v. Sumner County Schools, 942 F.3d 324,
328 (6th Cir. 2019) (Nalbandian, J., concurring), the AG asserts that Plaintiffs must separately
establish all four factors irrespective of Plaintiff's likelihood of success on the merits, and he
asks the Court to disregard Sixth Circuit precedent suggesting otherwise.  (ECF No. 27 at
PageID 364.)  The Sixth Circuit, however, has been consistently clear that the "crucial inquiry"
in a First Amendment case is the likelihood of success on the merits because the other factors
"entirely depend" on the constitutionality of the state action.  Bays, 668 F.3d at 819; see
Hamilton's Bogarts, Inc. v. Michigan, 501 F.3d 644, 649 (6th Cir. 2007); Nightclubs, Inc. v. City
of Paducah, 202 F.3d 884, 888 (6th Cir. 2000).  Thus, the Court will consider all four factors, but
success on the first will almost always be dispositive.  See Fischer v. Thomas, 52 F.4th 303, 307
(6th Cir. 2022) ("Before issuing an injunction pending appeal, we usually consider four factors.

Coins, 748 F.3d at 689–90.  The remaining factors "largely depend" on the constitutionality of

the state action.  Bays, 668 F.3d at 819.  It is "well-settled" that a violation of the First

Amendment "unquestionably constitutes irreparable injury" to the plaintiff.  Liberty Coins, 748

F.3d at 690 (quoting Connection Distrib. Co. v. Reno, 154 F.3d 281, 288 (6th Cir. 1998)).  And

the public will always have an interest in preventing the violation of a party's First Amendment

rights.  Id.  This interest can only be vindicated by enjoining enforcement of a law that is

probably unconstitutional.  Id.

## ANALYSIS

## I.    LIKELIHOOD OF SUCCESS ON THE MERITS

Plaintiffs can only succeed on the merits if the Court can reach the merits.  See Online

Merchants Guild v. Cameron, 995 F.3d 540, 547 (6th Cir. 2021) ("To succeed on the merits, a

party must first reach the merits, and to do so it must establish standing.").  Because standing is

a threshold jurisdictional inquiry, and because the AG asserts that Plaintiffs do not have it, the

Court begins here.

### A.    Standing

Federal courts can only hear "Cases" and "Controversies."  U.S. Const. art. III, § 2.  This

constitutional limitation on jurisdiction requires at least one plaintiff to have standing to sue.

McKay v. Federspiel, 823 F.3d 862, 866 (6th Cir. 2016) (quoting Susan B. Anthony List v.

Driehaus, 573 U.S. 149, 157 (2014)).  A plaintiff has standing to sue when she can show (1) an

"injury in fact" that is both (2) "fairly traceable" to the defendant and (3) capable of being

---

But in First Amendment cases, only one question generally matters to the outcome: Have the
plaintiffs shown a likelihood of success on the merits of the First Amendment claim?").

"redressed" by the court.  Id. at 867 (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560

(1992)).

Plaintiffs have the burden to establish standing at every stage of the litigation process.

Carney v. Adams, 592 U.S. 53, 59 (2020).  They must prove standing with the same degree of

specificity required at each successive stage.  McKay, 823 F.3d at 867 (quoting Lujan, 504 U.S.

at 561).  As a result, the plaintiff's burden grows as the case progresses.  Id.  A plaintiff can rely

on mere allegations to establish standing at the early pleading stage, but she must present specific

evidence to do so in response to a summary judgment motion.  Id. (quoting Lujan, 504 U.S. at

561).  Because Plaintiffs are now at the preliminary injunction stage, they only need to establish

a "clear showing" that they are "likely" to have standing.  Murthy v. Missouri, 603 U.S. 43, 58

(2024) (citing Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008)).

The AG incorrectly asserts that Plaintiffs failed to establish a likelihood of any of the

required elements.  The Court addresses each one in turn.

1.    Injury

An injury must be "actual or imminent"—hypothetical harm is not sufficient.  Online

Merchants, 995 F.3d at 547 (quoting Spokeo, Inc. v. Robins, 578 U.S. 330, 339 (2016)).  But this

requirement does not undercut a plaintiff's ability to plead an injury prior to enforcement of an

unconstitutional law.  Berry v. Schmitt, 688 F.3d 290, 296 (6th Cir. 2012) ("Where a plaintiff

alleges that state action has chilled his speech, 'it is not necessary that [he] first expose himself to

actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise

of his constitutional rights.'" (quoting Steffel v. Thompson, 415 U.S. 452, 459 (1974))).  A

plaintiff can show injury prior to enforcement when she alleges that (1) she intends to "engage in

a course of conduct arguably affected with a constitutional interest," (2) her intended conduct is

"proscribed by statute," and (3) her intended conduct gives rise to a certain threat of prosecution. McKay, 823 F.3d at 867.

The AG does not contest that Plaintiffs' intended speech is proscribed by the PTMA. (See ECF No. 27 at PageID 366.)  Instead, he argues that Plaintiffs have no constitutional interest in displaying indecent material to minors and do not suffer from a certainly impending threat of enforcement.  (Id.)  But Plaintiffs have never claimed an interest in allowing minors to view unprotected material.  Rather, they primarily seek to allow adults to view protected speech, and they have sufficiently alleged a certain threat of prosecution because the PTMA objectively chills that speech.

*i.    Constitutional Interest*

The AG's emphasis on the lack of a constitutional interest in displaying obscene material to minors is misplaced.  The major thrust of Plaintiffs' motion rests on their constitutional interest in providing protected material to <u>adults</u> and the corresponding interest that <u>adults</u> have in receiving that material.  (ECF No. 28 at PageID 434–35.)  The only constitutional interest they assert involving minors is their interest in displaying material that is <u>not</u> considered obscene for minors under well-established obscenity standards.  (Id. at PageID 435 n.2.)

The AG mistakenly relies on the Sixth Circuit's opinion in <u>Friends of George's v. Mulroy</u>, 108 F.4th 431 (6th Cir. 2024), to assert that Plaintiffs cannot point to a constitutional interest affected by the PTMA.  (ECF No. 27 at PageID 368.)  But the constitutional interest at stake in <u>Friends of George's</u> was an adult's ability to put on adult-oriented performances for minors, not for adults.  <u>Friends of George's</u>, 108 F.4th at 436.  In that case, the plaintiff challenged Tennessee's Adult Entertainment Act on First Amendment grounds.  Id. at 434.  The AEA prohibits "adult-oriented performances that are harmful to minors" on public property or in

10

a location where the performances could be viewed by a minor.  Id. at 433 (citing Tenn. Code
Ann. §§ 7-51-1407(c)(1), -1401(3)(A)).  The AEA's definition of "harmful to minors" explicitly
incorporated Tennessee's obscenity-for-minors standard, which prevented minors from accessing
patently offensive sexual material that appeals to the prurient interest when it "lacks serious
literary, artistic, political, or scientific" value for minors.  Id. at 433–34.

