# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TENNESSEE

|  |  |  |
|---|---|---|
| FREE SPEECH COALITION, INC.; DEEP CONNECTION TECHNOLOGIES, INC.; JFF PUBLICATIONS, LLC; PHE, INC.; and MELROSE MICHAELS, <br><br> Plaintiffs, <br><br> v. <br><br> JONATHAN SKRMETTI, in his official capacity as THE ATTORNEY GENERAL OF TENNESSEE, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. 2:24-cv-02933 <br><br> Judge Sheryl H. Lipman |

## AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs, by their undersigned attorneys, allege as follows:

### INTRODUCTION

1. The "Protect Tennessee Minors Act," codified within Tennessee Code Title 39, Chapter 17 and referred to herein as the "PTMA" or "Law," places substantial burdens on Plaintiff website operators, content creators, and countless others who use the internet by requiring websites to age-verify every internet user before providing access to non-obscene material that meets the State's definition of "harmful to minors." Specifically, and in relevant part, the PTMA subjects to liability any "individual or commercial entity that publishes or distributes in this state a website that contains a substantial portion of content harmful to minors" without first verifying the age of each user via a "reasonable age-verification method." Tenn.

Code Ann. § 39-17-912(c) (2024). That liability is twofold—owed both civilly to "an individual for damages resulting from a minor's accessing the content harmful to minors, including court costs and reasonable attorney fees" (the "civil provision"), and criminally to the State, as violation of the PTMA constitutes a Class C felony punishable by up to 15 years in prison and $10,000 in fines (the "criminal provision"). *Id.* at § 39-17-912(e),(i).

2. Pursuant to 18 U.S.C. § 2201 and 2202, and 42 U.S.C. § 1983 and 1988, this action seeks declaratory and injunctive relief to vindicate rights, privileges, and immunities secured by the Constitution and laws of the United States. The PTMA violates the First and Fourteenth Amendment to, and the Supremacy Clause of, the United States Constitution, because it impermissibly burdens Plaintiffs' exercise of their rights thereunder in myriad ways. To wit:

3. The PTMA violates the First Amendment, as it imposes a content-based burden on protected speech that must survive strict scrutiny or, at best, intermediate scrutiny, yet the poor tailoring is ill-suited to the task of protecting minors from materials they may easily obtain from other sources and via other means.

4. The PTMA also violates the Fourteenth Amendment. As a criminal law that fails to provide a person of ordinary intelligence with fair notice of to whom the PTMA applies, what is required, and what is prohibited, the PTMA is impermissibly vague, violating the procedural component of the Due Process Clause.

5. Finally, by treating website operators as the publishers of material hosted on their websites but produced by other content providers, the PTMA stands in direct conflict with 47 U.S.C. § 230 ("Section 230") and is therefore preempted by that supreme federal law.

6. In its 2024 Term, the Supreme Court addressed a First Amendment challenge to a Texas age verification law and held that a law that aims to protect children from sexual content while

incidentally burdening adult rights is subject to intermediate scrutiny so long as it adheres to

the well-worn obscenity standard established in *Miller* and *Ginsberg*. *See Free Speech*

*Coalition, Inc. v. Paxton*, No. 23-1122 (2025). The PTMA is materially different than the

Texas law challenged in *Paxton*, and this action seeks relief on grounds that the Supreme

Court did not address in that case. Put otherwise, *Paxton* impacts this case but doesn't decide

it.

**JURISDICTION AND VENUE**

7.  This case arises under the United States Constitution and the laws of the United States and

    presents a federal question within this Court's jurisdiction under Article III of the

    Constitution and 28 U.S.C. § 1331 and 28 U.S.C. § 1343(3). It seeks remedies under 28

    U.S.C. §§ 2201 and 2202, 42 U.S.C. §§ 1983 and 1988, and Fed. R. Civ. P. 65.

8.  Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the

    events giving rise to the claim occurred in this district.

**PARTIES**

**I.    Plaintiffs**

9.  Plaintiff <u>Free Speech Coalition, Inc. (FSC)</u> is a not-for-profit trade association incorporated

    under the laws of California with its principal place of business in Canoga Park, CA. FSC

    assists film makers, producers, distributors, wholesalers, retailers, internet providers,

    performers, and other creative artists located throughout North America in the exercise of

    their First Amendment rights and in the vigorous defense of those rights against censorship.

    Founded in 1991, the Free Speech Coalition currently represents hundreds of businesses and

    individuals involved in the production, distribution, sale, and presentation of constitutionally-

    protected and non-obscene materials that are disseminated to consenting adults via the

internet. Most of that material would fit within Tennessee's statutory definition of "content harmful to minors." FSC has had to devote substantial time and attention away from its usual operations as a result of the PTMA and related laws.

