**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | | |
|---|---|---|
| FREE SPEECH COALITION, INC., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>JONATHAN SKRMETTI, in his official capacity as THE ATTORNEY GENERAL OF TENNESSEE,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 2:24-cv-02933-SHL-tmp |

**ORDER DENYING DEFENDANT'S MOTION TO DISMISS**

The Constitution recognizes "a valid governmental interest in dealing with the problem of obscenity." Stanley v. Georgia, 394 U.S. 557, 563 (1969). Nonetheless, "the assertion of that interest cannot, in every context, be insulated from all constitutional protections." Id. In this lawsuit, filed in 2024, Plaintiffs Free Speech Coalition, Inc.; Deep Technologies, Inc.; JFF Publications, LLC; PHE, Inc.; and Melrose Michaels first challenged the Protect Tennessee Minors Act ("PTMA" or the "Act") as violative of their constitutional rights. Since then, several things have changed, including a related decision from the Supreme Court in Free Speech Coal., Inc. v. Paxton, 606 U.S. 461 (2025), and Tennessee's amendment of the PTMA. Through an Amended Complaint filed February 17, 2026, Plaintiffs again assert that the PTMA leaves the door "barring . . . state intrusion" into their free speech rights "ajar." See Stanley, 394 U.S. at 563.

In this motion filed February 19, 2026, Defendant Jonathan Skrmetti, Attorney General for the State of Tennessee ("AG"), argues that Plaintiffs' Amended Complaint must be dismissed for lack of subject matter jurisdiction and failure to state a claim for which relief can be granted. (ECF No. 71.) Plaintiffs responded in opposition on March 5, 2026. (ECF No. 73.) Although

Plaintiffs' Amended Complaint was filed fifteen days late,[1] the Court considers the Amended Complaint, Motion, Response, and Skrmetti's Reply in their entirety. For the reasons explained herein, Skrmetti's Motion to Dismiss is **DENIED**.

## I. BACKGROUND

### A. Pre-Paxton Procedural History

In November 2024, Plaintiffs filed the original complaint, challenging the Protect Tennessee Minors Act, which requires online entities publishing websites with thirty-three and one-third percent of their content being harmful to minors to verify all users' ages using a reasonable age-verification method. (ECF No. 1.) The Complaint alleged constitutional violations and sought equitable relief. Plaintiffs also sought and obtained a preliminary injunction preventing Skrmetti's enforcement of the PTMA, based on a determination that the Act likely violated Plaintiffs' First and Fourteenth Amendment rights. (ECF Nos. 2, 38.) Skrmetti appealed the grant of the injunction to the Sixth Circuit Court of Appeals. (ECF No. 39.)

Following a failed emergency motion to stay the injunction in this Court, Skrmetti petitioned the Sixth Circuit for an emergency stay pending a decision on the merits of his appeal. (See ECF No. 61 at PageID 1013.) The Sixth Circuit granted the emergency stay partly because Free Speech Coalition, Inc. v. Paxton, 606 U.S. 461 (2025), was pending before the United States Supreme Court at the time and involved enforcement of a similar age verification law in Texas. See Free Speech Coal., Inc. v. Skrmetti, No. 24-6158, 2025 U.S. App. LEXIS 771, at *8–11 (6th Cir. Jan. 13, 2025). And, on April 22, 2025, this Court granted in part Skrmetti's motion

[1] The Court set a February 2, 2026 deadline for Plaintiffs to file the Amended Complaint. (ECF No. 69.) Their tardiness is excused, but both Parties are cautioned to comply with applicable filing deadlines moving forward in this matter.

to stay proceedings pending the Paxton decision, but ordered the Parties to file a status update within ten days after the Supreme Court's decision, outlining its effect on this case. (ECF No. 55.)

While Skrmetti's appeal was pending, the Tennessee General Assembly amended the PTMA's definition of "harmful to minors" by removing the original definition of the term and instead relying on the already-existing definition of that term in Tennessee's obscenity statute. (ECF No. 65 at PageID 1025.) That amendment took effect on May 8, 2025. And, on June 27, the Supreme Court issued the Paxton opinion. The Parties submitted status reports as directed. (See ECF Nos. 56, 60.)

**B. The Amended PTMA**

The PTMA is one section of Tennessee's obscenity statute. The PTMA now states, in relevant part:

> (c) An individual or commercial entity that publishes or distributes in this state a website that contains a substantial portion[2] of content harmful to minors is liable if the individual or commercial entity does not:
>
> (1) Verify, using a reasonable age-verification method, the age of each active user attempting to access its website; or
>
> (2) Verify, using a reasonable age-verification method, the age of an active user attempting to access its website again after completion of an age-verified session.
>
> (d) A website owner, commercial entity, or third party that executes a required age-verification method shall:
>
> (1) Retain at least seven (7) years of historical anonymized age-verification data; and
>
> (2) Not retain any personally identifying information of the active user after access to the content harmful to minors has been granted.

[2] As it did before the Amended Complaint, "substantial portion" means "thirty-three and one-third percent" or more "of the total amount of data" on the website. Tenn. Code Ann. § 39-17-912(b)(13).

Tenn. Code Ann. § 39-17-912(c)–(d). An active user's age verification lasts for one sixty-minute "age-verified session." Id. § 912(b)(2) (the "verified-session provision"). After that sixty minute period, the user must re-verify their age.

Further, the PTMA defines "harmful to minors" as

> (6) . . . that quality of any description or representation, in whatever form, of nudity, sexual excitement, sexual conduct, excess violence[[3]] or sadomasochistic abuse when the matter or performance:
>
> (A) Would be found by the average person applying contemporary community standards to appeal predominantly to the prurient, shameful or morbid interests of minors;
>
> (B) Is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable for minors; and
>
> (C) Taken as whole lacks serious literary, artistic, political or scientific values for minors[.]

Tenn. Code Ann. § 39-17-901(6).

The Act exposes an individual or entity who violates subsection 39-17-912(c) to liability "for damages resulting from a minor's accessing the content harmful to minors, including court costs and reasonable attorney fees as ordered by the court." Tenn. Code Ann. § 39-17-912(e)(1). Further, violations of subsections 39-17-912(c) or (d) are Class C felonies. Id. § 39-17-912(i). The Tennessee Attorney General has the authority to "bring any appropriate action or proceeding in a court of competent jurisdiction against a commercial entity that fails to comply with" section 39-17-912. Id. § 39-17-912(j).

### C. The Amended Complaint and Motion to Dismiss[4]

[3] The Parties agree that the term "excess violence" was voided for vagueness by the Tennessee Supreme Court in Davis-Kidd Booksellers, Inc. v. McWherter, 866 S.W.2d 520, 533 (Tenn. 1993). (ECF Nos. 72 at PageID 1104; 73 at PageID 1128.)

[4] Because Skrmetti facially attacks subject matter jurisdiction under Rule 12(b)(1) and the sufficiency of Plaintiffs' pleadings under Rule 12(b)(6), the 12(b)(6) "plausible pleading"

On November 4, 2025, the Sixth Circuit vacated the injunction and remanded the case to this Court "for proceedings consistent with Paxton." (ECF No. 63 at PageID 1018–19.) Plaintiffs filed the Amended Complaint on February 17, 2026, alleging that the amended PTMA violates (1) the First Amendment on its face and as applied to Plaintiffs "because [it] unconstitutionally interferes with the ability to communicate constitutionally protected speech," (2) Fourteenth Amendment procedural due process "because it is impermissibly vague," and (3) the Supremacy Clause because it is preempted by 47 U.S.C. 230(e)(3), in that "it effectively treats Plaintiff [JFF] as the publisher or speaker of material provided by other information content providers." (ECF No. 70 at PageID 1085.)

As to each Plaintiff and their activities, Free Speech Coalition, Inc. ("FSC") is a non-profit trade association consisting of filmmakers, producers, distributors and other creators of digital media, suing on its own behalf and on behalf its members. (Id. at PageID 1065–66.) FSC alleges organizational standing, as it has diverted "substantial resources to address the challenges imposed by the PTMA." (Id. at PageID 1066.)

Deep Connection Technologies Inc. ("DCT") operates O.school, an online education platform that promotes sexual wellness. (Id.) As such, DCT provides sex education for "older minors" and "opposes any age-verification measure that would preclude those teens from accessing O.school's content." (Id. at PageID 1067.) DCT alleges that it is harmed because of the "prohibitive cost of providing complying age verification protocols" and challenges the PTMA's definition of "reasonable age-verification methods" as unconstitutionally unclear. (Id.)

standard applies, and all of Plaintiffs' well-pled factual allegations are accepted as true at this stage. RMI Titanium Co. v. Westinghouse Elec. Corp., 78 F.3d 1125, 1134 (6th Cir. 1996).