The plaintiff was a "drag-centric theater group," and it asserted that its performances
"absolutely" have value for a seventeen-year-old.  Id.  However, it brought a First Amendment
challenge against the AEA just in case the District Attorney disagreed.  Id. at 436.  The Sixth
Circuit held that the plaintiff, given its own position on the value of its performances for minors,
could not establish standing because it could not establish an intent to violate the AEA.  Id. at
437–38.  Because the proof offered was that the plaintiff's performances held value for minors,
the AEA would not prevent the plaintiff from performing to minors.  Id.

After the court determined that the plaintiff lacked standing because it could not show an
intent to violate the AEA, the court went on to address whether the plaintiff's conduct implicated
a constitutional interest.[8]  The plaintiff did not perform drag shows in public, but it argued that
the AEA infringed on its First Amendment right to sell tickets to its shows to older minors, and
that was the constitutional interest assessed by the court.  Id. at 435–39.  Because the AEA
defined "minor" as anyone under the age of eighteen, the plaintiff asserted, and the district court
agreed, that the AEA infringed on seventeen-year-old's right to view content that may be

_____

[8] Despite the AG's heavy reliance on this portion of the Sixth Circuit's opinion, it is all dicta.
The court did not have to reach the issue of whether the plaintiff had a constitutional interest in
performing its drag shows to minors because it had already decided that the plaintiff failed to
show an intent to engage in conduct proscribed by the statute—it only reached the issue of
establishing a constitutional interest for the sake of addressing each element.  Friends of
George's, 108 F.4th at 435–38.  However, because the AG relies on this dictum so extensively,
the Court reluctantly engages with its substance.

harmful to a nine-year-old.  Id.  The Sixth Circuit, however, relied on a previous opinion from

the Tennessee Supreme Court narrowly construing "minor" to mean a reasonable seventeen-

year-old.  Id. at 436 (citing Davis-Kidd Booksellers, Inc. v. McWherter, 866 S.W.2d 520, 522–

23, 528 (Tenn. 1993)).  After narrowly construing the term "minor," the court held that there was

no constitutional interest at stake because the AEA did not infringe on plaintiff's right to perform

for seventeen-year-olds.  Id. at 439.

The holding in Friends of George's is inapposite here for that very reason—the Sixth

Circuit never substantively addressed an adult's constitutional interest in communicating and

receiving protected material for adults.  Despite this difference in posture, the AG latches onto

the single instance in which the Sixth Circuit offhandedly mentioned protected adult speech.

After finding that a minor's constitutional interest was not at stake, the Sixth Circuit stated in

dicta that the "only constitutionally protected expressions implicated by the AEA are adult-

oriented performances that can be constitutionally restricted from minors but not from adults,"

which it considered "a narrow slice of speech."  Id. at 438–39.  The AG asserts that the PTMA

implicates this same "narrow slice of speech."  (ECF No. 27 at PageID 367.)  But his analogy

ignores both the breadth of the PTMA and the weight of the burden at issue here.

The AEA only regulates "adult-oriented performances" featuring "topless dancers, go-go

dancers, exotic dancers, strippers, male or female impersonators, or similar entertainers."

Friends of George's, 108 F.4th at 433.  The PTMA regulates websites.  This distinction alone is

dispositive—it is "no exaggeration to conclude that the content on the internet is as diverse as

human thought."  Reno, 521 U.S. at 852.  An adult-oriented performance is certainly a "narrow

slice of speech" compared to the staggering amount of diverse content available on a single

website, which can publish "material about topics ranging from aardvarks to Zoroastrianism."

See Ashcroft v. ACLU, 535 U.S. 564, 566 (2002).  And the PTMA regulates these websites irrespective of the staggering amount of constitutionally protected material they host.  Two-thirds of the total amount of content on a website could be constitutionally protected speech for both adults and minors, but that speech is still burdened by the age-verification restriction if one-third of the content is deemed "harmful to minors."  PTMA § (b)(13).

Despite acknowledging some burden on adult speech, the AG emphasizes that this speech is not banned, it is merely restricted to adults only, just like the performances at issue under the AEA.  (ECF No. 27 at PageID 367.)  But the "distinction between laws burdening and banning speech is but a matter of degree."[9]  United States v. Playboy Ent. Grp., Inc., 529 U.S. 803, 812 (2000).  It is irrelevant that the PTMA does not impose a complete ban—there is a constitutional interest at stake all the same.  See id.

The Court finds that Plaintiffs have sufficiently asserted an intent to engage in a course of conduct arguably affected with a constitutional interest.  See Free Speech Coal., Inc. v. Colmenero, 689 F. Supp. 3d 373, 385 (W.D. Tex. 2023), aff'd in part, vacated in part on different grounds sub nom Free Speech Coal., Inc. v. Paxton, 95 F.4th 263 (5th Cir. 2024), cert. granted, 144 S. Ct. 2714 (2024) (finding a constitutional interest where plaintiffs "seek to produce, distribute, and post legal adult content online, free of overbroad restrictions").  The Court next considers whether they have shown a certainly impending threat of prosecution.

---

[9] The AEA's burden on adult speech is not comparable to the burden at issue here.  There is a stark difference between requiring a brick-and-mortar location to spare one second to check government issued identification and requiring a website to pay a substantial amount of money to a third party to electronically verify a user's age in a manner that is not easily circumvented. Moreover, while an individual attending an event in-person has already given up some modicum of privacy to do so, an adult inside his home using his computer to access a website has not.

ii.    *Certainly Impending Threat of Prosecution*

The AG argues that Plaintiffs cannot establish a certainly impending threat of prosecution under the governing McKay framework.  (ECF No. 27 at PageID 368.)  The McKay court held that "mere allegations of a 'subjective chill' on protected speech are insufficient to establish an injury-in-fact" without "some other indication of imminent enforcement."  McKay, 823 F.3d at 868–69.  A plaintiff alleging a "subjective chill" can only show a certainly impending threat of prosecution when they also "point to some combination of the following factors": (1) "a history of past enforcement against the plaintiffs or others"; (2) "enforcement warning letters sent to the plaintiffs regarding their specific conduct"; (3) "an attribute of the challenged statute that makes enforcement easier or more likely"; and (4) "a defendant's refusal to disavow enforcement of the challenged statute against a particular plaintiff."  Id. at 869.