10. FSC sues on its own behalf and on behalf of its members to vindicate its own constitutional rights, its members' constitutional rights, and the rights of its members' owners, officers, employees, and current and prospective readers, viewers, and customers. FSC has associational standing to bring its claims on behalf of its members because FSC's individual members would have standing, FSC seeks to vindicate interests germane to its purpose, and neither the claim asserted nor the relief requested requires the individual members' participation. Likewise, FSC has direct organizational standing because it has suffered an injury all its own by having to divert substantial resources to address the challenges imposed by the PTMA. Both FSC and its members are harmed by the PTMA as detailed in this Complaint. The requested declaratory and injunctive relief will, in whole or in part, alleviate those harms.

11. Plaintiff Deep Connection Technologies Inc. (DCT) is a business corporation organized under the laws of Delaware with its principal place of business in San Francisco, CA. DCT operates O.school, a judgment-free online educational platform focused on sexual wellness. Andrea Barrica, O.school's founder and CEO, is a queer woman of color who has grown O.school to reach more than 25 million people globally and 4.2 million across the United States. O-school's mission is to help people worldwide improve their sexual health, power, and confidence. Previously, Barrica co-founded inDinero.com, the leading financial solution for growing startups, and served as a partner at 500 Startups, a global venture capital fund where she worked with hundreds of startup companies. Barrica was raised in a religious,

conservative Filipino family that preached abstinence, and she received only fear-based sex education in public schools. Seeking support and information about sex and sexuality, Barrica was unable to find reliable resources online, leading her to launch O.school in 2017 in order to change the way people learn about sexuality. She is the author of *Sextech Revolution: The Future of Sexual Wellness*, and she is a professional speaker, having presented for TED Unplugged, SXSW, the Women in Tech Festival, UN Women, Planned Parenthood, and others. Barrica fears that O.school contains a "substantial portion" of content that meets the statutory definition of content "harmful to minors."

12. As O.school provides critical sex education that it deems appropriate (and necessary) for older minors, DCT opposes any age-verification measure that would preclude those teens from accessing O.school's content. DCT is confused as to what constitutes "reasonable age verification methods" under the PTMA and concerned about the prohibitive cost of providing complying age verification protocols.

13. DCT is harmed by the PTMA as detailed in this Complaint. The requested declaratory and injunctive relief will, in whole or in part, alleviate those harms.

14. Plaintiff <u>JFF Publications, LLC (JFF)</u> is a limited liability company organized under the laws of Delaware with its principal place of business in Broward County, FL. It has one Member, a natural person who is a citizen of Florida. JFF operates an internet-based platform at the domain <JustFor.Fans> that allows independent producers/performers of erotic audiovisual works to publish their content and provide access to fans on a subscription basis. Each producer/performer operates and maintains an individual JustFor.Fans channel, which may contain photographs or videos and permits the exchange of messages between producers/performers and fans. JFF developed and continues to enhance the software and

features that drive the JustFor.Fans platform, it arranges third-party billing capabilities, and it otherwise maintains the platform. Although it develops and implements advertising and marketing plans for the platform, many of the independent producers/performers selling subscriptions on the platform implement their own marketing plans to drive customers to their specific JustFor.Fans channel. Most often, producers/performers maintain a social media presence through which they encourage their fans to purchase a subscription to their JustFor.Fans channel, sometimes providing a direct link to the JustFor.Fans platform.

15. JFF is confused about what constitutes a "website" (whether each performer channel, the JustFor.Fans platform, or even *other* platforms operated by JFF), confused as to what constitutes "reasonable age verification methods" under the PTMA and how a "substantial portion" of a "website's" content is to be measured, and concerned about the prohibitive cost of providing complying age verification protocols.

16. JFF, as well as the performers it hosts and the 'fans' viewing those performers, are harmed by the PTMA as detailed in this Complaint. The requested declaratory and injunctive relief will, in whole or in part, alleviate those harms.

17. Plaintiff PHE, Inc. (PHE) is a North Carolina Corporation doing business as Adam and Eve, an award-winning sexual wellness retailer that owns and operates various online stores and franchises brick and mortar stores bearing its well-respected trademark. Through its online store at adameve.com, PHE markets, processes payments for, and fulfills orders for adult toys, lingerie, soaps, lubricants, candles, bath items, novelty items, and adult games. PHE also publishes educational articles relating to sexual health and wellness on adameve.com, sells adult videos from a second web domain devoted exclusively to DVD sales (adultmoviemart.com), streams erotic movies on a third (adameveplus.com), and promotes its

brick-and-mortar franchise stores via a fourth site (adamevestores.com) that provides a separate subdomain for each of its franchised stores to offer its own store-specific information. (These subdomains are created by adding alphanumeric characters in front of the second level domain so that, for example, https://smokeymountains.adamevestores.com would send a user to the site for Adam and Eve's Sevierville, TN store.)

18. Each of the websites described above contains some material that might qualify as "content harmful to minors" under the PTMA, but PHE cannot determine which (if any) are out of compliance because it does not know, for example, what constitutes "the material as a whole" or how it should measure the 33 1/3% threshold under which its "harmful to minors" offerings must remain vis-à-vis its other offerings.