JFF Publications, LLC ("JFF") owns and operates an "internet-based platform" named "JustFor.Fans," which allows individual producers and performers of "erotic audiovisual works to publish their content and provide access to fans on a subscription basis." (Id.) Each producer or performer in turn operates their own JustFor.Fans channel, and each channel "may contain photographs or videos and permit[] the exchange of messages between" the channel owner and subscribers. (Id.) The independent channel owners engage in their own marketing and advertising on their channels. (Id. at PageID 1068.) JFF alleges that the PTMA is unclear as to what constitutes a website—it questions "whether each performer channel, the JustFor.Fans platform, or" other "platforms operated by JFF" are websites. (Id.) It alleges that itself, its channel owners, and its users are harmed by the PTMA, because of their confusion as to the statute's meanings of "website," "reasonable age verification methods," and "substantial portion." (Id.)

PHE, Inc. does business as Adam and Eve, and is a "sexual wellness retailer that owns and operates" both online and in-person stores. (Id.) PHE markets and sells "adult toys, lingerie, soaps, lubricants, candles, bath items, novelty items, and adult games." (Id.) It "also publishes educational articles relating to sexual health and wellness," "sells adult videos," "streams erotic movies," and promotes its in-person stores, all on different web domains. (Id. at PageID 1068–69.) Each of its domains "contains some material that might qualify as" harmful to minors, but PHE is unable to determine which domains may be subject to the PTMA because it cannot determine "what constitutes 'the material as a whole' or how it should measure the 33 1/3% threshold under which its [content is] 'harmful to minors.'" (Id. at PageID 1069.)

Finally, Tennessee resident Melrose Michaels, proceeding under her stage name, is a performer, producer, and editor of "erotic films," which she publishes through subscription-

based sites like JustFor.Fans. (Id.) She operates small businesses, including "(1) a company that provides adult content creators with education, resources, and community; (2) a company that develops AI software for use within the adult industry; and (3) and a company that performs surveys and gathers information from and for adult businesses." (Id.) Her work requires her to access adult websites, but she alleges that the PTMA places an unconstitutional burden on that access because adult "website operators have blocked access to Tennesseans" and most age-verification interfaces require her to provide "sensitive personal information about herself." (Id. at PageID 1069–70.)

Generally, Plaintiffs assert that the PTMA is unconstitutional "in ways that the Paxton court did not address." (ECF No. 70 at PageID 1080.) Whether Paxton applies is important. If it does, the statute must satisfy intermediate scrutiny, "which is deferential but not toothless." Paxton, 606 U.S. at 495. If it does not, the government must satisfy strict scrutiny—"the most demanding test known to constitutional law." Id. at 484 (quoting City of Boerne v. Flores, 521 U.S. 507, 534 (1997)). Plaintiffs allege that the amended PTMA violates the First Amendment to the U.S. Constitution, failing both strict and intermediate scrutiny and is unconstitutionally overbroad. Invoking Miller v. California, 413 U.S. 15 (1973), Plaintiffs aver that the PTMA falls outside of Paxton and thus is subject to strict scrutiny because it does not specifically define the sexual conduct unavailable to minors. (ECF No. 70 at PageID 1075–76.) They allege that, as a result, the PTMA "hinders adults' exercise of protected speech without meeting the modified-for-minors obscenity standard" that was applied in Paxton. (Id. at PageID 1076.) Given their assertion that the PTMA falls outside Paxton's reach, Plaintiffs allege that the PTMA cannot survive strict scrutiny. They allege alternatively that, even if Paxton is applied here, the PTMA cannot survive intermediate scrutiny. (Id. at PageID 1078–79.)

Plaintiffs also allege that the PTMA violates Fourteenth Amendment procedural due process because it "fails to provide a person of ordinary intelligence fair notice of what is prohibited," so it is void for vagueness. (ECF No. 70 at PageID 1085.) Also, Plaintiff JFF alleges that the PTMA violates the Supremacy Clause of the U.S. Constitution, as it is directly preempted by the Communications Act, 47 U.S.C. § 230(e)(3). (Id. at PageID 1085–86.) Plaintiffs allege that they "bring both facial and as-applied challenges," because some of the Plaintiffs are "online purveyors of non-pornographic content, some percentage of which nevertheless fit Tennessee's definition of 'harmful to minors.'" (Id. at PageID 1075.)

Skrmetti filed the instant Motion on February 19, 2026, arguing that the Amended Complaint fails because (1) Plaintiffs lack standing, (2) Skrmetti has sovereign immunity, (3) the PTMA does not violate the First Amendment, (4) the PTMA does not violate due process, and (5) the PTMA is not preempted by federal law. (ECF No. 72.) Each issue is considered in more detail below.

## II. ANALYSIS

Skrmetti seeks dismissal of Plaintiffs' Amended Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (ECF No. 71.) When a defendant moves to dismiss based on Rules 12(b)(1) and 12(b)(6), courts "are bound to consider the 12(b)(1) motion first, since the Rule 12(b)(6) challenge becomes moot if [the] court lacks subject matter jurisdiction." Moir v. Greater Cleveland Reg'l Transit Auth., 895 F.2d 266, 269 (6th Cir. 1990) (citing Bell v. Hood, 327 U.S. 678, 682 (1946); 5B Wright & Miller's Federal Practice and Procedure § 1350 (4th ed. 2026). Thus, subject matter jurisdiction is addressed first below.

### A. Subject Matter Jurisdiction

Article III of the Constitution prevents a court from addressing a claim over which it

lacks subject matter jurisdiction. A court lacks jurisdiction if a plaintiff has no standing to bring the case or if a defendant is immune from suit. Lyshe v. Levy, 854 F.3d 855, 857 (6th Cir. 2017); Russell v. Lundergan-Grimes, 784 F.3d 1037, 1046 (6th Cir. 2015).

In challenging the Court's jurisdiction, Skrmetti lodges the same arguments that he made in 2024: (1) Plaintiffs lack Article III standing because they allege no injury regarding the PTMA's civil component; (2) the traceability and redressability elements of standing fail because Skrmetti does not enforce the PTMA's criminal penalty; and (3) Skrmetti is shielded from suit by sovereign immunity. (ECF No. 72 at PageID 1097–1100.) These issues were all decided before the grant of the injunction was appealed, and the standing ruling was not disturbed by the Sixth Circuit. Ordinarily, that ruling would remain law of the case, and there appears to be little reason to relitigate jurisdictional issues, even with the intervening Paxton decision. See Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 816 n.5 (1988) ("There is no reason to apply law-of-the-case principles less rigorously to transfer decisions that implicate the transferee's jurisdiction. Perpetual litigation of any issue—jurisdictional or nonjurisdictional—delays, and therefore threatens to deny, justice."). But, given the Sixth Circuit's characterization of subject matter jurisdiction as an exception to the law-of-the-case doctrine, Doe v. Univ. of Mich., 78 F.4th 929, 940 (6th Cir. 2023), and out of an abundance of caution, the Court considers the AG's jurisdiction arguments.

As described below, Plaintiffs have standing because they plausibly allege facts establishing the three elements of standing, and Skrmetti lacks sovereign immunity under Ex parte Young, 209 U.S. 123 (1908). Therefore, the Court has subject matter jurisdiction.

1. Article III Standing

The party invoking federal jurisdiction bears the burden of establishing standing. Ames

v. LaRose, 86 F.4th 729, 732 (6th Cir. 2023) (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992)). To do so, "a plaintiff must allege (1) an injury in fact (2) that's traceable to the defendant's conduct and (3) that the courts can redress." Gerber v. Herskovitz, 14 F.4th 500, 505 (6th Cir. 2021) (citing Lujan, 504 U.S. at 559–61). This analysis is not a measure of a case's merits. See id. (citing Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 89 (1998) ("A merits defect deprives a court of subject matter jurisdiction only if the claim is utterly frivolous."). Upon a motion to dismiss for lack of standing, a court "must accept the allegations set forth in the complaint as true" and make "all inferences in favor of the plaintiff." Hile v. Michigan, 86 F.4th 269, 273 (6th Cir. 2023) (quoting Mosley v. Kohl's Dep't Stores, Inc., 942 F.3d 752, 756 (6th Cir. 2019)) (internal quotation marks omitted).

Skrmetti unconvincingly argues that Plaintiffs fail to establish the elements of Article III standing. The Court takes each element in turn.

a. Injury

An injury must be "actual or imminent"—hypothetical harm is insufficient. Spokeo, Inc. v. Robins, 578 U.S. 330, 339 (2016)). But this requirement does not undercut a plaintiff's ability to plead an injury prior to enforcement of an unconstitutional law. Berry v. Schmitt, 688 F.3d 290, 296 (6th Cir. 2012) ("Where a plaintiff alleges that state action has chilled his speech, 'it is not necessary that [he] first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights.'" (quoting Steffel v. Thompson, 415 U.S. 452, 459 (1974))). A plaintiff can show injury prior to enforcement when they allege that (1) they intend to "engage in a course of conduct arguably affected with a constitutional interest," (2) their intended conduct is "proscribed by statute," and (3) their intended conduct gives rise to a certain threat of prosecution. McKay, 823 F.3d at 867.