In proceeding straight to the McKay factors, the AG jumped the gun—he failed to acknowledge the first step in the analysis.  "To identify a credible threat of enforcement, the first and most important" step is to determine "whether the challenged action chills speech."  Fischer v. Thomas, 52 F.4th 303, 307 (6th Cir. 2022) (citing McKay, 823 F.3d at 869).  If the challenged action does chill speech, the court must next decide how it does so.  An "objective chill" refers to "laws or regulations that produce direct injuries," whereas the term "subjective chill" refers to laws or regulations that do not.  Speech First, Inc. v. Schlissel, 939 F.3d 756, 764 (6th Cir. 2019).

If the chill is merely "subjective," then the court should look to the McKay factors to determine whether the speech at issue is sufficiently chilled to indicate a certainly impending threat of prosecution.  McKay, 823 F.3d at 868–69.  The McKay factors exist because a "subjective apprehension and a personal (self-imposed) unwillingness to communicate" can lack "the sufficiently adverse interests necessary to establish standing."  Kareem v. Cuyahoga Cnty.

14

Bd. of Elections, 95 F.4th 1019, 1023 (6th Cir. 2024) (quoting Morrison v. Bd. of Educ. of Boyd
Cnty., 521 F.3d 602, 610 (6th Cir. 2008)).  But if the chill on speech is "objective," that chill
alone is sufficient to demonstrate an injury-in-fact, irrespective of the McKay factors, because it
is not self-imposed or voluntary.  Speech First, 939 F.3d at 764–65 (holding that the plaintiff
sufficiently alleged a credible threat of enforcement without reference to the McKay factors
because the plaintiff established an "objective chill").

 The chill on Plaintiffs' speech here is objective, mirroring the injury-in-fact suffered by
the plaintiffs in Virginia v. American Booksellers Association, Inc., 484 U.S. 383 (1988).  In that
case, the Court addressed a Virginia law criminalizing the display of obscene materials to minors
in stores.  Am. Booksellers, 484 U.S. at 387.  Several bookstores and bookseller associations
brought a pre-enforcement facial challenge on First Amendment grounds, arguing that the law
burdened the First Amendment rights of adults, "as to whom at least some of the covered works
are not obscene."  Id. at 388.  The Court held that the plaintiffs suffered a pre-enforcement injury
because the law was "aimed directly at plaintiffs, who, if their interpretation of the statute is
correct, will have to take significant and costly compliance measures or risk criminal
prosecution."  Id. at 392; see Birmingham v. Nessel, No. 21-1297, 2021 WL 5712150, at *3 (6th
Cir. Dec. 2, 2021) (recognizing this as the holding in American Booksellers).

 As soon as the PTMA becomes effective—if it ever does—it will produce this same kind
of direct injury.  It objectively chills speech because it is a costly barrier to speech.  Plaintiffs
must either take significant and costly measures to comply with the age verification requirement,
stop operating in Tennessee, or risk civil and criminal prosecution.  See id.  Indeed, this is the
"archetypical pocketbook injury-in-fact that satisfies Article III."  Rokita, 2024 WL 3228197, at
*6 (citing Czyzewski v. Jevic Holding Corp., 580 U.S. 451, 464 (2017) ("For standing purposes,

a loss of even a small amount of money is ordinarily an 'injury.'"))  The Supreme Court found

this to be a sufficient injury in <u>American Booksellers</u>—it is a sufficient injury here as well.  <u>See</u>

<u>Am. Booksellers</u>, 484 U.S. at 392.

Because the Court finds that Plaintiffs have likely established an injury-in-fact, it next

addresses whether Plaintiffs can trace their injury to the AG.  It finds that they can.

### 2.    Traceability

To establish traceability, Plaintiffs need only show that the AG's actions have a "causal

connection" to their injuries.  <u>See</u> <u>Turaani v. Wray</u>, 988 F.3d 313, 316 (6th Cir. 2021).  The AG

argues that Plaintiffs cannot point to a specific injury that is traceable to him because he cannot

criminally prosecute them, and he cannot control whether they are "haled into court by any

number of private individuals."  (ECF No. 27 at PageID 365.)  At the same time, however, he

acknowledges that he has civil enforcement authority over the PTMA, which states that he "may

bring any appropriate action or proceeding" against "a commercial entity that fails to comply."

(<u>Id.</u>)

Because the AG can enforce the PTMA by virtue of his civil enforcement authority,

Plaintiffs' injuries resulting from the threat of his own enforcement are certainly traceable to

him.  The Court finds that Plaintiffs' have likely established traceability and next considers the

AG's arguments about redressability, which are similarly unpersuasive.

### 3.    Redressability

For the same reasons the AG asserts that the Plaintiffs' injuries are not traceable to him,

he argues that they are also not redressable by an injunction against him.  (ECF No. 27 at PageID

365–66.)  He reasons that, because an injunction against him would neither prevent individual

district attorneys general from bringing criminal enforcement proceedings nor stop private

parties from filing civil suits, Plaintiffs cannot show that an injunction would redress their injuries.  (Id.)

It is usually true that an injunction can only bind the parties to the suit.  Fed. R. Civ. P. 65(d)(2).  But it is not clear that this matters here because Plaintiffs assert a facial challenge.  See Rokita, 2024 WL 3228197, at *6 n.9.  The difference between a facial challenge and an as-applied challenge "goes to the breadth of the remedy."  Citizens United v. FEC, 558 U.S. 310, 331 (2010).  If the PTMA is facially unconstitutional as to one person, it follows that it is facially unconstitutional as to all people.  See Rokita, 2024 WL 3228197, at *6 n.9 (quoting Mulholland v. Marion Cnty. Elec. Bd., 746 F.3d 811, 819 (7th Cir. 2014)); John Doe No. 1 v. Reed, 561 U.S. 186, 194 (2010) (stating that injunctive relief in response to a facial challenge reaches "beyond the particular circumstances" of the plaintiffs before the Court)).  The very nature of a facial challenge requires a court to determine "that the law would be unconstitutionally applied to different parties and different circumstances from those at hand."  Sabri v. United States, 541 U.S. 600, 609 (2004); see United States v. Nat'l Treasury Ems. Union, 513 U.S. 454, 477–78 (1995) (recognizing that a facial challenge would "provide relief to nonparties").

Regardless, the remedy need not redress every injury—it must only redress the injury-in-fact.  Rokita, 2024 WL 3228197, at *6 (citing Sprint Comms. Co., L.P. v. APCC Servs, Inc., 554 U.S. 269, 287 (2008)).  Here, Plaintiffs' injury is the threat of enforcement by the AG.  A preliminary injunction against the AG would redress that harm.  Thus, Plaintiffs can likely establish redressability and therefore have standing to bring their claims.  The Court will now address the substance of those claims.