19. PHE is harmed by the PTMA as detailed in this Complaint. The requested declaratory and injunctive relief will, in whole or in part, alleviate those harms.

20. Plaintiff <u>MelRose Michaels</u>[1] lives in Tennessee, works there in various aspects of the adult industry, and maintains an active membership with Plaintiff FSC. She performs in, produces, and edits erotic films, which she monetizes through various "fan sites" (similar to Plaintiff JFF's JustFor.Fans site). Ms. Michaels owns and operates several small businesses connected to the adult entertainment industry, including: (1) a company that provides adult content creators with education, resources, and community; (2) a company that develops AI software for use within the adult industry; and (3) and a company that performs surveys and gathers information from and for adult businesses. Ms. Michaels's career requires that she be able to access adult websites, but her efforts to do so will be frustrated by the PTMA because (1)

---

[1] MelRose Michaels is the plaintiff's stage name. This Court has permitted Ms. Michaels to proceed using her pseudonym and to seal the unredacted version of the Complaint.

many such website operators have blocked access to Tennesseans, and (2) Ms. Michaels has

grave concerns about providing sensitive personal information about herself in order to

access those websites that have attempted to comply with the PTMA by screening users via

"reasonable age-verification methods."

**II.    Defendant**

21. Defendant <u>Jonathan Skrmetti</u> is a person within the meaning of Section 1983 of Title 42 of

the United States Code, and he currently serves as the Attorney General for the State of

Tennessee. As such, he "has and shall exercise all duties vested in the office by the

Constitution of Tennessee and all duties and authority pertaining to the office of the attorney

general and reporter under the statutory law." Tenn. Code Ann. § 8-6-109(a). As pertains

here, these "duties and authority" exist both in the PTMA itself, as well as the general

Tennessee law.

22. The PTMA expressly empowers AG Skrmetti to "bring any appropriate action or proceeding

in a court of competent jurisdiction against a commercial entity that fails to comply with the

law." Tenn. Code Ann. § 39-17-912(j).

23. Elsewhere in the Tennessee Code, the fuller scope of his responsibilities are spelled out,

including his duty to attend to "[t]he trial and direction of all civil litigated matters and

administrative proceedings in which the state or any officer, department, agency, board,

commission or instrumentality of the state may be interested"; to give the governor and other

state officials "any legal advice required in the discharge of their official duties" and "written

legal opinions on all matters submitted by them in the discharge of their official duties"; to

"defend the constitutionality and validity of all legislation of statewide applicability"; and

even to defend, in his discretion, "the constitutionality and validity of all private acts." Tenn. Code Ann. § 8-6-109(b)(1),(5),(6),(9),(10).

24. AG Skrmetti is sued for prospective relief concerning his future exercise of the foregoing powers and duties in order to prevent his subjecting the Plaintiffs and others to a deprivation of rights, privileges, or immunities secured to them by the Constitution and laws of the United States. Plaintiffs seek a declaration of the constitutional invalidity of the PTMA and an injunction precluding the Attorney General from participating in the enforcement of the PTMA in any manner.

## FACTS

### I.    Statutory and Procedural History

### A.  PTMA – Original Version

25. In the Spring of 2024, the Tennessee Legislature enacted, and Governor Bill Lee signed into law, the PTMA—codified at Tenn. Code Ann. § 39-17-912 and effective as of January 1, 2025.

26. The Law's operative provisions, which remain in effect today, are as follows:

> (c) An individual or commercial entity that publishes or distributes in this state a website that contains a substantial portion of content harmful to minors is liable if the individual or commercial entity does not:
>
> > (1) Verify, using a reasonable age-verification method, the age of each active user attempting to access its website; or
> >
> > (2) Verify, using a reasonable age-verification method, the age of an active user attempting to access its website again after completion of an age-verified session.
>
> (d) A website owner, commercial entity, or third party that executes a required age-verification method shall:
>
> > (1) Retain at least seven (7) years of historical anonymized age-verification data; and
> >
> > (2) Not retain any personally identifying information of the active user after access to the content harmful to minors has been granted.

27. An entity found to have violated subsection (c) above "is liable to an individual for damages
resulting from a minor's accessing the content harmful to minors, including court costs and
reasonable attorney fees as ordered by the court," and a "violation of subsection (c) or (d) is a
Class C felony" prosecutable by the Attorney General. *See* Tenn. Code Ann. § 39-17-
912(e)(1),(i),(j).

28. As originally enacted, "content harmful to minors" included:

> (A)(i) Text, audio, imagery, or video the average person, applying
> contemporary community standards and taking the material as a whole and
> with respect to minors of any age, would find sexually explicit and harmful or
> inappropriate for minors or designed to appeal to or pander to the prurient
> interest; or

> > (ii) Text, audio, imagery, or video that exploits, is devoted to, or
> > principally consists of an actual, simulated, or animated display or
> > depiction of [certain body parts or acts]; and

> (B) When taken as a whole, lacks serious literary, artistic, political, or
> scientific value for minors.