Skrmetti does not contest that Plaintiffs' intended speech is proscribed by the PTMA. (See ECF No. 72 at PageID 1098.) Instead, he argues that Plaintiffs have no constitutional interest in disseminating obscenity to minors and do not face a certainly impending threat of enforcement. (Id.) But Plaintiffs do not claim an interest in allowing minors to view unprotected material. Rather, their claims involve (a) their rights to display protected content to minors and (b) the PTMA's effect of limiting adults to online zones that the Tennessee legislature deems fit only for children. And Plaintiffs have shown a certain threat of prosecution because they plausibly allege that the PTMA objectively chills their speech in ways not contemplated by the Paxton Court.

**i. Constitutional Interest**

Skrmetti challenges standing as to the PTMA's civil enforcement, arguing that this case "parallels . . . Friends of George's[, Inc. v. Mulroy]," where "the Sixth Circuit found no constitutional interest implicated by Tennessee's Adult Entertainment Act." (ECF No. 72 at PageID 1098.) Skrmetti contends that, like the Friends of George's plaintiffs, who had no constitutionally protected interest in displaying adult cabaret performances to minors, here, Plaintiffs "have 'no constitutional interest' in violating the PTMA by exhibiting the content of their websites to minors." (Id. at PageID 1099.)

Skrmetti's continued reliance on Friends of George's for his standing arguments is mistaken. The constitutional interest at stake in Friends of George's was an adult's ability to put on adult-oriented performances for minors, not for adults. Friends of George's, 108 F.4th at 436. In that case, the plaintiff challenged Tennessee's Adult Entertainment Act ("AEA") on First Amendment grounds. Id. at 434. The AEA prohibits "adult-oriented performances that are harmful to minors" on public property or in a location where the performances could be viewed

by a minor. Id. at 433 (citing Tenn. Code Ann. §§ 7-51-1407(c)(1), -1401(3)(A)). The AEA's definition of "harmful to minors" explicitly incorporated Tennessee's obscenity-for-minors standard, which is now also incorporated into the PTMA. Id. at 433–34.

The plaintiff was a "drag-centric theater group," and it asserted that its performances "absolutely" have value for a seventeen-year-old. Id. However, it brought a First Amendment challenge against the AEA just in case the District Attorney disagreed. Id. at 436. The Sixth Circuit held that the plaintiff, given its own position on the value of its performances for minors, could not establish standing because it could not establish an intent to violate the AEA. Id. at 437–38. Because the proof offered was that the plaintiff's performances held value for minors, the AEA would not prevent the plaintiff from performing to minors. Id.

After the court determined that the plaintiff lacked standing because it could not show an intent to violate the AEA, the court went on to address whether the plaintiff's conduct implicated a constitutional interest. The plaintiff did not perform drag shows in public, but it argued that the AEA infringed on its First Amendment right to sell tickets to its shows to older minors, and that was the constitutional interest assessed by the court. Id. at 435–39. Because the AEA defined "minor" as anyone under the age of eighteen, the district court ruled that the AEA infringed on a seventeen-year-old's right to view content that may be harmful to a nine-year-old. Id. The Sixth Circuit, however, relied on a previous opinion from the Tennessee Supreme Court narrowly construing "minor" to mean a reasonable seventeen-year-old. Id. at 436 (citing Davis-Kidd Booksellers, Inc. v. McWherter, 866 S.W.2d 520, 522–23, 528 (Tenn. 1993)). After narrowly construing the term "minor," the court held that there was no constitutional interest at stake because the AEA did not infringe on plaintiff's right to perform for seventeen-year-olds. Id. at 439.

The standing holding in Friends of George's is inapposite here for that reason—the Sixth Circuit never substantively addressed an adult's constitutional interest in communicating and receiving protected material for adults. Despite this difference in context, the AG latches onto the single instance in which the Sixth Circuit offhandedly mentioned protected adult speech. After finding that a minor's constitutional interest was not at stake, the Sixth Circuit stated that the "only constitutionally protected expressions implicated by the AEA are adult-oriented performances that can be constitutionally restricted from minors but not from adults," which it considered "a narrow slice of speech." Id. at 438–39. The AG asserts that the PTMA implicates this same "narrow slice of speech." (ECF No. 72 at PageID 1098.) But his analogy ignores the differences between this case and Friends of George's.

The AEA only regulates "adult-oriented performances" featuring "topless dancers, go-go dancers, exotic dancers, strippers, male or female impersonators, or similar entertainers." Friends of George's, 108 F.4th at 433. The PTMA regulates websites. This distinction alone is dispositive—it is "no exaggeration to conclude that the content on the internet is as diverse as human thought." Reno v. ACLU, 521 U.S. 844, 852 (1997). An adult-oriented performance is certainly a "narrow slice of speech" compared to the staggering amount of diverse content available on a single website, which can publish "material about topics ranging from aardvarks to Zoroastrianism." See Ashcroft v. ACLU, 535 U.S. 564, 566 (2002). And the PTMA regulates these websites irrespective of the staggering amount of constitutionally protected material they host. Two-thirds of the total amount of content on a website could be constitutionally protected speech for both adults and minors, but that speech is still burdened by the age-verification restriction if one-third of the content is deemed "harmful to minors." Tenn. Code Ann. § 39-17-901(6).

In addition, Skrmetti's assertion that "Plaintiffs have no constitutional interest in publishing or distributing this narrow slice of speech to minors" correctly recites the Paxton holding, but misses the mark as to a constitutional interest. (ECF No. 74 at PageID 1138.) Paxton itself stated that the Texas age-verification law did not "escape all First Amendment Scrutiny," and that "[a]dults have the right to access speech that is obscene only to minors." Paxton, 606 U.S. at 482. Plaintiffs allege that the PTMA infringes on their right to display constitutionally protected content to minors and adults. (ECF No. 73 at PageID 1117.) They also allege that the PTMA is unconstitutionally overbroad, vague, and preempted, which are issues not considered in Paxton. Therefore, Skrmetti's attempt to overcome the "constitutionally protected" requirement by reducing standing in this case to one sentence from Paxton fails.

Moreover, Skrmetti's argument that Plaintiffs lack an injury because they do not represent users of their websites is a nonstarter—"a plaintiff may challenge a law on its face because it is content based, or because it might chill the First Amendment rights not only of the plaintiff, but of others not before the court." N. Olmsted Chamber of Com. v. City of N. Olmsted, 86 F. Supp. 2d 755, 761 (N.D. Ohio 2000) (first citing R.A.V. v. City of St. Paul, 505 U.S. 377, 381 (1992); and then citing Virginia v. Am. Booksellers Ass'n, 484 U.S. 383, 392–93 (1988))).

The Court finds that Plaintiffs have sufficiently asserted an intent to engage in a course of conduct arguably affected with a constitutional interest. The Court next considers whether they have shown a certainly impending threat of prosecution.

**ii. "Certainly Impending" Threat of Enforcement**

"To identify a credible threat of enforcement, the first and most important" step is to determine "whether the challenged action chills speech." Fischer v. Thomas, 52 F.4th 303, 307 (6th Cir. 2022) (citing McKay v. Federspiel, 823 F.3d 862, 869 (6th Cir. 2016)). If the

challenged action does chill speech, a court then decides how it does so. An "objective chill" refers to "laws or regulations that produce direct injuries," whereas the term "subjective chill" refers to laws or regulations that do not. Speech First, Inc. v. Schlissel, 939 F.3d 756, 764 (6th Cir. 2019).

If the chill on speech is merely "subjective," then a court must examine the four McKay factors[5] to determine whether the speech at issue is sufficiently chilled to indicate a certainly impending threat of prosecution. McKay, 823 F.3d at 868–69. The McKay factors exist because a "subjective apprehension and a personal (self-imposed) unwillingness to communicate" can lack "the sufficiently adverse interests necessary to establish standing." Kareem v. Cuyahoga Cnty. Bd. of Elections, 95 F.4th 1019, 1023 (6th Cir. 2024) (quoting Morrison v. Bd. of Educ. of Boyd Cnty., 521 F.3d 602, 610 (6th Cir. 2008)). But if the chill on speech is "objective," that chill alone is sufficient to demonstrate an injury-in-fact, irrespective of the McKay factors, because it is not self-imposed or voluntary. Speech First, Inc., 939 F.3d at 764–65 (holding that the plaintiff sufficiently alleged a credible threat of enforcement without reference to the McKay factors because the plaintiff established an "objective chill").

Skrmetti asserts that there is no history of civil enforcement or "certainly impending" threat of civil enforcement that Plaintiffs can rely on to establish an injury. (Id. at PageID 1099–

---

[5] Specifically, a plaintiff asserting a pre-enforcement First Amendment claim can establish a credible threat of prosecution based on subjective chill when they "allege a subjective chill and point to some combination of the following factors:

> (1) a history of past enforcement against the plaintiffs or others, (2) enforcement warning letters sent to the plaintiffs regarding their specific conduct, [] (3) an attribute of the challenged statute that makes enforcement easier or more likely, such as a provision allowing any member of the public to initiate an enforcement action . . . [or (4)] a defendant's refusal to disavow enforcement of the challenged statute against a particular plaintiff.