17

B.      First Amendment Claims

The PTMA likely violates the First Amendment.  It is similar to attempts by others states

and the federal government to regulate internet content based on its appropriateness for minors at

the unfortunate expense of adults' constitutional rights.  Because of the breadth of these laws,

federal courts are not strangers to them, and they are not kind to them, either.  See, e.g.,

Colmenero, 689 F. Supp 3d at 416–17 (preliminarily enjoining Texas's age verification law);

Rokita, 2024 WL 3228197, at *12–19 (preliminarily enjoining Indiana's age verification law);

see also Reno, 521 U.S. at 874; Ashcroft v. ACLU, 542 U.S. 656, 664–670 (2004).  The most

basic First Amendment principle is that the "government has no power to restrict expression

because of its message, its ideas, its subject matter, or its content." Brown v. Ent. Merchants

Ass'n, 564 U.S. 786, 790 (2011).  This command does not vary just because the internet makes

it easier to access content that can be harmful.  Id. (quoting Joseph Burstyn, Inc. v. Wilson, 343

U.S. 495, 503 (1952)) ("And whatever the challenges of applying the Constitution to ever-

advancing technology, 'the basic principles of freedom of speech and the press, like the First

Amendment's command, do not vary' when a new and different medium for communication

appears.").

The First Amendment is as clear here as it is anywhere else: a content-based restriction

on protected adult speech is presumptively unconstitutional.  The AG has not shown otherwise,

and it is his burden to do so.

1.      The PTMA's Burden on Protected Adult Speech

In its noble fight to prevent minors from watching pornography on the internet, the

PTMA knocks out a wide range of sexual speech that adults have a constitutional right to access.

The PTMA sequesters this protected adult speech from adults and minors alike by requiring

websites to hide it behind age-verification software.  In doing so, the PTMA forces adult content creators to take costly measures to display constitutionally protected material, and it forces adult content consumers to give up their privacy to access material they have a constitutional right to access.  The PTMA creates this barrier to constitutionally protected speech even if two-thirds of the content available on the website is not deemed harmful to minors.  The State can and should take steps to protect children from harmful content, but it cannot unduly burden all sexual speech in its quest to eliminate obscenity for minors.

Obscenity jurisprudence has come a long way from its "tortured history."  Miller v. California, 413 U.S. 15, 20 (1973).  The obscenity standard laid out in Miller has withstood the test of time, and it has not changed in the fifty years since the Supreme Court established it.  The test is whether (1) "'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest"; (2) "the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law"; and (3) "the work, taken as a whole, lacks serious literary, artistic, political, or scientific value."  Miller, 413 U.S. at 24 (internal citations omitted).  If a community adjudicates a specific type of speech as obscene under the Miller standard, that specific type of speech receives no constitutional protection in that community.  Id.

But just because speech is sexual does not make it obscene.  Reno, 521 U.S. at 874 (quoting Sable Comms. of Cal., Inc. v. FCC, 492 U.S. 115, 126 (1989)) ("[S]exual expression that is indecent but not obscene is protected by the First Amendment.").  Sexual speech can be protected speech.  Id.  And when a content-based restriction unduly burdens constitutionally protected speech, it is subject to strict scrutiny.  The Supreme Court has been unwavering in its application of this principle.  See Sable, 492 U.S. at 126 (applying strict scrutiny to a law

regulating "sexual expression which is indecent but not obscene" because that expression "is protected by the First Amendment"); Reno, 521 U.S. at 874 (applying strict scrutiny to a law denying minors access to "harmful" internet content because it "effectively suppresses a large amount of adult speech that adults have a constitutional right to receive and to address to one another"); Playboy, 529 U.S. at 811–13 (applying strict scrutiny to a law regulating "indecent" and "sexually explicit adult programming" because it is a "content-based speech restriction" on "protected speech"); Ashcroft, 542 U.S. at 670 (applying strict scrutiny to a law regulating internet content that is harmful to minors because it is a content-based restriction on protected adult speech). "To do otherwise would be to do less than the First Amendment commands." Ashcroft, 542 U.S. at 670. But the AG argues that this Court should do otherwise.

> i.    *Ginsberg's* Scope

The AG asserts that the PTMA is only subject to rational basis review even though it burdens protected adult speech, based on the Supreme Court's holding in Ginsberg v. New York, 390 U.S. 629 (1968). (ECF No. 27 at PageID 371.) But Ginsberg held that rational basis review applies to laws that burden a minor's ability to access material that is obscene for minors—the law at issue there did not burden an adult's ability to access constitutionally protected material. Ginsberg, 390 U.S. at 634–38. In Ginsberg, the Court addressed a First Amendment challenge to a New York law that criminalized the knowing sale of material to minors that would be obscene for minors, regardless of whether that material would be obscene for adults. Id. at 631. The law at issue in Ginsberg had adapted the Miller standard to minors by regulating sexual content that (1) "predominantly appeals to the prurient, shameful or morbid interest of minors"; (2) "is patently offensive to the prevailing standards in the adult community as a whole with respect to what is suitable material for minors"; and (3) "is utterly without redeeming social importance for

minors." Id. at 646. The plaintiff challenged the law after he was criminally prosecuted for selling a sexual magazine to a minor, arguing that the law violated a minor's constitutional right to access that material. Id.

The Court disagreed, concluding that the law did not invade "minors' constitutionally protected freedoms" because "the power of the state to control the conduct of children reaches beyond the scope of its authority over adults." Id. at 638 (quoting Prince v. Commonwealth of Massachusetts, 321 U.S. 158, 170 (1944)). The Court recognized that speech could be protected for adults at the same time that it was not protected for minors. Id. Importantly, the Court found that the law did not impose a burden on adults because nothing prevented the plaintiff from selling his magazines to adults. Id. at 634–35.

The difference here is obvious. The PTMA does prevent adults from publishing and accessing protected content. Plaintiffs argue that the PTMA burdens "content providers that want to publish constitutionally-protected materials on the internet." (ECF No. 3-2 at PageID 280.) They assert that the PTMA "sweeps within its ambit a broad swath of content" that "adults have a First Amendment right to share and receive without state interference." (Id.) Not only is the PTMA a cost-prohibitive restriction on a website's ability to host protected adult speech, but it also deters adults from accessing content they have a legal right to access. (ECF No. 2-1 at ¶ 10 ("Because [O.School] operates at very low margins, age-verifying every user will be so expensive as to put O.School out of business.")); see ACLU v. Ashcroft, 322 F.3d 240, 259 (3d Cir. 2003) (finding that an online age-verification law "will likely deter many adults from accessing restricted content because they are unwilling to provide identification information in order to gain access" out of "fear" that their privacy will be compromised).