*Id.* at § 39-17-912(b)(5) (2024 version).

**B. Legal Challenge**

29. Plaintiffs sought and obtained a preliminary injunction when this Court determined that the
PTMA likely violated the First Amendment. *See* Dkt. No. 38.

30. Specifically, the Court held that the PTMA "deviates from the obscenity standard in
meaningful ways"—including through its use of disjunctive language separating the required
elements. *Id.* at 25-28. The Court invoked the "rule against surplusage" to deny the AG's
attempt to cast the discordance as a distinction without a difference. *See id.*

31. The AG obtained a stay of the injunction while it pursued an appeal of the Court's decision.
With that appeal pending, two things happened. First, the Tennessee Legislature amended the
PTMA to excise the section-specific "harmful to minors" definition and thereby revert to a
"harmful to minors" definition that precedes the PTMA in the same title, chapter, and part of

the Tennessee Code. *See infra*. That amendment took effect with the Governor's signing on May 8, 2025. Second, the Supreme Court decided *Free Speech Coalition v. Paxton*, which established intermediate scrutiny as the appropriate standard of review in a challenge to a Texas age verification law that adhered to the Supreme Court's well-worn obscenity standards set in *Miller v. California,* 413 U.S. 15 (1973) and *Ginsberg v. New York*, 390 U.S. 629 (1968).

32. On November 4, 2025, the Sixth Circuit Court of Appeals vacated this Court's injunction and remanded the case "for proceedings consistent with *Paxton*." Dkt. No. 61. That panel recognized that although "[n]either party has shown that the pending appeal is actually moot[,] . . . as a practical matter, everyone agrees, we should remand the case to the district court to adjudicate, in the first instance, any issues remaining in the case's new legal landscape." *Id.*

**C. PTMA – Amended Version**

33. By its amendment to the PTMA, the Tennessee Legislature kept in effect all provisions of the prior Law except with respect to what constitutes material "harmful to minors." Now, that term is defined as:

> that quality of any description or representation, in whatever form, of nudity, sexual excitement, sexual conduct, excess violence or sadomasochistic abuse when the matter or performance:
>
> > (A) Would be found by the average person applying contemporary community standards to appeal predominantly to the prurient, shameful or morbid interests of minors;
> >
> > (B) Is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable for minors; and
>
> > (C) Taken as whole lacks serious literary, artistic, political or scientific values for minors[.]

Tenn. Code Ann. § 39-17-901(6) (2024). "Excess violence"—defined as "the depiction of acts of violence in such a graphic or bloody manner as to exceed common limits of custom and candor, or in such a manner that it is apparent that the predominant appeal of the material is portrayal of violence for violence's sake, *see id.* at § 39-17-901(4)—has been voided for vagueness and excised from the statute by the Tennessee Supreme Court; it cannot supply a basis for civil or criminal actions under the PTMA. *See Davis-Kidd Booksellers, Inc. v. McWherter*, 866 S.W.2d 520, 532-33 (Tenn. 1993).

### D.  Impact of *Paxton*

34. In *Free Speech Coalition v. Paxton*, the Supreme Court granted certiorari "to decide whether the[] burdens [on adult visitors to Plaintiffs' sites] likely render [Texas's age verification law] unconstitutional under the Free Speech Clause of the First Amendment." *Paxton*, Slip Op. at 1. The core holding is narrowly aimed at resolving that question only—establishing the standard of review in First Amendment challenges to laws (like Texas's) that both (1) adhere to the *Miller/Ginsberg* obscenity standard and (2) produce only an incidental (not intentional) burden on adults' rights:

> Adults have the right to access speech that is obscene only to minors. And, submitting to age verification is a burden on the exercise of that right. But, adults have no First Amendment right to avoid age verification, and [Texas law] can readily be understood as an effort to restrict minors' access. Any burden experienced by adults is therefore only incidental to the statute's regulation of activity that is not protected by the First Amendment. That fact makes intermediate scrutiny the appropriate standard under our precedents.

> *Paxton*, Slip Op. at 18.

35. The *Paxton* Plaintiffs were the Free Speech Coalition and operators of adult websites whose core offerings were understood to meet the statutory definition of "material harmful to minors" and exceed the one-third threshold. Put otherwise, there was no chill imposed on them, and their challenge was thus fashioned as a facial attack on H.B. 1181. *See Paxton*,

Slip Op. at 4 (noting that Petitioner-Plaintiffs "sought to enjoin enforcement of the statute as

facially unconstitutional under the Free Speech Clause of the First Amendment"). But

Plaintiffs here include online purveyors of non-pornographic content, some percentage of

which nevertheless fit Tennessee's definition of "harmful to minors." Plaintiffs thus bring

both facial *and* as-applied challenges, requiring an analysis that the Supreme Court did not

have occasion to conduct in *Paxton*.