McKay, 823 F.3d at 869 (internal citations omitted).

1100.) He chiefly relies on McKay v. Federspiel, 823 F.3d 862 (6th Cir. 2016), arguing that Plaintiffs' alleged subjective chill is insufficient to establish an impending threat of prosecution. And, in a footnote, Skrmetti argues that, because of the Paxton holding, "any allegation of objective chill under the First Amendment should be rejected as a matter of law." (ECF No. 72 at PageID 1099 n.1.)

Like he did pre-Paxton, Skrmetti skips the first step in the "threat of enforcement" inquiry. He does not analyze Paxton as it relates to objective chill. The AG may be relying on the statement in Paxton that the Texas age-verification law at issue there did "not directly regulate adults' protected speech," and that the law only incidentally burdened adults' First Amendment speech. Paxton, 606 U.S. at 462. Skrmetti seems to argue that, because the statute in Paxton did not directly burden protected speech, the PTMA cannot objectively chill Plaintiffs' speech as a matter of law. Skrmetti misinterprets the governing law in several ways.

First, Paxton did not analyze Article III standing. The analyses for Article III injury and determining the applicable level of scrutiny are different, and one cannot assume that Paxton's holding as to the applicable level of scrutiny extends to the injury analysis here. See CHKRS, LLC v. City of Dublin, 984 F.3d 483, 489 (6th Cir. 2021) ("Yet just because a plaintiff's claim might fail on the merits does not deprive the plaintiff of standing to assert it. If that were the test, every losing claim would be dismissed for want of standing." (citations and quotations omitted)). This conclusion is further supported by the fact that this Court's previous ruling as to injury was not disturbed by the Sixth Circuit.

In addition, although the Supreme Court held that "adults have no First Amendment right to avoid age verification," which could mean the Texas statute in Paxton did not objectively chill speech (despite the Court's lack of standing analysis), Plaintiffs allege that the PTMA's chill on

speech is different from the Texas statute.[6] Even if the PTMA were identical to the Texas statute, Skrmetti does not argue that Plaintiffs lack injury as to their vagueness and supremacy clause claims.

What is more, Paxton did not overrule Virginia v. American Booksellers Ass'n, Inc., 484 U.S. 383 (1988), which this Court previously relied on in finding that Plaintiffs had alleged injury. In fact, American Booksellers governs the injury analysis here. The chill on Plaintiffs' speech is objective and mirrors the injury suffered there, where the Court addressed a Virginia law criminalizing the display of obscene materials to minors in stores. Am. Booksellers, Inc., 484 U.S. at 387. Several bookstores and bookseller associations brought a pre-enforcement facial challenge on First Amendment grounds, arguing that the law burdened the First Amendment rights of adults, "as to whom at least some of the covered works are not obscene." Id. at 388. The Court held that the plaintiffs suffered a pre-enforcement injury because the law was "aimed directly at plaintiffs, who, if their interpretation of the statute is correct, will have to take significant and costly compliance measures or risk criminal prosecution." Id. at 392; see Birmingham v. Nessel, No. 21-1297, 2021 WL 5712150, at *3 (6th Cir. Dec. 2, 2021) (recognizing this as the holding in Am. Booksellers).

Insofar as Plaintiffs' claims here are like those in Paxton, the PTMA cannot produce a direct injury based solely on the fact that it requires website users to submit to age verification to

[6] The Texas statute defines "sexual material harmful to minors" as

> material that: (1) "is designed to appeal to or pander to the prurient interest" when taken "as a whole and with respect to minors"; (2) describes, displays, or depicts "in a manner patently offensive with respect to minors" various sex acts and portions of the human anatomy, including depictions of "sexual intercourse, masturbation, sodomy, bestiality, oral copulation, flagellation, [and] excretory functions"; and (3) "lacks serious literary, artistic, political, or scientific value for minors.

Paxton, 606 U.S. at 467 (quoting Tex. Civ. Prac. & Rem. Code § 129B.001(6)).

view obscene-to-minors content. However, Skrmetti's conclusory assertion that no objective chill exists as a matter of law is unfounded, given Plaintiffs' multiple claims, one of which is an as-applied challenge. In this case, the PTMA may produce a direct injury that objectively chills speech. Viewing the well-pled allegations of the Amended Complaint as true, under the PTMA, Plaintiffs must either take significant and costly measures to comply with the age-verification requirement, stop operating in Tennessee, or risk civil and criminal prosecution. The Supreme Court found this to be a sufficient injury in American Booksellers—it is a sufficient injury here as well. See Am. Booksellers, Inc., 484 U.S. at 392.

Because the Court finds that Plaintiffs plausibly allege injury-in-fact, it next addresses whether Plaintiffs can trace their alleged injury to the AG. They can.

b. Traceability

To establish traceability, Plaintiffs need only show that Skrmetti's actions have a "causal connection" to their injuries. See Turaani v. Wray, 988 F.3d 313, 316 (6th Cir. 2021). In this case, Plaintiffs must show that he "can and may take some enforcement action against them." Nabors, 35 F.4th at 1032 (internal citations omitted). Tennessee's attorney general does not have authority to initiate criminal prosecutions; rather, that power belongs to local district attorneys. Id. (citation omitted).

As for traceability, Skrmetti argues that Plaintiffs cannot establish this element because he does not enforce criminal violations of the PTMA. (ECF No. 72 at PageID 1097.) He contends that only district attorneys general can prosecute crimes in Tennessee. (Id.) As a result, he insists, Plaintiffs' alleged injuries cannot be traced to him. He does not discuss the impact that his ability to civilly enforce the PTMA has on traceability.

Nonetheless, the PTMA expressly empowers the Attorney General to enforce the statute against any "commercial entity that fails to comply" with it. Tenn. Code Ann. § 39-17-912(j). Plaintiffs plausibly allege that they are commercial entities, or own and operate commercial entities, that may violate the PTMA. (See ECF No. 70 at PageID 1065–70.) Because Skrmetti can enforce the PTMA against Plaintiffs through his civil enforcement authority, Plaintiffs' injuries resulting from the threat of his enforcement are certainly traceable to him. The fact that he may not criminally enforce the PTMA does not defeat traceability. The Court finds that Plaintiffs' have plausibly pled traceability and next considers the AG's arguments about redressability, which similarly lack merit.

c. Redressability

For the same reasons the AG asserts that the Plaintiffs' injuries are not traceable to him, he argues that they are also not redressable by an injunction against him. (ECF No. 72 at PageID 1097.) He reasons that, because an injunction against him would not prevent individual district attorneys general from bringing criminal enforcement proceedings, Plaintiffs cannot show that injunctive relief would redress their alleged injuries. (Id.)

Here, relying on the PTMA and other Tennessee statutes, Plaintiffs allege that Skrmetti has the duty and "authority" to enforce the PTMA through civil litigation. (ECF No. 70 at PageID 1070–71 (citing Tenn. Code Ann. §§ 8-6-109(b)(1), (5), (6), (9), (10)).) See also Tenn. Code Ann. § 39-17-912(j). As a result, Plaintiffs' injury is the threat of civil enforcement by Skrmetti. An injunction against the AG would prospectively prevent that harm. Plaintiffs plausibly allege redressability and therefore have standing to bring their claims. Given the finding that Plaintiffs have Article III standing, the Court now considers Skrmetti's sovereign immunity arguments.

2. Sovereign Immunity

Skrmetti asserts that he is shielded by sovereign immunity under the Eleventh Amendment to the U.S. Constitution. (ECF No. 72 at PageID 1100–01.) He argues that the narrow exception to sovereign immunity under Ex parte Young, 209 U.S. 123 (1908), does not apply to him because he lacks the required authority to criminally enforce the PTMA and there is no impending threat of civil enforcement. (Id. at PageID 1101.) Eleventh Amendment sovereign immunity can shield a state's agents or officials from suit in certain circumstances. See Town of Smyrna v. Mun. Gas Auth., 723 F.3d 640, 650 (6th Cir. 2013) (noting that Eleventh Amendment immunity protects only "defendants that are the state itself or an 'arm of the state'" (quoting Ernst v. Rising, 427 F.3d 351, 358 (6th Cir. 2005) (en banc)). Nonconsenting states are protected by the Eleventh Amendment when sued by citizens of the state in question. See, e.g., Tenn. Student Assistance Corp. v. Hood, 541 U.S. 440, 446 (2004) (collecting cases).

Lawsuits related to an individual's official capacity, like here, "generally represent only another way of pleading an action against an entity of which an officer is an agent." Kentucky v. Graham, 473 U.S. 159, 165 (1985) (quoting Monell v. N.Y.C. Dep't of Soc. Servs., 436 U.S. 658, 690 n. 55 (1978)) (citation modified). Thus, Skrmetti has sovereign immunity unless one of three exceptions to Eleventh Amendment immunity apply: (1) the Ex parte Young Doctrine; (2) state consent to the suit; or (3) congressional abrogation of state sovereign immunity. S&M Brands, Inc. v. Cooper, 527 F.3d 500, 507 (6th Cir. 2008) (citing Kovacevich v. Kent State Univ., 224 F.3d 806, 817 (6th Cir. 2000)).