21

The AG spills a lot of ink discussing the State's ability to regulate speech for minors, but Ginsberg is inapposite where the challenged burden is on adults. The Supreme Court has since made this clear. In Reno, the Court addressed a facial challenge to a provision of the Communications Decency Act that criminalized the "indecent transmission" and "patently offensive display" of "obscene or indecent" messages to minors. Reno, 521 U.S. at 858–60. The Court affirmed that sexual expression that is indecent but not obscene is protected by the First Amendment and recognized that Congress's attempt to prevent minors from accessing harmful material "effectively suppresses a large amount of speech that adults have a constitutional right to receive and to address to one another." Id. at 874. Because the law unnecessarily suppressed protected adult speech, the Court held that strict scrutiny, not rational basis review under Ginsberg, was appropriate. Id. at 874–75. Even though the government has an interest in protecting minors, that "interest does not justify an unnecessarily broad suppression of speech addressed to adults." Id. at 875.

After Reno, Congress tried again, but the Court stood its ground. The Child Online Protection Act made it illegal to post content online for commercial purposes if that content was "harmful to minors." Ashcroft, 542 U.S. at 661–62. Unlike the CDA, COPA defined "harmful to minors" by explicitly incorporating the obscenity-for-minors standard from Ginsberg. Id. The only way to avoid liability was to verify the age of anyone visiting the website. Id. In addressing the applicable standard of review, the Court reiterated its holding from Reno: a law that "effectively suppresses a large amount of speech that adults have a right to receive and to address to one another" is subject to strict scrutiny. Id. at 665 (quoting Reno, 521 U.S. at 874). No one contested that COPA burdened protected adult speech. Id. The Court strictly scrutinized the law and affirmed the district court's grant of a preliminary injunction against COPA's

22

enforcement without any reference to Ginsberg at all.  Id. at 664–70.  The PTMA is a "dead ringer" for COPA.  See Rokita, 2024 WL 3228197, at *18.

Here, the AG argues that neither Reno nor Ashcroft overturned Ginsberg, and that is true. But Plaintiffs do not argue that Ginsberg is bad law; they correctly argue that it does not apply here, where their challenge focuses on an adult's ability to distribute and access speech that is constitutionally protected for adults.  The Supreme Court has never used Ginsberg to apply rational basis review to a content-based restriction that burdens protected adult speech—"[N]o such cases exist."  Paxton, 95 F.4th at 294 (Higginbotham, J., dissenting).

Because there is no Supreme Court precedent applying Ginsberg in this context, the AG relies on the Fifth Circuit's decision in Free Speech Coalition, Inc. v. Paxton, where the court addressed a similar age verification requirement in Texas.  (ECF No. 27 at PageID 372.)  In Paxton, the Fifth Circuit reversed the district court's grant of a preliminary injunction because it held that strict scrutiny did not apply.  Paxton, 95 F.4th at 269.  Instead, the court applied rational basis review under Ginsberg because it decided that it was not beholden to the Supreme Court's decision in Ashcroft.  Paxton, 95 F.4th at 273–74.  The court recognized that Ashcroft supplied the plaintiffs with the "best ammunition" against the age verification law.  Id.  But it questioned the soundness of that decision, pointing to "startling omissions" in the Supreme Court's reasoning.  Id.  The Fifth Circuit wondered why Ashcroft included "no discussion of rational-basis review under Ginsberg."  Id.  The Fifth Circuit found it "particularly surprising" that the Ashcroft Court did not distinguish Ginsberg "considering that the Court in Reno felt the need to distinguish [it] at length."  Paxton, 95 F.4th at 274.

This Court concludes that the Ashcroft Court did not discuss Ginsberg because it explicitly cited to Reno for the appropriate standard of review.  See Ashcroft, 542 U.S. at 665

(quoting Reno, 521 U.S. at 874). In Reno, the Court soundly rejected the argument that Ginsberg applies when the law burdens protected adult speech. Reno, 521 U.S. at 874. And that is exactly why the Fifth Circuit's concern is misplaced—the Court did not need to rehash the entire discussion from Reno when it could just cite to Reno instead. The suggestion that the Ashcroft Court "did not rule on the appropriate tier of scrutiny," Paxton, 95 F.4th at 274, is also belied by the fact that Justice Scalia specifically dissented from the majority because he did not agree that strict scrutiny applied, Ashcroft, 542 U.S. at 676 (Scalia, J., dissenting).

To the extent that the AG asks this Court to follow the Fifth Circuit, it will not do so. The Fifth Circuit may have concluded that it was not bound by Ashcroft, but this Court is. See Rokita, 2024 WL 3228197, at *8 ("[D]espite no intervening change in Supreme Court precedent, the Fifth Circuit found that the aforementioned Supreme Court precedents were not binding upon it . . . . However, this court is bound by [Ashcroft].").

Even if the Supreme Court affirms the Fifth Circuit in Paxton, Ginsberg still would not offer the appropriate standard of review here. The PTMA is materially different from Texas's law because it does not incorporate the obscenity standard in Ginsberg. The Texas law defines sexual material that is harmful to minors by incorporating "the well-established Miller standard" as adapted to minors under Ginsberg. Paxton, 95 F.4th at 267. Focusing only on Ginsberg, the Fifth Circuit applied rational basis review because the Texas law regulated "the distribution to minors of speech obscene for minors." Id. at 270 (emphasis altered). Obscenity is not protected expression, and it does not receive heightened review. Miller, 413 U.S. at 20; Ginsberg, 390 U.S. at 642. Plaintiffs correctly point out that Tennessee's law, on the other hand, is not limited to obscenity for either adults or minors.

24

ii.    _Breadth of the PTMA_

The PTMA deviates from the obscenity standard in meaningful ways.  First, it is

disjunctive where the Ginsberg/Miller standard is conjunctive.[10]  The PTMA regulates content

that is "sexually explicit and harmful or inappropriate for minors" or "designed to appeal to or

pander to the prurient interest."  PTMA § (b)(5)(A)(i).  As Plaintiffs point out, "sexually

explicit" material that is "harmful or inappropriate for minors" is subject to the regulation even if

it is not "designed to appeal to or pander to the prurient interest," and vice versa.  (ECF No. 3-2

at PageID 281.)  The AG argues that this is a distinction without a difference because "those

things go hand-in-hand."  (ECF No. 27 at PageID 373.)  But the rule against surplusage requires

---

[10] The full text of the definition appears below:
> (5) "Content harmful to minors" means:
>> (A)(i) Text, audio, imagery, or video the average person, applying contemporary community standards and taking the material as a whole and with respect to minors of any age, would find sexually explicit and harmful or inappropriate for minors or designed to appeal to or pander to the prurient interest; or
>> (ii) Text, audio, imagery, or video that exploits, is devoted to, or principally consists of an actual, simulated, or animated display or depiction of any of the following:
>>> (a) Pubic hair, vulva, vagina, penis, testicles, anus, or nipple of a human body;
>>> (b) Pubic hair, vulva, vagina, penis, testicles, anus, or nipple of a fictitious character's body, or the parts of a fictitious character's body analogous or functionally equivalent to the aforementioned parts of the human body;
>>> (c) Touching, caressing, fondling, or other sexual stimulation of human nipples, breasts, buttocks, anuses, or genitals, or the analogous or functionally equivalent parts of a fictitious character's body; or
>>> (d) Sexual intercourse, masturbation, sodomy, bestiality, oral copulation, flagellation, excretory functions, exhibitions, or any other sexual act; and
> (B) When taken as a whole, lacks serious literary, artistic, political, or scientific value for minors.