## II.    The Amended PTMA Fails to Abide the Modified-for-Minors Obscenity Standard and Therefore is Subject to Strict, Not Intermediate, Scrutiny.

36. For more than a half-century after *Miller v. California*—including up to and following the

Supreme Court's *Paxton* decision—the obscenity standard, if not easy to apply, was at least

easy enough to recite. "The basic guidelines for the trier of fact must be: (a) whether the

average person, applying contemporary community standards would find that the work, taken

as a whole, appeals to the prurient interest; (b) whether the work depicts or describes, in a

patently offensive way, sexual conduct[2] specifically defined by the applicable state law; and

(c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific

value." *Miller v. California*, 413 U.S. 15, 24 (1973) (internal quotation marks and citations

omitted). And, per *Paxton*, as long as a legislature adheres to it in crafting age verification

laws affecting providers of "harmful to minors" contents, the resulting statute will receive

only intermediate scrutiny on review.

### A.  An Obscenity Statute Must Specifically Define the Content that is Proscribed.

37. Tennessee's failure to specifically define the proscribed contents renders the PTMA (as

amended) constitutionally suspect. Every other state to have enacted an age verification law

---

[2] As discussed *supra*, the Tennessee Supreme Court has already voided for vagueness and
excised the statute's "excess violence" provision of the "harmful to minors" definition.

has gotten this part correct—spelling out the specific sexual acts and organs that meet the state's definition.

38. This is, in fact, a fundamental feature of due process, and one that the Supreme Court reiterated in *Paxton. See Paxton*, Slip Op. at 9 ("When regulating minors' access to sexual content . . . a State may prevent minors from accessing works that (a) taken as a whole, and under contemporary community standards, appeal to the prurient interest of minors; (b) depict or describe <u>specifically defined sexual conduct</u> in a way that is patently offensive for minors; and (c) taken as a whole, lack serious literary, artistic, political, or scientific value for minors.") (underlining added, italics omitted).

39. Tennessee has failed to meet the long-venerated standard by declining to outline the specific contents that run afoul of the Amended PTMA. Because that statute hinders adults' exercise of protected speech without meeting the modified-for-minors obscenity standard in this critical respect, it must be subject to strict, not intermediate, scrutiny for this reason.

**B.  The PTMA Cannot Survive Strict Scrutiny.**

40. Under strict scrutiny, the PTMA "would be constitutional only if [Tennessee] could show that it '(1) serves a compelling governmental interest, (2) is narrowly tailored to achieve it, and (3) is the least restrictive means of advancing it." *Paxton*, Slip Op. at 4 (brackets omitted). And this Court has already reasoned that, with strict scrutiny as the standard, the PTMA is substantially unlikely to survive a trial on the constitutional merits.

41. The PTMA largely fails to accomplish its goal of protecting Tennessee's minors. Because it requires age-verification in order to access only those websites that offer "content harmful to minors" as a "substantial portion" of their total content (defined as one-third or more), minors will face no impediment to obtaining such material from websites watered down—

either incidentally or purposefully in order to avoid the consequences of the Acts—with *other* content unoffensive to the sensibilities of the Tennessee Legislature.

42. Further, via the one-third "substantial portion" threshold, Tennessee appears to have exempted social media companies and search engines from the reach of its age-verification law. Ironically, however, it is these same sites that are most likely to provide a minor's first exposures to sexually explicit content. As a pair of researchers recently reported, "a higher proportion of 16- and 17-year-olds in the United Kingdom have been exposed to sexually explicit videos or pictures on social media (63%) and search engines (51%) than on dedicated pornographic websites (47%)."[3]

43. Minors also have other routes to obtaining content "harmful to minors" over the internet, including by: (1) pursuing such content published by persons and entities in other countries beyond the jurisdiction of Tennessee's state or federal courts; (2) resorting to the dark web via a Tor browser[4] to obtain material far more harmful than what is available from popular adult websites; and (3) using a virtual private network (VPN)[5] to create an encrypted connection between the device and a remote server operated by the VPN service in another

---

3 *See* Thurman, Neil J. and Obster, Fabian, "The Regulation of Internet Pornography: What a Survey of Under-18s Tells Us About the Necessity for and Potential Efficacy of Emerging Legislative Approaches," POLICY & INTERNET (May 15, 2021), *available at* SSRN: https://ssrn.com/abstract=3846713.

4 Tor (an acronym for "The Onion Router") is a network that masks online traffic. A Tor browser provides a way to browse the web anonymously. It also may be used to access services that regular browsers cannot reach, such as .onion sites which are hidden from the front-facing internet.