The Ex parte Young Doctrine allows private parties to sue state defendants in their official capacities for prospective injunctive relief. Block v. Canepa, 74 F.4th 400, 406 (6th Cir. 2023) (citations omitted). The question of sovereign immunity is closely related to standing—

when "a threatened injury becomes sufficiently imminent and particularized to confer Article III standing, that threat of enforcement also becomes sufficient to satisfy this element of Ex parte Young." Russell, 784 F.3d at 1047 (citing 209 U.S. at 154–55). State officials with a specific tie to a statute and an explicit charge to enforce it may thus be subject to suit for prospective injunctive relief. Id. at 1047 (citing Ex parte Young, 209 U.S. at 157); see also Welty v. Dunaway, 791 F. Supp. 3d 818, 837 (M.D. Tenn. 2025) ("Under this exception, a defendant who 'seeks to enforce' a law that is 'a violation of the Federal Constitution' is 'stripped of his official . . . character' and thus his ability to rely on sovereign immunity." (quoting Ex parte Young, 209 U.S. at 159–60)). However, a statewide official's general enforcement power is insufficient for suit. Children's Healthcare Is a Legal Duty, Inc. v. Deters, 92 F.3d 1412, 1416 (6th Cir. 1996).

If there is no reason to question that the state will enforce a challenged statute, Ex parte Young may apply to pre-enforcement matters. Am. Booksellers, 484 U.S. at 393; Welty, 791 F. Supp. at 837–38; Russell, 784 F.3d at 1047. For instance, in American Booksellers, the Supreme Court held that plaintiffs had standing to bring a pre-enforcement facial challenge based on injury to booksellers and infringement of the First Amendment rights of book buyers. Am. Booksellers, 484 U.S. at 391–93. The Supreme Court was "not troubled by the pre-enforcement nature" of the challenge because "[t]he State ha[d] not suggested that the . . . law will not be enforced, and [the Supreme Court saw] no reason to assume otherwise." Id. at 393.

Plaintiffs argue that Ex parte Young's exception applies here because of Skrmetti's responsibility for civilly enforcing the PTMA. (ECF No. 73 at PageID 1119.) As discussed above, Plaintiffs have standing to sue Skrmetti because of his explicit, active role in the PTMA enforcement process, which creates a reasonable risk of civil prosecutorial action by the AG. Skrmetti has enforcement power via Tennessee Code Annotated § 39-17-912(j), and he has not

suggested that he will refrain from enforcing the PTMA. Like American Booksellers, there is no reason to assume the PTMA will not be enforced. Thus, Skrmetti is subject to suit under Ex parte Young's exception to state sovereign immunity.

Viewing the Amended Complaint in the light favorable to Plaintiffs, the Court has Article III jurisdiction over this matter, and Skrmetti's Eleventh Amendment shield is removed under Ex parte Young. The Court now turns to the plausibility of Plaintiffs' complaint under Rule 12(b)(6).

**B. Plausibility of Amended Complaint**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Jackson v. Ford Motor Co., 842 F.3d 902, 906 (6th Cir. 2016) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)) (internal quotation marks omitted). Courts "construe the complaint in the light most favorable to the plaintiff, accept all the factual allegations as true, and determine whether the plaintiff can prove a set of facts in support of its claims that would entitle it to relief." Bovee v. Coopers & Lybrand C.P.A., 272 F.3d 356, 360 (6th Cir. 2001) (citing Mayer v. Mylod, 988 F.2d 635, 637–38 (6th Cir. 1993)). However, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." Torres v. Vitale, 954 F.3d 866, 871 (6th Cir. 2020) (quoting Iqbal, 556 U.S. at 678) (internal quotation marks omitted).

Skrmetti asserts that Plaintiffs' Amended Complaint fails to plausibly state claims for which relief can be granted and must be dismissed. He begins by arguing that intermediate scrutiny applies to the First Amendment claims here because the PTMA and the statute at issue in Paxton are "materially similar." (ECF No. 72 at PageID 1104.) He then asserts that the PTMA survives intermediate scrutiny. (ECF No. 72 at PageID 1104.) Second, Skrmetti argues

that Plaintiffs' void-for-vagueness due process claim fails because the PTMA clearly defines the conduct that it prohibits. Third, he contends that the PTMA is not preempted by 47 U.S.C. § 230 because the PTMA regulates a website owner and operator, not third-party content. (ECF No. 72 at PageID 1101–11.) The Court begins with Plaintiffs' First Amendment claims.

1. First Amendment Claims

The First amendment to the United States Constitution, "applicable to the States through the Fourteenth Amendment, prohibits the government from 'abridging the freedom of speech.'" Josephson v. Ganzel, 115 F.4th 771, 783 (6th Cir. 2024) (quoting U.S. Const. amend. I). As a threshold inquiry under the First Amendment, a court must decide whether, and, if so, how, the challenged statute regulates a plaintiff's free speech. Id. A regulation of unprotected speech, however, does not trigger First Amendment protections. Miller v. California, 413 U.S. 15, 23 (1973). Unprotected speech includes "obscenity, defamation, fraud, incitement, and speech integral to criminal conduct." Paxton, 606 U.S. at 471 (quoting United States v. Stevens, 559 U.S. 460, 468 (2010)).

a. Level of Scrutiny

The Parties disagree as to the level of scrutiny to be used to assess whether the PTMA violates the First Amendment, specifically whether to apply strict or intermediate scrutiny. The level of scrutiny applicable in First Amendment cases depends on "both the nature of the burden imposed by the law and the nature of the speech at issue." Id. at 470–71. Put simply, the "burden imposed" is the restriction, and the "nature of the speech" refers to whether the speech is protected or unprotected. Strict scrutiny is more demanding than intermediate scrutiny.

First, content-based statutes that "target [protected] speech based on its communicative content . . . are presumptively unconstitutional." Id. (quoting Reed v. Town of Gilbert, 576 U.S.

155, 163 (2015)). To survive a challenge, they must satisfy strict scrutiny. Strict scrutiny requires a statute to be "the least restrictive means of achieving a compelling state interest." Id. (quoting McCullen v. Coakley, 573 U.S. 464, 478 (2014)). Second, content-neutral statutes that regulate protected speech based on something other than its message "are subject to" intermediate scrutiny "because in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue." Id. (quoting Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 642 (1994)).

In Paxton, the Supreme Court applied intermediate scrutiny to a law that restricted adult access to speech that is obscene to minors. Because these laws restrict access based on the substance of the speech, such statutes regulate a partially protected area of speech. That is obscene-to-minors speech is unprotected for minors, but protected for adults. Id. at 482–83. Further, the Court held that "adults have no First Amendment right to avoid age verification," and states have the power to regulate obscene-to-minors content. Id. at 483. Therefore, age-verification statutes impose a burden on adults that is merely "incidental" to regulation of obscene-to-minors speech. Id. at 483.

However, regulation of obscene-to-minors speech must comport with the modified-for-minors obscenity standard outlined in Paxton. Id. at 474, 483 (citing Boy Scouts of Am. v. Dale, 530 U.S. 640, 659 (2000)). Under that standard, a state

> may prevent minors from accessing works that (a) taken as a whole, and under contemporary community standards, appeal to the prurient interest of minors; (b) depict or describe specifically defined sexual conduct in a way that is patently offensive for minors; and (c) taken as a whole, lack serious literary, artistic, political, or scientific value for minors.

Paxton, 606 U.S. at 474 (first citing Miller, 413 U.S. at 24; and then citing Ginsberg v. New York, 390 U.S. 629, 635, 638 (1968)). Intermediate scrutiny requires the statute to "advance[]

important government interests unrelated to the suppression of free speech and . . . not burden substantially more speech than necessary to further those interests." Id. at 470–71 (quoting Turner Broad. Sys., Inc. v. FCC, 520 U.S. 180, 189 (1997)).

Turning to the arguments, Skrmetti asserts that intermediate scrutiny applies under Paxton because the PTMA aligns directly with the Texas statute at issue there, which imposed an age-verification burden on adults' access to obscene-to-minors content. (ECF No. 72 at PageID 1102.) Skrmetti argues that the PTMA's definition of "harmful to minors" imports the Ginsberg, 390 U.S. 629 (1968), obscenity standard into the digital age, which triggers intermediate scrutiny under Paxton. (Id. at PageID 1103.) He contends that the PTMA defines the proscribed conduct well enough to meet the modified-for-minors obscenity standard because it specifically defines the proscribed sexual content as "any description or representation . . . of nudity, sexual excitement, sexual conduct . . . or sadomasochistic abuse." (Id. at PageID 1104 (quoting Tenn. Code Ann. § 39-17-901(6)).)