PTMA § (b)(5).

25

the Court to give effect to every word in the statute.  In re Davis, 960 F.3d 346, 354–55 (6th Cir. 2020).  The Court does not assume that the Tennessee legislature was redundant.  Id.  It would not have added "sexually explicit and harmful or inappropriate for minors" if it did not believe those words conveyed something meaningfully different than "appeals to or panders to the prurient interest."

Even if the Court narrowly construes subpart (i) to make it redundant, this would not save the PTMA.  Subpart (ii) is separated from subpart (i) of subsection (A) by another disjunctive. PTMA § (b)(5)(A).  This means that content that "principally consists of" an enumerated organ or act is subject to the regulation even if it is not "designed to appeal to or pander to the prurient interest" and even if it is not "sexually explicit and harmful or inappropriate for minors."  Id. Moreover, there is no requirement for these forbidden depictions to be patently offensive.  Id.  In essence, "text" that "principally consists of" the words "pubic hair, vulva, vagina, penis, testicles, anus, or nipple" does not even have to be "harmful" for minors to fall under the definition of "content harmful to minors."  Id.  The AG argues that this is irrelevant because the catch-all provision at the end requires that the text be measured by its value.  (ECF No. 27 at PageID 373.)  But that catch-all provision would not solve this problem—just because content may not have serious value for minors does not make it harmful for them.  Plaintiffs emphasize, and this Court agrees, that under the PTMA, the mere phrase "the human nipple" and the symbols "(o)(o)" would be subject to the age-verification requirement so long as they lack serious value for minors, even though they would not qualify as obscene.  (ECF No. 28-2 at PageID 441.)

The AG asserts that these differences between the PTMA and the Ginsberg/Miller standard are not material.  (ECF No. 27 at PageID 372.)  But he acknowledges that "the key" to

the decision in both <u>Paxton</u> and <u>Ginsberg</u> "was that the States had adopted <u>obscenity</u>

definitions." (<u>Id.</u> (emphasis added).)  With the PTMA, Tennessee chose not to adopt an

obscenity definition, and it could have done so—in fact, it has done so before.  The AEA

explicitly incorporates by reference Tennessee's well-established obscenity-for-minors standard,

which faithfully follows long-standing Supreme Court precedent.  <u>Friends of George's</u>, 108 F.4th

at 436 (recognizing the AEA's "harmful to minors" standard, as construed by the Tennessee

Supreme Court, "(1) incorporates the [United States] Supreme Court's three-part obscenity test

from <u>Miller v. California</u> and (2) modifies it to apply to minors" in the same way that the

Supreme Court permitted in <u>Ginsberg</u>).

Instead of incorporating that same <u>Miller/Ginsberg</u> standard, the PTMA completely

rewrites it. <u>Compare</u> Tenn. Code Ann. § 39-17-901(6),[11] <u>with</u> PTMA § (b)(5).  Plaintiffs argue

that this legislative decision produced "a Frankenstein's monster that gestures at the

<u>Miller/Ginsberg</u> standard without coming close to applying it."  (ECF No. 28 at PageID 435 n.2.)

While this description is colorful, it is apt.  By failing to follow the <u>Ginsberg/Miller</u> standard, the

PTMA not only captures more speech that is protected for adults, but it also captures speech that

has traditionally been protected for minors.  Thus, even if the Supreme Court overturns decades

---

[11] Tennessee's traditional obscenity-for-minors standards is defined as follows:
> [A]ny description or representation, in whatever form, of nudity, sexual excitement, sexual conduct, excess violence or sadomasochistic abuse when the matter or performance:
>> (A) Would be found by the average person applying contemporary community standards to appeal predominantly to the prurient, shameful or morbid interests of minors;
>> (B) Is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable for minors; and
>> (C) Taken as whole lacks serious literary, artistic, political or scientific values for minors.

Tenn. Code Ann. § 39-17-901(6).

of precedent and affirms the Fifth Circuit's decision in <u>Paxton</u>, that decision would have no bearing here, where the PTMA intentionally deviates from the <u>Ginsberg/Miller</u> standard in meaningful ways.

The Court will not apply rational basis review under <u>Ginsberg</u> to a law that does not narrowly track the obscenity standard in <u>Ginsberg</u>. The First Amendment requires "precision" when the State "regulates the content of speech." <u>See</u> <u>Reno</u>, 521 U.S. at 874. There is no precision here.

### iii.    *Intermediate Scrutiny*

In the alternative, the AG argues that the PTMA should be subject to intermediate scrutiny. (ECF No. 27 at PageID 375.) He states that the secondary effects doctrine would apply even "if the Court concludes that the PTMA is a <u>content-based</u> law." (<u>Id.</u> (emphasis added).) But, in so arguing, the AG ignores the fact that the secondary effects doctrine only applies to laws that are <u>content-neutral</u>. <u>See</u> <u>Renton v. Playtime Theatres, Inc.</u>, 475 U.S. 41, 48 (1986) (applying the secondary effects doctrine to a "content-neutral" regulation that was justified "without reference to the content of the regulated speech").

The PTMA is not content-neutral. The PTMA explicitly regulates material that is "harmful to minors," and it does so by defining the types of content it considers harmful. PTMA § (b)(5). The AG concedes that "the purpose of the PTMA is to regulate children's access to pornography because of the deep and long-term effects of consuming that content." (ECF No. 27 at PageID 376.) This is the "essence of a content-based regulation" because it is justified based on the content's direct impact on minors. <u>See</u> <u>Playboy</u>, 529 U.S. at 812 (quoting <u>Boos v. Barry</u>, 485 U.S. 312, 321 (1988)).

Consistent with decades of Supreme Court precedent, the Court applies strict scrutiny

because the PTMA is a content-based restriction on protected adult speech.  See Reno, 521 U.S.

at 867–68 (applying strict scrutiny because the law was a content-based restriction on speech and

therefore could not be properly analyzed under the secondary effects doctrine).