5 A VPN functions as an intermediary between an individual computer and the targeted server. It hides the user's actual public IP address and instead "tunnels" traffic between the user's device and a remote server. Setting up a VPN is free and simple, and doing so permits users to hide their location while browsing the web.

state or country. Studies show that nearly *half* of 16- and 17-year-olds have used a VPN or Tor browser and another 23% know what they are.[6]

44. At the same time, there are alternative means available for Tennessee parents to address the Act's goal. The two major personal computer operating systems, Microsoft and Apple, include parental control features straight out of the box. Almost all browsers, including Google Chrome, Mozilla Firefox, Microsoft Edge, and Apple's Safari, also have parental control options. These features enable parents to block access to sexually explicit materials on the Web, prevent minors from giving personal information to strangers by e-mail or in chat rooms, limit a child's screentime, and maintain a log of all online activity on a home computer. Parents can also use screening software that blocks messages containing certain words, as well as tracking and monitoring software. A parent also may restrict and observe a child's use of the internet merely by placing a computer in a public space within the home. All of these methods constitute "less restrictive means" for accomplishing the same ends.

45. Over twenty years ago, the United States Supreme Court recognized that even the parental filtering programs available at the time were less restrictive and certainly more effective than government-imposed age-verification methods. *See Ashcroft v. ACLU*, 542 U.S. 656, 666 (2002). In that case, although a credit card was required for age-verification, the Court noted that it was *still* a less effective option due to the high rate of false certification.

46. Because the PTMA is neither narrowly tailored to the State's interest nor the least restrictive means of pursuing it, it cannot survive strict scrutiny.

**III.    The Amended PTMA Fails to Survive Even Intermediate Scrutiny Because It Betrays a Legislative Intent to Curtail Adult Rights**

---

[6] *See* Thurman and Obster, *supra* note 3.

47. Even with intermediate scrutiny as the standard, a law will survive review only "if it advances important governmental interests *unrelated to the suppression of free speech* and does not burden substantially more speech than necessary to further those interests." *Paxton*, Slip Op. at 6 (emphasis added) (quoting *Turner Broadcasting System, Inc. v. FCC*, 520 U. S. 180, 189 (1997)).

48. The *Paxton* Court cautioned that the applicable intermediate scrutiny is deferential but not "toothless," citing Texas's concession at oral argument that "it could not require as proof of age an 'affidavit' from the individual's 'biological parent'"—or just "the sort of manipulation of a legitimate kind of regulation that intermediate scrutiny can weed out but that rational-basis review cannot." *Paxton*, Slip Op. at 31.

49. The Amended PTMA includes at least one such manipulation. Absent from the Texas law at issue in *Paxton*, the PTMA requires affected websites to reverify their users *every sixty minutes* over the course of a single session—a requirement that can only exist for the purpose of shaming the adult viewer and heightening concerns about breaches to their privacy. *See* Tenn. Code. Ann. § 39-17-912(b)(2). The result is as cumbersome and disquieting for the viewer as it is expensive for the company—as commercial age verification providers typically charge *per verification*.

50. The PTMA also requires the age-verifier to "[r]etain at least seven (7) years of historical anonymized age-verification"—further exacerbating the privacy risks to viewers and raising the costs on providers. *Id.* at § 39-17-912(d)(1).

51. On information and belief, both the every-hour and seven-years-retention provisions—which Tennessee alone has incorporated—reflect the State's forbidden motive not just to protect minors from harmful content online, but to stifle *adult* access to sexual content, as well.

IV.    **The Amended PTMA Infringes Constitutional Rights in Ways that the *Paxton* Court Did Not Address.**

**A.  Criminal Penalties, Vagueness, and Overbreadth**

52. The PTMA imposes liability in two different ways—owed both civilly to "an individual for damages resulting from a minor's accessing the content harmful to minors, including court costs and reasonable attorney fees" and criminally to the State, with a violation constituting a Class C felony punishable by up to 15 years in prison and $10,000 in fines.

53. The Texas law at issue in *Paxton* did not include any criminal provision—much less one subjecting a violator to *15 years imprisonment.* And although the State may legislate to protect the health, welfare, and safety of its people, the Supreme Court has repeatedly emphasized that statutes regulating expressive conduct "must be scrutinized with special care when they are enforced by criminal sanctions." *NAACP v. Button*, 371 U.S. 415, 438 (1963). This is because the "deterrent effect of criminal sanctions" heightens the chill on protected speech, *Speiser v. Randall*, 357 U.S. 513, 526 (1958), and statutory vagueness is "especially" intolerable where a statute imposes criminal penalties, *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964).

54. Because many of the statutory terms are vague and overbroad, the PTMA further restricts and chills the speech of online content providers and restricts the availability of certain material to those entitled and wishing to receive it. The PTMA is riddled with vague words, phrases, and requirements, including the following.

55. The phrase "taken as a whole" in the definition of "harmful to minors" is vague because what constitutes the "whole" is unclear in the context of the internet generally, or a particular website more specifically. Should one consider only a specific article, certain text, or an

individual image on a website? Or should one consider the web page on which that text or image appears? Or the entire website? And should one include linked material?