In opposition, Plaintiffs argue that strict scrutiny applies because the PTMA's obscene-to-minors standard is outdated, and, unlike the Texas statute in Paxton, because it incorporates the modified-for-minors obscenity standard used in Ginsberg, which predated Miller. (ECF No. 73 at PageID 1124.) They assert that Miller updated the Ginsberg standard by requiring obscene-to-minors speech to be "'taken as a whole,' reviewed pursuant to 'contemporary community standards,' [and] adjudged 'lack[ing] serious literary, artistic, political, or scientific value.'" (ECF No. 73 at PageID 1123.) Plaintiffs emphasize that the PTMA regulates media including sexual material "without the further limitation that the" sexual material "itself be 'patently offensive,'" so it sweeps "within its ambit materials that might be 'patently offensive' for reasons unrelated to their sexual characteristics.'" (ECF No. 73 at PageID 1122–23.) Thus,

they argue that the PTMA fails to match the Paxton or Miller obscene-to-minors standard. (Id.)

Intermediate scrutiny applies here. The PTMA's definition of "harmful to minors," found in Tenn. Code Ann. § 39-17-901(6), is a definition approved by the Sixth Circuit in Friends of George's. 108 F.4th at 436. That court, applying the Tennessee Supreme Court's construction of this subsection, held that it "(1) incorporates the Supreme Court's three-part obscenity test from Miller v. California and (2) modifies it to apply to minors." Id. Despite Plaintiffs' insistence that the PTMA's use of the Ginsberg obscene-to-minors standard requires strict scrutiny, the Paxton Court never stated that the obscenity standard used in Ginsberg was somehow invalidated by Miller. In fact, the Court relied heavily on Ginsberg's explanation of laws that restrict obscenity for minors in determining that intermediate scrutiny applies to digital age-verification obscenity laws. Paxton, 606 U.S. at 478, 479, 481, 485. And neither Ginsberg nor Miller involved regulations of internet content, so Paxton controls. Cf. id. at 491 ("[R]espect for past judgments also means respecting their limits." (quoting Brown v. Davenport, 596 U.S. 118, 141 (2022))).

Plaintiffs' suggestions otherwise are unavailing. They correctly identify that the respective texts of the Texas statute and the PTMA are different. (ECF No. 73 at PageID 1122.) In illustrating these differences, Plaintiffs state that the Texas statute meets the "specifically defined sexual conduct" requirement. They point to the statute's text that restricts:

> material that, "in a manner patently offensive with respect to minors, exploits, is devoted to, or principally consists of descriptions of actual, simulated, or animated displays or depictions of: (i) a person's pubic hair, anus, or genitals or the nipple of the female breast; (ii) touching, caressing, or fondling of nipples, breasts, buttocks, anuses, or genitals; or (iii) sexual intercourse, masturbation, sodomy, bestiality, oral copulation, flagellation, excretory functions, exhibitions, or any other sexual act[.]"

(ECF No. 73 at PageID 1122 (quoting Tex. Civ. Prac. & Rem. Code § 129B.001(6)).)

According to Plaintiffs, unlike the Texas statute, the PTMA fails to specify the sexual content that is restricted, such that it fails to meet the modified-for-minors obscenity standard. But they ignore that Tennessee is free to modify the for-minors obscenity standard in a manner different from Texas. Friends of George's, 108 F.4th at 436 (discussing Ginsberg, 390 U.S. at 635, 645, and noting that the Supreme Court approves of "state adaptations of the obscenity test to apply to minors"); see also Am. Booksellers v. Webb, 919 F.2d 1493, 1496 (11th Cir. 1990) ("Ginsberg approved the use of a 'variable obscenity standard.'" (citation omitted)). Further, the PTMA lists the sexual content that falls within its scope as "any description or representation, in whatever form, of nudity, sexual excitement, sexual conduct . . . or sadomasochistic abuse." Tenn. Code Ann. § 39-17-901(6). That list of sexual content is at least as, if not more, narrowly defined than the Texas statute's relatively broad phrase "any other sexual act." Tex. Civ. Prac. § Rem. Code § 129B.001(6)(B)(iii). The statutes may not be identical, but their definitions of "harmful to minors" are specific enough to meet the modified-for-minors standard that triggers intermediate scrutiny.

As for Plaintiffs' argument that the PTMA sweeps in materials that could be "patently offensive" for reasons unrelated to sexual content, they appear to misinterpret the statute. If "matter" is "patently offensive to" adults' "with respect to what is suitable for minors," it would not trigger PTMA liability unless it also consists of a "description or representation" of the sexual content listed in subsection (6). Tenn. Code Ann. § 39-17-901(6) (stating that a "matter or performance" is "harmful to minors" when it is a form of sexual conduct that meets the list of conditions that follow in subsections (A)–(C)).

Although the original PTMA certainly ran afoul of the modified-for-minors obscenity standard and triggered strict scrutiny, it no longer constitutes a rewriting of that standard and

instead triggers intermediate scrutiny. The Court now considers whether Plaintiffs plausibly allege that the PTMA fails intermediate scrutiny.

b. Challenge Under Intermediate Scrutiny

For Plaintiffs' First Amendment claim to survive dismissal under intermediate scrutiny, Plaintiffs must plausibly allege that the PTMA does not "advance[] important governmental interests unrelated to the suppression of free speech" or that it "burden[s] substantially more speech than necessary to further those interests." Paxton, 606 U.S. at 495–96.

Skrmetti asserts that the PTMA "pass[es] this test." (ECF No. 72 at PageID 1104.) He first argues that the PTMA advances Tennessee's important government interest in preventing minors from accessing internet sexual material that is harmful to them. (Id.) That interest, he contends, is unrelated to the suppression of free speech because obscene-to-minors content is not protected. He further argues that the PTMA is adequately tailored to serve Tennessee's interest because preventing minors from obscene content would be "ineffectual" without the methods of verification it specifies. (Id. at PageID 1105.) Thus, because the PTMA's methods of age verification—involving government identification or "commercially reasonable method[s]" of using transactional data—match the methods approved in Paxton, Skrmetti asserts that Plaintiffs cannot plausibly allege improper tailoring. (Id. at PageID 1105–06.)

In addition, addressing the PTMA's verified-session and data-retention provisions, Skrmetti argues that the sixty-minute verified-session provision "ensures that the age-verified user remains the consumer of the content and guards against a child accidentally stumbling on an adult's unattended device displaying content harmful to minors." (Id. at PageID 1106.) He also argues that the anonymized data retention provision enables Tennessee to "investigate compliance with the PTMA." (Id.)

In response, Plaintiffs assert that the PTMA's tailoring is its exact problem. They first argue that the PTMA's sixty minute verified-session provision "works to shame" adult viewers of obscene-to-minor content. (ECF No. 73 at PageID 1124.) They further contend that the verified-session provision is prohibitively expensive for them because "commercial age verification providers typically charge per verification." (Id. (emphasis omitted).) Moreover, Plaintiffs assert that the data retention provision, which requires the age-verification provider to retain seven years of anonymized age-verification data, is costly and risks breaches of privacy for adult viewers. (Id. at PageID 1125.) According to Plaintiffs, these two provisions reflect Tennessee's additional motive of "stifl[ing] adult access to sexual content," and neither was included in the Texas statute in Paxton. (Id. (emphasis omitted).) Thus, both provisions result in the PTMA restricting more speech than necessary to further its aims.

Accepting Plaintiffs' well-pled allegations as true at this stage, they plausibly allege that the PTMA could fail under intermediate scrutiny. To be sure, the PTMA advances the important governmental interest in restricting obscene-to-minor content. But as an initial matter, Plaintiffs need not prove that the PTMA is unconstitutional now.

The dispute, then, is about the PTMA's tailoring. The two provisions at issue are different than the statute in Paxton. Plaintiffs allege that the verified-session and data retention provisions make the PTMA burden more speech than necessary to prevent minors from accessing "harmful" content. (ECF No. 70 at PageID 1079.) In these two ways, Plaintiffs allege, the PTMA differs from the Paxton statute; encumbers website operators and users; and infringes on individuals' privacy. (Id.) For instance, age-verification providers often charge a website operator per verification; therefore, a session that lasts two or three hours may result in Plaintiffs being charged two or three times for verifying a user's age. (ECF No. 70 at PageID

1079.) As for the privacy interests, Plaintiff Michaels' career requires her to "access adult websites," but to do so, she is forced to "provide sensitive personal information about herself," which then must be retained in anonymized form by an operator or verifier for seven years. (Id. at PageID 1070.) Thus, Plaintiffs allegedly face burdens more cumbersome than those the Paxton plaintiffs faced.

Skrmetti has little response to these differences. He does not explain how the PTMA would protect minors from "harmful" content "less effectively" without the verified-session provision. (ECF No. 74 at PageID 1141–42.) Skrmetti relies on a hypothetical child stumbling upon a device containing sexual content. (ECF No. 72 at PageID 1106.) However, that hypothetical only addresses a speculative harm based on adult use of the internet—it "is speculation about why" the Tennessee legislature "might have wanted" the verified-session provision, not what is necessary to achieve the legitimate government interest. See Pagan v. Fruchey, 492 F.3d 766, 777 n.9 (6th Cir. 2007). Further, Plaintiffs allege that the verified-session provision is both costly for website providers and chilling to adults' First Amendment activity. Skrmetti ignores these allegedly substantial costs. Accepting Plaintiffs' allegations as true, the verified-session provision appears to be a heightened burden on adult users' access to sexual content based on conjecture about in-person actions taken by "irresponsible adult[s]." (ECF No. 74 at PageID 1141.)