        2.      Strict Scrutiny

To survive strict scrutiny, the PTMA must (1) serve a compelling governmental interest,

(2) be narrowly tailored to achieve that interest, and (3) be the least restrictive means of

advancing that interest.  Sable, 492 U.S. at 126.  "This test 'really means what it says': few laws

will survive."  Rokita, 2024 WL 3228197, at *14 (quoting Emp. Div., Dep't of Hum. Res. of Or.

v. Smith, 494 U.S. 872, 888 (1990)).  The PTMA is not one of those few.

Content-based restrictions can be "a repressive force in the lives and thoughts of a free

people."  Ashcroft, 542 U.S. at 660.  To "guard against" this threat, "the Constitution demands

that content-based restrictions on speech be presumed invalid."  Id. (citing R.A.V. v. St. Paul,

505 U.S. 377, 382 (1992)).  As a result, the State has the burden to prove that the PTMA is

constitutional.  See id. (citing Playboy, 529 U.S. at 817).  Everyone agrees that "Tennessee has a

compelling interest in protecting minors from exposure to harmful materials on the internet."

(ECF No. 3-2 at PageID 282.)  Thus, the Court will only address whether the AG has shown that

the PTMA is narrowly tailored to achieve that interest and is the least restrictive means of

advancing that interest.  The AG has not met this substantial burden.

        *i.*      *Narrow Tailoring*

The PTMA is not narrowly tailored to achieve the State's interest in protecting minors

from harmful internet content because internet content does not actually have to be "harmful" to

be subject to the PTMA.  PTMA § (b)(5)(A)(ii) (regulating "text" that "principally consist of"

the "depiction" of the "nipple of a human body" even if it is not patently offensive, "harmful or inappropriate for minors," or "designed to appeal to or pander to the prurient interest").  Internet content does not even have to be obscene to be subject to the PTMA because the PTMA fails to meaningfully track the obscenity standard.  Given the importance of the First Amendment rights at stake, this haphazard drafting does not create confidence that the PTMA was carefully crafted to avoid infringing on those rights.

The State has the burden to prove that the PTMA is narrowly tailored, but the AG could not explain <u>why</u> Tennessee chose not to use the obscenity-for-minors standard it already codified.  (ECF No. 34 at PageID 789 ("Your Honor, that is not something we have in the record or have any sort of knowledge of.  We did cite to some legislative history about [] the PTMA in our brief, but it does not . . . contain any sort of discussion like that.").)  To be sure, this is not a failing on the part of Counsel—it is a failing on the part of the State.

The AG argues that it would be unfair to assume that the legislature intended to capture more speech by rewriting the standard.  (<u>Id.</u> at PageID 790.)  But the AG offers no other explanation for that decision.  If the legislature intended to capture the same amount of speech, it would have just incorporated the obscenity standard, as it did in the AEA.  <u>See</u> <u>Friends of George's</u>, 108 F.4th at 433–34.  By rewriting it to replace conjunctives with disjunctives and to remove key language, the legislature made a conscious decision to capture more speech than the definition it previously penned, speech that is not "patently offensive," "prurient," or even "harmful."  <u>See</u> PTMA § (b)(5)(A).  That alone is enough to find that the PTMA is not narrowly tailored, but it is not the only reason.

The PTMA is also underinclusive in the amount of harmful speech it actually captures.  The AG asserts that the PTMA is the only way to stop a child from "willy-nilly" accessing "the

most despicable content the darkest corners of the internet have to offer."[12]  (ECF No. 27 at PageID 380.)  But, under the PTMA, children do not have to go to the darkest corners of the internet to view pornography—they just have to go to social media websites, the same websites they are most likely to visit in the first place.  See Colmenero, 689 F. Supp. at 393.

Because the total amount of harmful content on a social media website is not likely to meet the PTMA's one-third threshold, minors can visit websites like Reddit or X to view as much pornography as they want, and the PTMA would do nothing to prevent that.  See id. (recognizing that an age verification law with a similar one-third threshold "will likely have a greatly diminished effect because it fails to reduce the online pornography that is most readily available to minors"); Rokita, 2024 WL 3228197, at *16 ("Another option for a minor seeking to circumvent the Act is to just go to a website like Reddit, which is roughly 24% sexually explicit material and thus not required to verify its user's age.  That website has entire subreddits dedicated to sexual material.").  Tennessee is "perfectly willing to 'leave this dangerous, mind-altering material in the hands of children,' so long as the children receive that content from Google, Bing, any newspaper, Facebook, Reddit, or the multitude of other websites not covered."[13]  See Rokita, 2024 WL 3228197, at *15 (quoting Brown, 564 U.S. at 802).

---

[12] The PTMA would not prevent minors from accessing the internet's "darkest corners" because the PTMA would have no effect on the dark web.  (See ECF No. 27 at PageID 380.)  As Plaintiffs' point out, the PTMA may actually have the effect of diverting minors to the dark web, where they will encounter content that is far more harmful than anything available on Plaintiffs' websites.  (ECF No. 2-6 at PageID 252.)  This is even more likely if, as the AG asserts, "nothing stops a child . . . from using a device on which there are no such restrictions" on the types of content they can access.  (See ECF No. 27 at PageID 380.)

[13] Motivated minors can also use a VPN to circumnavigate the age-verification process.  (ECF No. 2-6 at PageID 252; ECF No. 2-2 at ¶ 13.)  A VPN would allow a minor to trick a website into thinking that his device is in a different state, one without age verification requirements.  (Id.)  This technology is free and easy to use.  Rokita, 2024 WL 3228197, at *15.

Ignoring the realities of the internet while regulating internet content "is not how one addresses a serious social problem." Id. at *16 (quoting Brown, 564 U.S. at 802). It is clear that the PTMA is not narrowly tailored, if it is even tailored at all.

### ii. Least Restrictive Means

Ultimately, the PTMA's most glaring flaw is that it is not the least restrictive means of advancing Tennessee's interest in protecting minors from pornography. If there is a less restrictive alterative that would serve the State's purpose, the State "must use that alternative." Playboy, 529 U.S. at 813. Blocking and filtering controls on individual devices are both more effective and less restrictive than the State's suppression of speech at the source. (ECF No. 2-2 at ¶ 13.) These applications are more comprehensive than geography-based age restrictions because they prevent children from accessing harmful content no matter where they go, and they cannot be circumvented with a VPN. (Id.) These programs often come pre-installed on computers and phones, and some are free to download. (Id. at ¶¶ 8–13.) Unlike age-verification requirements at the source, parental controls on a device are highly customizable based on the user's age and sensitivity—they would not prevent adults from accessing protected adult content, but they would prevent minors from accessing it. (Id.) This technology is available, affordable, and effective. (ECF No. 3-2 at PageID 291.)