56. The phrase "substantial portion," defined as one-third or more of the "total amount of data available on a website," is vague insofar as it fails to explain how "total material" is calculated and what metric is used to measure. Gigabytes? Character count? Number of images? Video runtime? And what about linked material? May a website avoid the problem altogether by providing a link to all the anodyne content in the local public library?

57. The terms "commercial entity" and "website" lack the requisite precision demanded by the First Amendment. Because a "commercial entity" includes every "legally recognized entity" from the largest corporation down to the smallest "sole proprietorship," the PTMA (intentionally or otherwise) requires individual performers to implement their own age-verification protocols even when relying on another company's platform to host their content. At best, this is an inefficient and cost-prohibitive way of effecting the State's interest. At worst, it is impossible where performers do not control the computer code upon which the platforms are built.

58. Compounding the problem is the lack of clarity as to what constitutes a "website" in the first place. In its simplest form, a website can mean a series of connected pages under a single domain name. Often, however, webpages have more complicated structures, sometimes involving multiple domain names or subdomains, links to separate but related businesses, or links to third-party content living on different servers. In failing to define "website," the PTMA likely captures far more speech than intended, and certainly more than is constitutional.

59. The statutory catch-all permitting a "commercially reasonable method relying on public or private transactional data" as a means of verifying a user's age provides no guideposts whatsoever, as "commercially reasonable" is a vague term not defined by the PTMA.

60. Reference to "contemporary community standards" is vague and overbroad, due to the borderless nature of the internet. Tennessee is a diverse state, and the "contemporary community standards" vary widely from Nashville to Cleveland. But when a content provider publishes material on a website, the same material is made available in *every* Tennessee county. To avoid running afoul of the PTMA, website operators must abide by a "most prudish county" standard—restricting (in the case of minors) or chilling (in the case of adults) substantial quantities of constitutionally protected content.

61. This imprecision might be tolerable in a civil statute. But the PTMA imposes draconian carceral penalties and the lifelong stigma of being adjudicated a felon. The First Amendment and due process demand more when the stakes are so high.

**B.  The Rights of Older Minors**

62. The Tennessee Legislature has painted all minors, regardless of age or maturity, with a single brush. Whether material is designed to appeal to the shameful or morbid interest is determined by an average person applying contemporary community standards with respect to an undifferentiated group of "minors." And whether the material lacks serious literary, artistic, political, or scientific value is, again, considered with respect to "minors" without further limitation. But there is a broad range of material that has serious value for at least some 16- and 17-year-olds which might legitimately be considered "harmful" to a 10-year-old—like that concerning the risk of sexually-transmitted diseases, sexual health, and the

enjoyment of sex (in a state where 17-year-old minors may get married with parental consent).

63. The PTMA fails to explicitly exclude material appropriate for older minors from the "harmful to minors" for which access is conditioned upon proof of majority. Requiring entities that publish such material on the internet to place it behind an age-verification wall infringes upon the constitutional rights of both the older minors who are denied access to constitutionally-protected material and the entities who wish to communicate with them.

64. *Paxton* addressed the First Amendment rights of *adults* impacted by the Texas law. Plaintiffs did not raise, and the Court did not opine on, the rights of older *minors* to receive certain materials proscribed by that statute. Those claims demand a fresh look.

### C. The Express Conflict with Federal Statutory Law

65. Under Section 230, "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C § 230(c)(1).

66. Plaintiff JFF is a "provider or user of an interactive computer service" within the intendment of the statute. See 47 U.S.C § 230(f)(2) (defining "interactive computer service" to mean "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions."). JFF does not produce content that could plausibly be deemed "content harmful to minors." Rather, it merely provides the platform for other "information content providers." See 47 U.S.C § 230(f)(3) (defining term to mean "any

person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service").

67. In seeking to render JFF and other providers and users of "interactive computer services" liable on account of the actions of "content providers," the PTMA stands in direct conflict with Section 230, which expressly preempts inconsistent state laws. *See* 47 U.S.C § 230(e)(3). Article VI, Paragraph 2 of the U.S. Constitution requires that federal law take precedence in such case, and *Paxton* did not address this conflict at all.

**V.    The Need for, and Nature of, the Injunctive Relief Sought.**

68. The PTMA has placed Plaintiffs in justified fear that, if they continue to exercise their constitutional rights, they will be prosecuted criminally or haled into court by any number of private individuals alleging harm cognizable under the PTMA.

69. All Plaintiffs seek an injunction precluding Attorney General Skrmetti from participating in the enforcement of the PTMA through any action, including but not limited to the following: (i) the real or threatened prosecution (or supervision of such prosecution) brought pursuant to that PTMA;  (ii) the real or threatened issuance of subpoenas, holding of hearings, or adoption of rules regarding the PTMA or perceived violations thereof; or (iii) the provision of a controlling legal opinion to the Tennessee Legislature or any state officer, board, or commission regarding a question of law concerning the PTMA.