As for the data-retention provision, that, too, is absent from the Texas statute. Although Skrmetti asserts that, without it, "there is no way to ensure that a website is complying with the PTMA," here, too, he speculates. (ECF No. 74 at PageID 1142.) Plaintiffs allege that, on information and belief, this provision is intended to limit adult access to obscene-to-minors content. It may do so by substantially burdening website operators and age-verifiers, who must

facilitate retention of users' personal data for a seven-year period or face legal action. (ECF No. 70 at PageID 1079.) Also, it may substantially burden adult access to sexual content by causing adults who do not want content providers to retain their age-verification information for seven years to avoid obscene-to-minors content. (Id.) That is, Plaintiffs plausibly allege that the data-retention provision "discourages participation" of adults with sexual content, meaning protected speech. See Buckley v. Am. Const'l L. Found., 525 U.S. 182, 200 (1999).

At this stage, it is unclear how either of the PTMA's foregoing provisions prevent minors on the internet from accessing content that is harmful to them. Skrmetti's arguments to the contrary[7] are aimed more at proving that the PTMA satisfies intermediate scrutiny now, which the Court declines to decide without the benefit of a developed factual record. E.g., Million v.

---

[7] Insofar as Skrmetti seeks dismissal of the Amended Complaint based solely on common sense, there are several aspects of his approach that are inapt. To begin, the "common-sense justification" cases that the Parties cite are factually dissimilar; they involved 18 U.S.C. § 922(g)(4) and local restrictions on signs and billboards. See Tyler v. Hillsdale Cnty. Sheriff's Dep't, 837 F.3d 678, 694 (6th Cir. 2016) (discussing the tailoring of § 922(g)(4)); Pagan v. Fruchey, 492 F.3d 766, 774 (6th Cir. 2007) ("We deal here with the law of billboards." (citation omitted)). And even those cases held that "common sense decisions require some justification." Pagan, 492 F.3d at 777; see Tyler, 837 F.3d at 694 (stating that the government "may not rely upon mere anecdote and supposition" (quotations and citations omitted)). Plus, the courts in those cases were able to rely on years of caselaw in determining the proper tailoring of the restrictions at issue.

Paxton is the most recent case on point as to the tailoring issue here. But the PTMA's two dissimilarities with the Texas statute and the lack of evidence make it inappropriate to rule on tailoring at this posture. Indeed, in Ward v. Rock Against Racism, 491 U.S. 781 (1989), for example, the Court could determine proper tailoring because complaints about "excessive volume" existed in the record to justify the law's tailoring. 491 U.S. at 800. And, in Reno v. ACLU, 521 U.S. 844 (1997), the Court noted that legislative findings or data supporting the statute were important to the tailoring analysis. 521 U.S. at 879.

Here, there is no highly developed evidentiary record. Just like how this Court cannot rule that the PTMA fails under intermediate scrutiny based on a subjective disagreement with its tailoring, see Paxton, 606 U.S. at 496 (quoting Ward, 491 U.S. at 798), it cannot grant Skrmetti's dismissal based on age-verification requirements that are allegedly incomparable to other obscenity statutes. These realities amplify the importance of not dismissing the Amended Complaint at this stage based on a tailoring conclusion before an adequate factual record has been developed.

Rausch, 671 F. Supp. 3d 851, 863 (E.D. Tenn. 2023) ("Though it is presently unclear to what degree the Act burdens Million's free speech, allowing the claim to go forward enables the parties to compile a full factual record from which to resolve the issue.") (citations omitted). Thus, Plaintiffs plausibly allege that the PTMA as amended may substantially burden more speech than necessary, both facially and as applied to them.

c. Overbreadth

Plaintiffs allege that the PTMA is "substantially overbroad" in violation of the First Amendment. (ECF No. 70 at PageID 70 at PageID 1085.) Neither Party discusses this claim in their briefing, and they frame their First Amendment arguments in terms of the PTMA satisfying intermediate scrutiny, not in terms of its alleged overbreadth. Yet, there is no question that the scrutiny and overbreadth analyses are different.

The "relationship" between scrutiny analysis and overbreadth remains relatively unexplained. See Marc Rohr, Parallel Doctrinal Bars: The Unexplained Relationship Between Facial Overbreadth and "Scrutiny" Analysis in The Law of Freedom of Speech, 11 Elon L. Rev. 95, 96 (2019). As the Middle District of Tennessee recently put it, "the best the Court can glean is that if a defendant can show that the challenged statute withstands whatever level of 'scrutiny' to which it is subject, then it is not substantially overbroad in regard to a facial challenge." Doe v. Lee, 518 F. Supp. 3d 1157, 1210 n.48 (M.D. Tenn. 2021) (collecting cases).

Invalidation of a law based on overbreadth is "strong medicine" requiring a plaintiff to "demonstrate from the text of the statute and from actual fact that a substantial number of instances exist in which the law cannot be applied constitutionally." Speet v. Schuette, 726 F.3d 867, 878 (6th Cir. 2013) (first quoting Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 450 n.6 (2008); and then quoting United States v. Coss, 677 F.3d 278, 289 (6th Cir.

2012)). However, Skrmetti makes no challenge to the overbreadth claim, so the Court need not consider its plausibility. See ECIMOS, LLC v. Nortek Global HVAC, LLC, 736 F. App'x 577, 583–84 (6th Cir. 2018) (declining to review issues "adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation" (citation omitted)). Therefore, Plaintiffs' overbreadth claim survives dismissal.

2. Fourteenth Amendment Void-for-Vagueness Claim

Plaintiffs allege that the terms "taken as a whole," "substantial portion," "commercial entity," "website," "commercially reasonable," and "contemporary community standards" are unconstitutionally vague. (ECF No. 70 at PageID 1080–82.) Under the Fifth Amendment due process clause, "laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." FCC v. Fox Television Stations, Inc., 567 U.S. 239, 253 (2012); see Grayned v. City of Rockford, 408 U.S. 104, 108 (1972)). To survive a vagueness challenge, a statute must (1) define the criminal offense with "sufficient definiteness" such that "ordinary people can understand what conduct is prohibited" and (2) define the offense in a manner that does not encourage arbitrary and discriminatory enforcement. Kolender v. Lawson, 461 U.S. 352, 357 (1983); accord NetChoice, LLC v. Yost, 180 F.4th 268, 293 (6th Cir. 2026). A statute must rigorously adhere to these "demands" when alleged vagueness "threatens to 'chill protected speech.'" Yost, 180 F.4th at 293 (quoting Fox Television Stations, Inc., at 253–54). And "laws that include criminal prohibitions typically require a higher level of specificity than purely civil laws." Welty v. Dunaway, 749 F. Supp. 3d 882, 914 (M.D. Tenn. 2024) (citing Village of Hoffman Estates v. Flipside, Hoffman Ests., Inc., 455 U.S. 489, 498–99 (1982)).

In support of dismissal of the vagueness claim, Skrmetti argues that its facial aspect fails because Plaintiffs have not "demonstrate[d] that the law is impermissibly vague in all of its

applications." (ECF No. 72 at PageID 1109 (quoting Hoffman Ests., 455 U.S. at 497)). As for the "as-applied" claim, he asserts that people of ordinary intelligence would understand what is prohibited by the Act. (Id.) He contends that its definition of "website" is not ambiguous and aligns with the term's dictionary definition. (Id. at PageID 1110.) He asserts that "taken as a whole" and "contemporary community standards" are terms from historical "obscenity definitions that have survived vagueness challenges." (Id. (quotations and citations omitted).) He argues that "substantial portion," "commercial entity," and "commercially reasonable" are not vague because "[t]he first is expressly defined by the statute, and the second and third appear throughout federal and state law." (Id. (internal citations omitted).) Finally, Skrmetti asserts that the PTMA has a default mens rea of recklessness, which forecloses any "vagueness concerns." (Id. at PageID 1111 (quoting Gonzales v. Carhart, 550 U.S. 124, 149–50 (2007)).)

In response, Plaintiffs generally rely on the allegations in the Amended Complaint. They also emphasize that, because the PTMA is a criminal statute that affects their First Amendment interests, they need not show that it is vague in all its applications. (ECF No. 73 at PageID 1127–30.)