The Supreme Court reached the same conclusion twenty years ago in Ashcroft. 542 U.S. at 667–68 ("Blocking and filtering software is an alternative that is less restrictive than COPA, and, in addition, likely more effective as a means of restricting children's access to materials harmful to them."). The Court found that filters can "prevent minors from seeing all pornography," not just pornography in a specific state. See id. Today, filtering is still more accurate in identifying and blocking harmful content, it still gives more control to parents, it

imposes no costs on third parties, and it is easy to use.  (ECF No. 2-2 at ¶¶ 8–13.)  It remains a less restrictive means of advancing the State's interest, and the AG's arguments to the contrary are not persuasive.

In fact, the AG's only argument against the effectiveness of parental controls is that they would not prevent a child from using a friend's device to access pornography.  (ECF No. 27 at PageID 380.)  But the PTMA does not even prevent a child from using his <u>own</u> device to access pornography on social media or through a VPN.  The AG acknowledges this, but he confusingly asserts that a minor's ability to circumvent regulated content under the PTMA is a virtue—"that makes the PTMA less restrictive than" parental controls because the PTMA "cannot cover every instance of minors' access to the content."  (ECF No. 27 at 381.)  In arguing that the PTMA is less restrictive, he exposes it for being underinclusive, which is a fatal blow all on its own.  The AG cannot have his cake and eat it too.

The question is not whether the PTMA is effective—the question is whether it would keep more harmful material from minors than less restrictive alternatives.  See <u>Ashcroft</u>, 542 U.S. at 667 ("It is not an answer to say that COPA reaches some amount of materials that are harmful to minors; the question is whether it would reach more of them than less restrictive alternatives.").  The AG himself admits that it does not.  (ECF No. 27 at PageID 381.)  In doing so, he concedes that the PTMA will not be able to do what it is supposed to do—prevent minors from accessing sexual content.  But it would still place an unconstitutional burden on the First Amendment right of an adult to do so.

There is no evidence that the legislature considered the PTMA's tailoring or made any effort to ensure that it was the least restrictive means of advancing its interest.  This is the AG's burden to meet, yet he has not done so.  Based on the arguments and the evidence, the PTMA

fails strict scrutiny.  Plaintiffs have shown a strong likelihood that they will succeed on the merits of their First Amendment claims.  Because they can show a likelihood of success on the merits, the balance of harms also weighs in their favor.

## II.    BALANCE OF HARMS

Because the PTMA likely violates Plaintiffs' First Amendment rights to free speech, they are likely to suffer irreparable harm in the absence of an injunction.  The "loss of First Amendment Freedoms . . . unquestionably constitutes irreparable injury." Liberty Coins, 748 F.3d at 690.  And it is always in the public's interest to prevent the violation of a party's First Amendment rights. Id.  This interest will be vindicated by enjoining the PTMA. See id.  The AG argues that Tennessee's interest in protecting minors will be impaired if the Court grants an injunction.  (ECF No. 27 at PageID 386.)  But this interest would be just as impaired if the PTMA went into effect because it does not actually prevent children from accessing the harmful material it seeks to regulate.  The Court finds that the balance of harms and the public interest favor an injunction.

## SCOPE OF THE INJUNCTION

A facial challenge on First Amendment grounds is an "overbreadth challenge." Speet v. Schuette, 726 F.3d 867, 872 (6th Cir. 2013).  To succeed on their facial challenge, Plaintiffs must show that a substantial number of the PTMA's applications would be unconstitutional. See Moody v. NetChoice, LLC, 603 U.S. 707, 743 (2024).  Even a law with a "plainly legitimate sweep" can be "struck down in its entirety" if its "unconstitutional applications substantially outweigh its constitutional ones." Id.  Plaintiffs have met this burden.

Because the PTMA is a content-based restriction that burdens protected speech, it is subject to strict scrutiny.  It will be subject to strict scrutiny in any situation in which it burdens

protected speech, and it will fail strict scrutiny every time.  That necessarily means that the

PTMA is unconstitutional in a substantial number of its applications.  The AG argues that only a

narrow class of protected speech is implicated here.  Regardless of whether that is true or not—

and, as discussed at length above, it is not—there "is no de minimus exception for a speech

restriction that lacks sufficient tailoring."  See Lorillard Tobacco Co. v. Reilly, 533 U.S. 525,

567 (2001).  Plaintiffs have met their burden to show that the PTMA is facially unconstitutional

because it fails strict scrutiny.

A facial challenge "goes to the breadth of the remedy."  See Citizens United v. Federal

Election Comm'n, 558 U.S. 310, 331 (2010).  If the PTMA is facially unconstitutional as to one

person, it follows that it is facially unconstitutional as to all people.  See Rokita, 2024 WL

3228197, at *6 n.9 (quoting Mulholland v. Marion Cnty. Elec. Bd., 746 F.3d 811, 819 (7th Cir.

2014)); John Doe No. 1 v. Reed, 561 U.S. 186, 194 (2010) (stating that injunctive relief in

response to a facial challenge reaches "beyond the particular circumstances" of the plaintiffs

before the Court).  Facial challenges not only benefit the litigants, they benefit society—they

prevent unconstitutional laws from chilling the First Amendment rights of non-parties.  Sec. of

State of Md. v. Joseph H. Munson Co., Inc., 467 U.S. 947, 958 (1984).  In this context, it is

reasonable to enjoin the PTMA statewide.  See Rokita, 2024 WL 3228197, at *6 (enjoining

Indiana's law statewide); Colmenero, 689 F. Supp. 3d at 416 (enjoining Texas's law statewide).

## CONCLUSION

"If the First Amendment means anything, it means that a state has no business telling a

man, sitting alone in his house, what books he may read and what films he may watch."  Stanley

v. Georgia, 394 U.S. 557, 565 (1969).  The PTMA does just that.  The State's interest in

protecting children is strong, but that does not justify a limitation on adult discourse "to that

35

which would be suitable for a sandbox." <u>Butler</u>, 352 U.S. at 383 (quoting <u>Bolger v. Young Drug</u>

<u>Prods. Corp.</u>, 463 U.S. 60, 74–75 (1983)).  Because the PTMA is a content-based restriction on

protected adult speech that fails strict scrutiny, Plaintiffs' motion is **GRANTED**.

### TERMS OF THE PRELIMINARY INJUNCTION

The Attorney General of Tennessee is **PRELIMINARILY ENJOINED** from enforcing

the Protect Tennessee Minors Act, Tennessee Code Annotated section 39-17-912.  Federal Rule

of Civil Procedure 65(c) requires a prevailing party to provide "security in an amount the court

considers proper."  Thus, Plaintiffs are **ORDERED** to post with the Clerk of Court, no later than

**January 10, 2025**, a surety bond in the amount of $10,000.

**IT IS SO ORDERED,** this 30th day of December, 2024.

s/ Sheryl H. Lipman
SHERYL H. LIPMAN
CHIEF UNITED STATES DISTRICT JUDGE