## CAUSES OF ACTION

### COUNT 1: Violation of Free Speech Rights Secured Under the First and Fourteenth Amendments of the United States Constitution

70. Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth entirely herein.

71. The PTMA violates the First Amendment (made applicable to the states through the Fourteenth Amendment) both on its face and as applied to Plaintiffs because

unconstitutionally interferes with the ability to communicate constitutionally protected speech.

72. The PTMA violates Plaintiffs' rights under the First and Fourteenth Amendments to the United States Constitution because, under either strict or intermediate scrutiny, it is not appropriately tailored to the State's stated interest in protecting minors.

73. The PTMA violates Plaintiffs' rights under the First and Fourteenth Amendments to the United States Constitution because it is substantially overbroad.

74. All Plaintiffs seek an injunction against the Attorney General precluding his participation in the enforcement of the PTMA, as articulated *infra.*

**COUNT 2: Violation of Due Process Rights Secured Under the Fourteenth Amendment of the United States Constitution**

75. Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth entirely herein.

76. The PTMA violates Plaintiffs' rights under the Due Process Clause of the Fourteenth Amendment (procedural component) because it is impermissibly vague and fails to provide a person of ordinary intelligence fair notice of what is prohibited.

77. All Plaintiffs seek an injunction against the Attorney General precluding his participation in the enforcement of the PTMA, as articulated *infra.*

**COUNT 3: Violation of the Supremacy Clause of the United States Constitution and Section 230 of Title 47, United States Code**

78. Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth entirely herein.

79. The PTMA violates the rights of Plaintiff JFF, a provider and user of an "interactive computer service" within the meaning of 47 U.S.C. § 230, because it effectively treats Plaintiff as the publisher or speaker of material provided by other information content providers. As 47 U.S.C. § 230(e)(3) states that "[n]o cause of action may be brought and no

liability may be imposed under any State or local law that is inconsistent" with Section 230, the PTMA violates Section 230.

80. Article VI, Paragraph 2 of the United States Constitution (Supremacy Clause) exalts the laws of the United States as "the supreme law of the land" notwithstanding "anything in the constitution or laws of any State to the contrary." Given the direct conflict between the PTMA and Section 230, the federal law must preempt the State's.

81. Plaintiff JFF seeks an injunction against the Attorney General precluding his participation in the enforcement of the PTMA, as articulated *infra*.

## COUNT 4: Declaratory Judgment Act

82. Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth entirely herein.

83. There is a genuine present and justiciable dispute as to whether participation in the enforcement of the PTMA by the Attorney General violates the Plaintiffs' rights under the U.S. Constitution and federal law, as stated in Counts 1-3.

84. The interests of Plaintiffs, on the one hand, and the Attorney General, on the other, are real and adverse.

85. Absent court intervention, which would resolve the dispute over the PTMA's lawfulness, the Attorney General will proceed with participating in the enforcement of the PTMA, even though it is unconstitutional and void.

86. All Plaintiffs seek a judicial declaration stating that the PTMA is unconstitutional and unenforceable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the Court:

A.  Permanently enjoin the Attorney General, his officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction, from participating in the enforcement of the PTMA;

B.  Declare that the PTMA violates the First and Fourteenth Amendments to, and the Supremacy Clause of, the United States Constitution and is therefore unenforceable and void;

C.  Award Plaintiffs their reasonable costs and attorneys' and other fees pursuant to 42 U.S.C. § 1988; and

D.  Grant Plaintiffs such other and further relief as the Court deems just and proper.

Respectfully Submitted,

Dated: February 17, 2026

By attorneys:

*/s/ Jeffrey Sandman*

_____
Edward M. Bearman #14242
The Law Office of Edward M. Bearman
780 Ridge Lake Blvd suite 202
Memphis, Tennessee 38120
Phone: (901) 682-3450 x125
Facsimile: (901) 682-3590
e-mail: ebearman@jglawfirm.com

Gary E Veazey # 10657
The Law Office of Gary E, Veazey
780 Ridge Lake Blvd suite 202
Memphis, Tennessee 38120
Phone: (901) 682-3450 x125
Facsimile: (901) 682-3590
e-mail: gveazey@jglawfirm.com

James Allen # 15968
The Allen Law Firm
780 Ridge Lake Blvd suite 202
Memphis, Tennessee 38120
Phone: (901) 682-3450 x125
Facsimile: (901) 682-3590
e-mail: jim@jmallenlaw.com

Jeffrey Sandman (*pro hac vice*)
Sandman Law LLC
5208 Magazine St., Suite 364
New Orleans, LA 70115
Phone: (978) 886-0639
Email: jeff@sandman-law.com

D. Gill Sperlein (*pro hac vice*)
Law Office of D. Gill Sperlein
345 Grove Street
San Francisco, CA 94102
Phone: (415) 404-6615
Email: gill@sperleinlaw.com