"Perfect clarity may not be a prerequisite to constitutionality, but the statute at issue is likely far off the mark." Backpage.com, LLC v. Cooper, 939 F. Supp. 2d 805, 834 (M.D. Tenn. 2013). For starters, dismissal of the vagueness claim is not appropriate merely because Plaintiffs may have not shown "how [the PTMA] works in all of its applications." (ECF No. 74 at PageID 1142.) Skrmetti relies on the void-for-vagueness doctrine enunciated in United States v. Salerno, 481 U.S. 739 (1987) which stated that "[g]enerally, an enactment is unconstitutionally vague on its face only if it is 'impermissibly vague in all its applications.'" Kindhearts for Charitable Humanitarian Dev., Inc. v. Geithner, 647 F. Supp. 2d 857, 888–89 (N.D. Ohio 2009) (quoting

Hoffman Ests., 455 U.S. at 497); Salerno, 481 U.S. at 745 ("[T]he challenger must establish that no set of circumstances exists under which the Act would be valid."). However, when a challenged statute imposes criminal sanctions or reaches "constitutionally protected conduct," the Salerno doctrine does not strictly apply. See Belle Maer Harbor v. Charter Township of Harrison, 170 F.3d 553, 557 (6th Cir. 1999); accord Simon v. Cook, 251 F. App'x 873, 882 (6th Cir. 2008); see also Geithner, 647 F. Supp. 2d at 889 (concluding that plaintiff had to prove a statute vague in all its applications because it imposed civil consequences and did not "reach a substantial amount of constitutionally protected conduct"). The PTMA is a criminal statute that plainly affects adults' First Amendment interests. Therefore, Skrmetti's initial argument against the vagueness claim fails. See Welty, 749 F. Supp. 3d at 914 ("As a criminal law governing speech, the recruitment provision, therefore, faces a relatively strong requirement of specificity.").

Furthermore, it is plausible that the terms Plaintiffs challenge are so vague that they would not apprise a person of ordinary intelligence of what is prohibited by the PTMA. Although the term "website" has a statutory definition, that definition merely points to itself: all "content or material" accessible on "the internet" and "particular to the functioning of the website." Tenn. Code Ann. § 39-17-912(b)(14). It makes sense that, as Skrmetti states, a website contains everything on a website. Indeed, a court contains everything in a court, but that does not define "court." To Plaintiffs' point, websites can, at times, have very simple forms, and, at others, "have more complicated structures, sometimes involving multiple domain names or subdomains, links to separate but related businesses, or links to third-party content living on different servers." (ECF No. 70 at PageID 1081.) Questions remain about what "website" means in the context of entities like JFF, whose business hosts digital creators' individual

subscription-based performance pages. (Id. at PageID 1084.) Skrmetti's motion falls short of answering those questions.

A similar issue arises regarding "substantial portion," which the PTMA defines as "thirty-three and one-third percent (33⅓ %) or more of the total amount of data available on a website." Tenn. Code Ann. § 39-17-912(b)(13). The PTMA does not specify how "total amount of data" is to be measured by any objective standard. Skrmetti's gesture towards the term's definition does not rescue it; a vague word is not saved by reference to a vague definition. Davis-Kidd Booksellers, 866 S.W.2d at 532 ("[T]he definition of the term . . . gives little, if any, objective guidance to booksellers or officials charged with enforcement."). The definition here prevents Plaintiffs from objectively measuring "total amount of data" for "substantial portion" purposes. It also allows Tennessee to decide what constitutes a "substantial portion" of the "total amount" with "an excessively subjective" standard. See Allied Artists Pictures Corp. v. Alford, 410 F. Supp. 1348, 1357 (W.D. Tenn. 1976) ("It is impermissible to set out a law violation where the offense is too subjective, involving a risk of discriminatory enforcement of the law.")

What of "commercial entity" and "commercially reasonable?" Skrmetti insists that those terms are not vague because they appear in other statutes. (ECF No. 72 at PageID 1110.) But Plaintiffs plausibly allege that those terms suffer from the same deficits as the others when used here, as "commercial entity" may make it impossible for Plaintiffs Michaels, PHE, and JFF to determine whether individual account owners or main web domains (either of which may be LLCs, partnerships, or corporations under Tenn. Code Ann. § 39-17-912(b)(4)) must verify users' ages.[8] Plaintiffs also plausibly allege that "commercially reasonable" lacks objective

[8] As an illustration, JFF argues that, if individual JustFor.Fans performers are required by the PTMA to incorporate age verification onto their profile pages where subscribers access their content, compliance would be impossible, as performers control their subscription page, but "do

guideposts. (ECF No. 70 at PageID 1082.) Skrmetti's references to Tennessee's sale of dextromethorphan and secured transactions statutes, and the U.S. Bankruptcy Code, (ECF No. 72 at PageID 1110), offer little help here, where the context of the PTMA makes the meaning of these terms unclear. See Welty, 749 F. Supp. 3d at 915 ("[T]he fact that [a term] was sufficiently clear in the original context does not mean that it will be clear in the new one.").

Skrmetti correctly notes that "taken as a whole" and "contemporary community standards" originate from obscenity definitions that generally are not vague. See Friends of George's, 108 F.4th at 436. Nonetheless, "taken as a whole" may be unconstitutionally vague in the context of the digital age and the internet. See Free Speech Coal. v. Knudsen, 754 F. Supp. 3d 1037, 1059 (D. Montana 2024); see also Backpage.com, LLC, 939 F. Supp. at 836 (noting that the meaning of the statutory term "offer" is made unclear in the internet advertising context because online servicers conduct business differently from in-person advertisers).

Moreover, that the PTMA has a scienter requirement does not mean the vagueness claim is implausible, especially because it is a criminal statute that touches First Amendment rights. Hoffman Ests., 455 U.S. at 499 ("[P]erhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights.") The strictness of the vagueness test is somewhat reduced by its "implicit scienter requirement," Platt v. Bd. of Comm'rs on Grievs. & Discipline of the Ohio Sup. Ct., 894 F.3d 235, 246 (6th Cir. 2018), but it does not defeat the claim. Scienter provisions are included in "nearly all criminal statutes." Welty, 749 F. Supp. 3d at 914 (citing Hoffman Ests., 455 U.S. at 498–99). Ultimately, Plaintiffs may fail to prove the vagueness of these terms

---

not control the computer code upon which the platforms are built." (ECF No. 70 at PageID 1081.)

on the merits, but they have sufficiently identified why they allege the terms are unconstitutionally vague at this stage.

3. Preemption Claim

Finally, Plaintiff JFF alleges that the PTMA violates the Supremacy Clause of the Constitution because it is in direct conflict with the Communications Decency Act ("CDA"). (ECF No. 70 at PageID 1085–86.) Article VI, clause two of the U.S. Constitution establishes federal law as "the supreme Law of the Land." U.S. Const. art. VI, cl. 2. When a state law conflicts with a federal law, it is preempted and invalid.

Of the three types of preemption, two appear relevant here. First, "Congress may withdraw specified powers from the States by enacting a statute containing an express pre-emption provision." Arizona v. United States, 567 U.S. 387, 399 (2012) (citing Chamber of Com. of U.S. v. Whiting, 563 U.S. 582, 592 (2011)). Second is conflict preemption, "where 'compliance with both federal and state regulations is a physical impossibility.'" Id. (quoting Fla. Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142–43 (1963)).

Under the CDA, "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider," and providers of an interactive computer service cannot be held liable for the internet actions of other "content providers." 47 U.S.C. § 230(c)(1). The CDA also contains a preemption provision. Id. § 230(e)(3) ("No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."). On this issue, Skrmetti relies on the Fifth Circuit's holding in NetChoice, LLC v. Paxton, 49 F.4th 439, 466 (5th Cir. 2022), vacated on other grounds by Moody v. NetChoice, LLC, 603 U.S. 707 (2024), arguing that, if Plaintiffs just follow the PTMA, the preemption issue goes away. (ECF No. 72 at

PageID 1111–12.)

The Court finds the Middle District of Tennessee's ruling on this issue in Backpage.com, LLC v. Cooper, 939 F. Supp. 2d 805 (M.D. Tenn. 2013), highly persuasive. There, the defendant argued that the challenged statute does not regulate "speech itself," so it did not treat "websites" as "publisher or speakers" in conflict with the CDA. Backpage.com, LLC, 939 F. Supp. 2d at 823. The court disagreed, holding that the plaintiffs' status or conduct "as an online publisher of classified advertisements" brought it within the ambit of liability under the state statute. Id. at 824.

Similarly, here, Plaintiff JFF alleges that it would be treated as publisher and distributor of PTMA-restricted content by virtue of its hosting erotic content creators on JustFor.Fans. (ECF No. 70 at PageID 1067.) Indeed, JFF "is the quintessential publisher contemplated by the CDA: it hosts and maintains an ongoing forum for user-generated postings—some paid, others free—that it shares with the public at large." See Backpage.com, LLC, 939 F. Supp. 2d at 823. For these reasons, the PTMA appears expressly preempted by the CDA's provision that liability cannot attach to an interactive computer service provider based on the harmful actions of a third party. Therefore, Skrmetti's arguments for dismissal of the preemption claim fail at this stage.

## III. CONCLUSION

Plaintiffs plausibly allege that the Court has subject matter jurisdiction and that relief can be granted for the claims. For the reasons explained above, Skrmetti's Motion to Dismiss is **DENIED**.

**IT IS SO ORDERED,** this 15th day of September, 2026.

s/ Sheryl H. Lipman
SHERYL H. LIPMAN
CHIEF UNITED STATES DISTRICT JUDGE